GABRIEL P. HERRERA, State Bar No. 287093
*gherrera@kmtg.com*
KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
A Professional Corporation
1331 Garden Hwy, 2nd Floor
Sacramento, California 95833
Telephone: (916) 321-4500
Facsimile: (916) 321-4555

Attorneys for Creditor,
CSPRF 2 LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>CHANTILLY ROAD, LLC,<br><br>Debtor. | Case No. 8:24-bk-13197-TA<br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1); MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT**<br><br>Judge:   Hon. Theodor C. Albert<br>Date:    February 12, 2025<br>Time:   10:00 a.m.<br>Crtrm.:  5B, 5th Floor<br>        411 W. Fourth Street, Suite 5085<br>        Santa Ana, CA 92701-4593 |

**TO:  THE DEBTOR, ALL CREDITORS, THE UNITED STATES TRUSTEE AND PARTIES IN INTEREST IN THE ABOVE-CAPTIONED CHAPTER 11 BANKRUPTCY CASE:**

**PLEASE TAKE NOTICE** that on February 12, 2025 at 10:00 a.m. in Courtroom 5B, 5th Floor of the above-entitled Court, located at 411 W. Fourth Street, Suite 5085, Santa Ana, California, secured creditor and interested party CSPRF 2 LLC ("Creditor") will and hereby does move to dismiss Chantilly Road, LLC's ("Debtor") Chapter 11 bankruptcy case for cause pursuant to 11 U.S.C. § 1112(b) because proper authorization was not provided under California law for the filing of the bankruptcy case.  Adrian Rudomin never held a direct ownership interest in the Debtor nor did he have the authority to authorize the filing of the bankruptcy case on behalf of the Debtor.  See

4919-1683-6365.1 014764.005

1

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

California Corporations Code section 17704.07(c).

**PLEASE TAKE FURTHER NOTICE** that this Motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities; the Declaration of David Blatt; the Exhibits filed in support of the Motion; all pleadings and papers on file in this action; and upon such other matters as may be presented to the Court at the time of the hearing.

**PLEASE TAKE FURTHER NOTICE** that Lobal Bankruptcy Rule 9013-1(f) requires a written response to be filed and served at least 14 days before the hearing.  If you fail to timely file and serve documents, pursuant to Local Bankruptcy Rule 9013-1(h), the Court may deem this to be your consent to the granting of the Motion.

DATED:  January 14, 2025                KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
                                        A Professional Corporation


                                        By: _____
                                            Gabriel P. Herrera
                                            Attorneys for Creditor,
                                            CSPRF 2 LLC

## MEMORANDUM OF POINTS AND AUTHORITIES

Adrian Rudomin, as an individual, falsely claimed that he was "the owner of the LLC" in order to provide authorization to commence this bankruptcy case.  However, Adrian Rudomin never held a direct interest in the Debtor nor did anyone have authorization to file a voluntary petition other than the Creditor (through Leviathan, LLC, the sole member of the Debtor) and David Blatt. After the Debtor defaulted on its loan obligations with the Creditor, on December 4, 2024, the Creditor foreclosed on pledged membership interests in Leviathan, LLC ("Leviathan"), ultimately becoming the sole member of the Debtor. On the same day, the Creditor amended the operating agreement for Leviathan and the Debtor such that David Blatt was appointed as the manager.  As a result of the foreclosure and the amendments, the Creditor, through Leviathan (the sole member of the Debtor), and David Blatt, the manager of the Debtor, held the only right to commence a voluntary petition as of December 15, 2024 (the petition date).  Consequently, no authority was provided for the commencement of this bankruptcy case, and the case should be dismissed.

## JURISDICTION AND FACTUAL BACKGROUND

1.     This Court has jurisdiction pursuant to 28 U.S.C. sections 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.  This motion is proper pursuant to 11 U.S.C. § 1112.

### A.    The Organization of the Debtor

2.     On or about March 12, 2018, the Debtor was organized as a limited liability company under the State of California's Revised Limited Liability Company Act.  (See Operating Agreement ¶ A.)  To that end, an Operating Agreement was executed to establish the governance for the Debtor. The Operating Agreement provided that the Debtor was manager managed, stating "[t]he business of the Company shall be managed by THE KRAKEN, LLC, who shall serve as the sole manager of the Company.  The manager(s) of THE KRAKEN, LLC shall have full an absolute authority either individually and/or collectively to enter into any and all transaction of the Company and to manage any and all matters of The Company."  (See Operating Agreement Article 4.1.)

3.     The Operating Agreement is silent as to any amendments to the agreement.  As such, the "unanimous vote of all members" is required for any amendment to the operating agreement

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

1  under Corporations Code section 17704.07(r)(2).

2      4.    Leviathan was the sole member of the Debtor.  (See Operating Agreement p. 8.)

3      5.    The Operating Agreement further reflects that Adrian Rudomin and Diego Rudomin

4  were the managers of THE KRAKEN, LLC.  (See Operating Agreement p. 7.)

5  **B.    The Organization of Leviathan, LLC**

6      6.    Leviathan was organized on or about December 31, 2012.

7      7.    By unanimous consent of its members, Leviathan's Operating Agreement was

8  Amended on June 18, 2021.  The Operating Agreement for Leviathan reflects that the company was

9  also manager managed, and that THE KRAKEN, LLC was to serve as the manager.  (Leviathan

10  Operating Agreement Article 4.1.)

11      8.    The Operating Agreement for Leviathan was silent as to any amendments to the

12  agreement and identified the following membership interests: (a) Pablo Rudomin 12.5%; (b) Isaac

13  Rudomin 12.5%; (c) THE KRAKEN, LLC 1%; (d) Adrian Rudomin 37%; and (e) Diego Rudomin

14  37%.  (Leviathan Operating Agreement p. 7.)

15  **C.    The Creditor Issues a Loan to the Debtor**

16      9.    The Debtor was issued a loan by the Creditor and the membership interests of

17  Leviathan were pledged as collateral.  To that end, on or about November 20, 2023, the Debtor, for

18  valuable consideration, executed and delivered a Mortgage Note in favor of the Creditor in the

19  amount of $2,350,000 ("Note").

20      10.    Pursuant to the terms of the Note, the Debtor promised to repay the principal amount

21  of $2,350,000 and interest at the rate specified in the Note.  The Note provided for interest only

22  payments until the Maturity Date, August 1, 2024 ("Maturity Date"), at which time the unpaid

23  principal balance, all unpaid accrued interest and all other charges under the Note would be due and

24  payable.  The Note further provided for a higher interest rate (i.e., Default Rate) in the event of a

25  default and for late charges.

26      11.    To secure repayment of the indebtedness evidenced by the Note, dated

27  November 20, 2023, the Debtor, as grantor, executed a Deed of Trust and Security Agreement

28  ("Deed of Trust") for the benefit of Creditor.  The Deed of Trust created a lien upon the real property

commonly known as 1116 Chantilly Road, Los Angeles, CA 90077 and legally described in Exhibit A attached thereto, together with all the existing or subsequently erect or affixed buildings, improvements and fixtures, more particularly described in the Deed of Trust ("Real Property").  Said Deed of Trust was duly recorded.

12.     In connection with the Note, and for good and valuable consideration, on or about November 20, 2023, Adrian Rudomin, Diego Rudomin, Pablo Rudomin, and Isaac Rudomin (collectively "Guarantors") made, executed, and delivered to the Creditor a Guaranty ("Guaranty"). Under the terms of the Guaranty, the Guarantors "absolutely, unconditionally and irrevocably" guaranteed all present and future obligations of the Debtor, including all sums then owing or thereafter incurred or created by the Debtor.

13.     Also in connection with the Note, the Guarantors and THE KRAKEN LLC executed and delivered an Ownership Interests Pledge and Security Agreement in favor of the Creditor ("Pledge Agreement").   Under the terms of the Pledge Agreement, the Guarantors and THE KRAKEN LLC each pledged their entire membership interest in Leviathan.  In the event of a default under the Note or any other loan documents, the Creditor was afforded the ability to foreclose on the membership interests in Leviathan through public or private sale.  (See Pledge Agreement section 12.)

14.     The Guarantors and THE KRAKEN LLC provided the Creditor with their share certificates in Leviathan.

15.     In connection with the Note, the Deed of Trust, the Pledge Agreement, and the other loan documents, THE KRAKEN, LLC executed a Managing Member Consent, consenting to the execution of the documents.

**D.      The Debtor Defaults Under the Note**

16.     The Creditor complied with all of the terms and conditions of the Note, the Deed of Trust, and the other loan documents.  In fact, the Creditor advanced all sums at the request of the Debtor and performed all the conditions precedent on its part required to be performed.

17.     However, on or about August 1, 2024, the Debtor defaulted under the terms of the Note by, among other things, failing to pay the total amount due to the Creditor on the Maturity

1    Date.  Despite demand being made, the Debtor failed and/or refused to issue payment.

2    **E.    The Creditor Elects to Foreclose Under the Terms of the Pledge Agreement**

3          18.    On or about August 20, 2024, the Creditor issued a Notice of Sale, notifying parties

4    that Maltz Auctions would be conducting a public sale of the Guarantors' and THE KRAKEN, LLC's

5    membership interests in Leviathan on or about October 4, 2024 at 2:30 p.m.  The auction was to be

6    conducted via online bidding.

7          19.    On or about the same day, the Creditor issued a Notification of Disposition of

8    Collateral to the Guarantors and THE KRAKEN, LLC.  Through the Notice, the Creditor notified

9    the Guarantors and THE KRAKEN, LLC that, among other things, their membership interests in

10    Leviathan would be auctioned.

11          20.    Ultimately, the auction was continued to December 4, 2024.  The Creditor was the

12    successful bidder through credit bid in the amount of $1,000, becoming the 100% owner of

13    Leviathan.

14    **F.    The Creditor Amends the Operating Agreement for Leviathan**

15          21.    Immediately following its successful bid for the membership interests in Leviathan,

16    the Creditor, as the sole member of Leviathan, amended the Operating Agreement for Leviathan

17    identifying the Creditor as the sole member and appointing David Blatt as the Manager.

18          22.    Given the Creditor's control of Leviathan, the Creditor then amended the Debtor's

19    Operating Agreement through a Corporate Resolution replacing THE KRAKEN LLC as manager

20    and appointing David Blatt, who was "authorized to manage all matters of the Company and make

21    any decisions on behalf of the Company…."

22    **G.    The Debtor is Purportedly Authorized to File Bankruptcy**

23          23.    Despite the Creditor and David Blatt not authorizing the filing of a bankruptcy as

24    manager of the Debtor and its sole member Leviathan, on December 15, 2024, the above-captioned

25    bankruptcy case was commenced.

26          24.    To purportedly demonstrate that the filing of the bankruptcy case was duly

27    authorized, a Statement Regarding Authority to Sign and File Petition was submitted by Adrian

28    Rudomin ("Statement").  In the Statement, Adrian Rudomin declared that he is the "owner of the

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

1    LLC" and that he was authorized to file a voluntary petition in the United States Bankruptcy Court.

2    Adrian Rudomin was never, individually, the owner of the Debtor nor was he the manager of the

3    Debtor.  The Statement is not executed by any other person in any other capacity.

4                                    **BASIS FOR RELIEF**

5            No authority was provided for the filing of the Debtor's voluntary petition.  Indeed, the

6    Creditor (through Leviathan) and Mr. Blatt had the only authority to commence a voluntary

7    bankruptcy case as of December 15, 2024.  Adrian Rudomin, on the other hand, had absolutely no

8    authority.  A voluntary petition is commenced by the filing of a bankruptcy petition by an entity that

9    may be a debtor.  11 U.S.C. § 301.  State law determines who has the authority to file a voluntary

10   petition on behalf of a debtor.  *In re Sino Clean Energy, Inc.*, 901 F.3d 1139, 1141 (9th Cir. 2018),

11   citing *Price v. Gurney*, 324 U.S. 100, 106-107 (1945); see also Collier on Bankruptcy, ¶ 301.04[2][c]

12   at 301-8.  If a voluntary petition is filed by persons or entities that lack authority under state law,

13   dismissal of the bankruptcy case is warranted.  See *Id*. at 1140 (holding that since "the individuals

14   attempting to file the petition lacked authority," the bankruptcy court "correctly dismissed the

15   action"); see also *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380-81 (Bankr.D.Or. 2003); *In

16   re A-Z Electronics, LLC*, 350 B.R. 886, 891 (Bankr.D.Idaho 2006).

17           California's Revised Uniform Limited Liability Company Act governs the Debtor.  The Act

18   provides that:

19           '[e]xcept as **otherwise provided in this section**,' the operating agreement governs,
             among other matters, the relations of its members and the activities of the limited
20           liability company.  Cal. Corp. Code § 17701.10(a) (emphasis added).  Cal. Corp.
             Code § 17704.07(b) and (c), respectively, set forth the default rules for control of
21           member-managed and manager-managed limited liability companies.  Regardless
             of which one applies … the consent of all members is required to take action on
22           behalf of the company outside **the ordinary course of business**.  See Cal. Corp.
             Code § 17704.07(b)(4), (c)(4).
23

24           Members of a limited liability company can, however, adopt a different rule within
             an operating agreement.  Cal. Corp. Code § 17701.10.
25

26           *In re SSRE Holdings, LLC*, 2021 WL 3829303, *4 (9th Cir. BAP 2021) (adjudicating

27   whether a manager had authority to commence a voluntary bankruptcy case for a limited liability

28   company).

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

1  Moreover, the operating agreement of a limited liability company may be amended by the

2  unanimous vote of all members.  Cal. Corp. Code § 17704.07(r)(2).

3  Here, the Creditor (through Leviathan, the sole member of the Debtor) and David Blatt held

4  the rights to file a bankruptcy petition on behalf of the Debtor.  Even assuming that someone other

5  than the Creditor or David Blatt held the right, Adrian Rudomin did not have the authority to

6  authorize the filing of the voluntary petition on behalf of the Debtor.

7  **A.    The Creditors (through Leviathan) and David Blatt Had the Sole Right to Commence**

8  **the Case.**

9  Leviathan, as the sole member of the Debtor, and David Blatt as the manager held the right

10  to file the voluntary petition.  As explained above, upon the organization of the Debtor, Leviathan

11  was the sole member and THE KRAKEN, LLC was the manager.  The members of Leviathan, in

12  turn, were the Guarantors and THE KRAKEN, LLC.  In order to induce the Creditor to provide a

13  loan to the Debtor in the amount of $2,350,000, the Guarantors and THE KRAKEN, LLC each

14  pledged their entire interest in Leviathan to the Creditor through the Pledge Agreement.  The Pledge

15  Agreement specifically provided that in the event of default, the Creditor could, among other things,

16  elect to sell the pledged interests by public or private sale.

17  On or about August 1, 2024, the Debtor defaulted under the terms of the loan issued by the

18  Creditor.  As a result, the Creditor sought to enforce its rights against the Guarantors' and THE

19  KRAKEN, LLC's pledged interests in Leviathan.  On December 4, 2024, after affording multiple

20  opportunities for the Debtor, the Guarantors, and THE KRAKEN LLC to avoid a public auction of

21  the shares in Leviathan, the pledged interests were sold by auction and the Creditor was the

22  successful bidder.  On that same day, the Creditor, now as the sole member of Leviathan, amended

23  the Operating Agreement for Leviathan.  The amendment identified the Creditor as the sole member

24  and appointed David Blatt as the Manager.  Thereafter, on the same day, through its membership

25  interest and control of Leviathan, the Creditor then amended the Debtor's Operating Agreement

26  through a Corporate Resolution replacing THE KRAKEN LLC as manager and appointing David

27  Blatt, who was "authorized to manage all matters of the Company and make any decisions on behalf

28  of the Company…."

As of December 4, 2024, the Creditor (through Leviathan) and David Blatt held the rights to commence any voluntary bankruptcy proceeding on behalf of the Debtor.  See *In re Lake County Grapevine Nursery Operations*, 441 B.R. 653, 655 (Bankr.N.D.Cal. 2010) (recognizing that when a secured creditor forecloses on a pledged interest the original members lose their right to vote to commence a bankruptcy case).  Neither the Creditor nor David Blatt authorized the filing of the Debtor's voluntary petition.  Consequently, the Debtor's bankruptcy case should be dismissed.

**B.    Adrian Rudomin Was Not the Owner of the Debtor**

Separate and apart from the Creditor (through Leviathan) and David Blatt holding the sole authority to commence a voluntary bankruptcy petition as of December 15, 2024, Adrian Rudomin never held any authority to commence a voluntary petition.  As noted above, Adrian Rudomin merely held a 37% interest in Leviathan.  Moreover, contrary to the Statement filed with the voluntary petition, Adrian Rudomin was not "the owner of the LLC" and was never an owner of the Debtor.  On that separate basis, dismissal of the Debtor's bankruptcy case is also warranted.

<div align="center">

**CONCLUSION**

</div>

Based on the foregoing, the Debtor's bankruptcy case should be dismissed.  On December 15, 2024, Leviathan and David Blatt were the only two entities or persons that could file a voluntary petition on behalf of the Debtor

DATED:  January 14, 2025            KRONICK, MOSKOVITZ, TIEDEMANN & GIRARD
                                    A Professional Corporation


                                    By: _____
                                        Gabriel P. Herrera
                                        Attorneys for Creditor,
                                        CSPRF 2 LLC

## DECLARATION OF DAVID BLATT

1.       I am the manager and authorized representative of CSPRF 2 LLC, a Delaware limited liability company ("Creditor).  I have been the manager since the creation of the Creditor.  I make this declaration in support of the Motion to Dismiss.  I am over the age of 18 years old and if called as a witness, I could and would testify competently to the facts stated herein.

2       Due to my experience and position with the Creditor, I have personal knowledge of the business practices of the Creditor in preparing and maintaining business records, and of all acts, conditions, and events that occur in the regular course of administering agreements similar to the loan at issue.

3.       With respect to the loan held by the Creditor and issued to CHANTILLY ROAD, LLC ("Debtor") and the corresponding guaranties executed by Adrian Rudomin, Diego Rudomin, Pablo Rudomin, and Isaac Rudomin (collectively "Guarantors") and THE KRAKEN, LLC, I am one of the custodians of the books, records, files, and credit records of the Creditor as those books, records, files, and credit records pertain to that loan and guaranties.  I personally worked on these books, records, files, and credit records and, as to the following facts in which I make this declaration, I know them to be true of my own knowledge or I have gained knowledge of them from my review of the business records of the Creditor.  These business records are maintained in the ordinary course of the Creditor's business and were created at or near the time dated therein.

4.       As part of the loan process and due diligence for the loan issued by the Creditor to the Debtor, the Debtor provided a copy of its Operating Agreement.  The Operating Agreement reflects that on or about March 12, 2018, the Debtor was organized as a limited liability company under the State of California's Revised Limited Liability Company Act.  A true and correct copy of the Debtor's Operating Agreement, in force prior to December 4, 2024, is attached hereto as **Exhibit A**.

5.       The Operating Agreement is silent as to any amendments to the agreement.

6.       Leviathan, LLC ("Leviathan") was the sole member of the Debtor.

7.       The Operating Agreement further reflects that Adrian Rudomin and Diego Rudomin were the managers of THE KRAKEN, LLC.

4919-1683-6365.1 014764.005

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

8.      As further part of the loan process and due diligence for the loan issued by the Creditor to the Debtor, I was provided a copy of Leviathan's then in force Operating Agreement. I understand that Leviathan was organized on or about December 31, 2012.

9.      The June 18, 2021 Operating Agreement reflects that it was amended by unanimous consent of its members. The Operating Agreement for Leviathan reflects that the company was also manager managed, and that THE KRAKEN, LLC was to serve as the manager.

10.     The Operating Agreement for Leviathan was silent as to any amendments to the agreement and identified the following membership interests: (a) Pablo Rudomin 12.5%; (b) Isaac Rudomin 12.5%; (c) THE KRAKEN, LLC 1%; (d) Adrian Rudomin 37%; and (e) Diego Rudomin 37%. A true and correct copy of the June 18, 2021 Operating Agreement for Leviathan is attached hereto as **Exhibit B**.

11.     As a result of providing the documents, including the documents referenced above, a loan was issued to the Debtor by the Creditor. To that end, on or about November 20, 2023, the Debtor, for valuable consideration, executed and delivered a Mortgage Note in favor of the Creditor in the amount of $2,350,000 ("Note"). A true and correct copy of the Note is attached hereto as **Exhibit C**.

12.     Pursuant to the terms of the Note, the Debtor promised to repay the principal amount of $2,350,000 and interest at the rate specified in the Note. The Note provided for interest only payments until the Maturity Date, August 1, 2024 ("Maturity Date"), at which time the unpaid principal balance, all unpaid accrued interest and all other charges under the Note would be due and payable. The Note further provided for a higher interest rate (i.e., Default Rate) in the event of a default and for late charges.

13.     To secure repayment of the indebtedness evidenced by the Note, dated November 20, 2023, the Debtor, as grantor, executed a Deed of Trust and Security Agreement ("Deed of Trust") for the benefit of Creditor. The Deed of Trust created a lien upon the real property commonly known as 1116 Chantilly Road, Los Angeles, CA 90077 and legally described in Exhibit A attached thereto, together with all the existing or subsequently erect or affixed buildings, improvements and fixtures, more particularly described in the Deed of Trust ("Real Property"). Said

1  Deed of Trust was duly recorded.  A true and correct copy of the Deed of Trust is attached hereto

2  as **Exhibit D**.

3       14.    In connection with the Note, and for good and valuable consideration, on or about

4  November 20, 2023, the Guarantors made, executed, and delivered to the Creditor a Guaranty

5  ("Guaranty").  Under the terms of the Guaranty, the Guarantors "absolutely, unconditionally and

6  irrevocably" guaranteed all present and future obligations of the Debtor, including all sums then

7  owing or thereafter incurred or created by the Debtor.  A true and correct copy of the Guaranty is

8  attached hereto as **Exhibit E**.

9       15.    Also in connection with the Note, the Guarantors and the Kraken LLC executed and

10  delivered an Ownership Interests Pledge and Security Agreement in favor of the Creditor ("Pledge

11  Agreement").  Under the terms of the Pledge Agreement, the Guarantors and THE KRAKEN LLC

12  each pledged their entire membership interest in Leviathan.  In the event of a default under the Note

13  or any other loan documents, the Creditor was afforded the ability to foreclose on the membership

14  interests in Leviathan through public or private sale.  A true and correct copy of the Pledge

15  Agreement is attached hereto as **Exhibit F**.

16       16.    The Guarantors and THE KRAKEN LLC provided the Creditor with their share

17  certificates in Leviathan LLC.  True and correct copies of share certificates are attached hereto as

18  **Exhibit G**.

19       17.    In connection with the Note, the Deed of Trust, the Pledge Agreement, and the other

20  loan documents, THE KRAKEN, LLC executed a Managing Member Consent, consenting to the

21  execution of the documents referenced above.  A true and correct copy of the Managing Member

22  Consent is attached hereto as **Exhibit H**.

23       18.    The Creditor complied with all of the terms and conditions of the Note, the Deed of

24  Trust, and the other loan documents.  In fact, the Creditor advanced all sums at the request of the

25  Debtor and performed all the conditions precedent on its part required to be performed.

26       19.    On or about August 1, 2024, the Debtor defaulted under the terms of the Note by,

27  among other things, failing to pay the total amount due to the Creditor on the Maturity Date.  Despite

28  demand being made, the Debtor failed and/or refused to issue payment.

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

20.     On or about August 20, 2024, the Creditor issued a Notice of Sale, notifying parties that Maltz Auctions would be conducting a public sale of the Guarantors' and THE KRAKEN, LLC's membership interests in Leviathan on or about October 4, 2024 at 2:30 p.m.  The auction was to be conducted via online bidding.  A true and correct copy of the Notice of Sale is attached hereto as **Exhibit I**.

21.     On or about the same day, the Creditor issued a Notification of Disposition of Collateral to the Guarantors and THE KRAKEN, LLC.  Through the Notice, the Creditor notified the Guarantors and THE KRAKEN, LLC that, among other things, their membership interests in Leviathan would be auctioned.  A true and correct copy of the Notification of Disposition of Collateral is attached hereto as **Exhibit J**.

22.     Ultimately, the auction was continued to December 4, 2024.  The Creditor was the successful bidder through credit bid in the amount of $1,000.  As such, the Creditor became the 100% owner of Leviathan.  A true and correct copy of the Memorandum of Sale is attached hereto as **Exhibit K**.

23.     Immediately following its successful bid for the membership interests in Leviathan, the Creditor, as the sole member of Leviathan, amended the Operating Agreement for Leviathan identifying the Creditor as the sole member and appointing me as the Manager.  A true and correct copy of the amended operating agreement is attached hereto as **Exhibit L**.

24.     Given the Creditor's control of Leviathan, the Creditor then amended the Debtor's Operating Agreement through a Corporate Resolution replacing THE KRAKEN LLC as manager and appointing me. I was "authorized to manage all matters of the Company and make any decisions on behalf of the Company…."  A true and correct copy of the Corporate Resolution is attached hereto as **Exhibit M**.

25.     We did not authorize any bankruptcy filing when a petition was filed on December 15, 2024.

/ / /

/ / /

/ / /

4919-1683-6365.1 014764.005

13

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

26.    To purportedly demonstrate that the filing of the bankruptcy case was duly authorized, a Statement Regarding Authority to Sign and File Petition was submitted by Adrian Rudomin ("Statement").  In the Statement, Adrian Rudomin declared that he is the "owner of the LLC" and that he was authorized to file a voluntary petition in the United States Bankruptcy Court.  Adrian Rudomin was never, individually, the owner of the Debtor nor was he the manager of the Debtor.  The Statement is not executed by any other person in any other capacity.  A true and correct copy of the Statement is attached hereto as **Exhibit N**.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January ___, 2025, at Miami, Florida.

David Blatt

NOTICE OF MOTION AND MOTION TO DISMISS CASE PURSUANT TO 11 U.S.C. SECTION 1112(b)(1);
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF DAVID BLATT

# Exhibit A

# CHANTILLY ROAD, LLC
## A California Limited Liability Company

### Operating Agreement

A. THIS OPERATING AGREEMENT of CHANTILLY ROAD, LLC (the "Company") is entered into as of the date set forth on the signature page hereto by each of the persons named in Exhibit A hereto (referred to individually as a Member and collectively as the Members).

B. The Members have formed a limited liability company under the California Revised Limited Liability Company Act (New Act). The articles of organization of the Company filed with the California Secretary of State are hereby adopted and approved by the Members.

C. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the California Limited Liability Company Act.

"°Capital Contribution" means the amount of cash, property or services contributed to the Company.

"Company" means CHANTILLY ROAD, LLC, a California limited liability company.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest' means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, Limited Liability Company, or other entity, whether domestic or foreign.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

CHANTILLY ROAD, LLC OPERATING AGREEMENT

## ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 Membership Interests of each Member are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 Subsequent Contributions. No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 Capital Accounts. Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 Interest. No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 Limited Liability. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3. l Allocations. The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 Distributions. The Company shall have the right to make distributions of cash and property to the Members pro rata based on the relative Membership Interests. The timing and amount of distributions shall be determined by the Members in accordance with California law.

## ARTICLE 4: MANAGEMENT

4.1 Management. The business of the Company shall be managed by THE KRAKEN, LLC, who shall serve as the sole manager of the Company. The manager(s) of THE KRAKEN, LLC shall have full an absolute authority either individually and/or collectively to enter into any and all transactions of The Company and to manage any and all matters of The Company.

4.2 Banking. The Manager(s) are authorized to set up one or more bank accounts and is authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company.

4.3 Officers. The Members by majority are authorized to appoint one or more officers from time to time. The officers shall hold office until their successors are chosen and qualified. Subject to any employment agreement entered into between the officer and the Company, an officer shall, serve at the pleasure of the Members. The current officers of the Company are listed on Exhibit B.

4.4 COMPENSATION OF THE MANAGER(S). Compensation of the Manager(s) of the Company shall be decided in accordance to a resolution obtained by majority voting between the members.

ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 Accounts. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member. The costs of such inspection and copying shall be borne by the Member.

5.2 Records. At all times during the term of existence of the Company, and beyond that term if the Members dooms it necessary, the Manager shall keep or cause to be kept the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member;

(b) A copy of the articles of organization and any amendments;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; and

(d) An original executed copy or counterparts of this agreement and any amendments.

5.3 Income Tax Returns. Within 45 days after the end of each taxable year, the Manager shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

5.4 Tax Matters. The Manager(s) shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 6: MEMBERSHIP—MEETINGS, VOTING

6.1 Members and Voting Rights. Members shall have the right and power to vote on all matters with respect to which this agreement or California law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under California law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

6.2 Meetings. Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

Meetings may be called by any member or members holding 10% or more of the Membership Interests, for the purpose of addressing any matters on which the Members may vote. A written notice shall be given not less than 10 days nor more than 60 days before the date of the meeting to each member entitled to vote at the meeting. In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by California law, including by conference telephone or similar communications equipment. In addition, notice to any meeting may be waived, and any action which could be taken at a meeting can be approved if a consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1 Withdrawal. A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this Section 7.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account.

7.2 Restrictions on Transfer. A Member may transfer Membership Interests to any other Person without the consent of any other Member. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

## ARTICLE 8: DISSOLUTION AND WINDING UP

8.1 Dissolution. The Company shall be dissolved upon the first to occur of the following events:

(a) The tote of Members holding a majority of the outstanding Membership Interests to dissolve the Company.

(b) Entry of a decree of judicial dissolution under Section 17351 of the California Corporations Code.

(c) At any time there are no Members, provided that the Company is not dissolved and is not required to be wound up if, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the legal representative of such Member or its assignee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

8.2 No automatic dissolution upon certain events. Neither the death, incapacity, disassociation, bankruptcy or withdrawal of a Member shall automatically cause a dissolution of the Company;

ARTICLE 9: INDEMNIFICATION

9.1 Indemnification, The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be inn the best interests of the Company, and, in the case of a criminal proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contenders or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or meter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 Expenses. Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

ARTICLE 10: GENERAL PROVISIONS

10.1 Entire Agreement; Amendment. This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

10.2 Governing Law; Severability. This agreement shall be construed and enforced in accordance with the internal laws of the State of California. If arty provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or enforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or enforceability, be severed, and the remaining provisions of this agreement shall remain in effect.

10.3 Benefit. This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.4 Number and Gender. Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this agreement may require.

10.5 No Third Party Beneficiary. This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement as of the date below.

Dated: March 12, 2018

FOR LEVIATHAN, LLC

FOR LEVIATHAN, LLC

FOR LEVIATHAN LLC
FOR THE KRAKEN LLC
DIEGO RUDOMIN-MANAGER

FOR LEVIATHAN LLC
FOR THE KRAKEN LLC
ADRIAN RUDOMIN-MANAGER

EXHIBIT A

CHANTILLY ROAD, LLC OPERATING AGREEMENT

## MEMBERS

The following persons are the initial Members of the Company, and their ownership is set forth below.

| Name | Membership Interest |
|------|---------------------|
| LEVIATHAN, LLC | 100% |

CHANTILLY ROAD, LLC OPERATING AGREEMENT

EXHIBIT B

### OFFICERS

The following person(s) are elected as officers of the Company:

| Name | Title |
| --- | --- |
| ADRIAN RUDOMIN | CO-President |
| DIEGO RUDOMIN | CO-President |

CHANTILLY ROAD, LLC OPERATING AGREEMENT

EXHIBIT C

### NEW MEMBER'S CONSENT

The undersigned agrees to be bound as member by the terms of the Operating agreement of THE LEVIATHAN, LLC as if the undersigned was a signatory thereof.

_____

(Signature)
By:
Date:

# Exhibit B

## LEVIATHAN, LLC
### A California Limited Liability Company

Operating Agreement Dated June 18, 2021

A. THIS OPERATING AGREEMENT of LEVIATHAN, LLC (the "Company") is entered into as of the date set forth on the signature page hereto by each of the persons named in Exhibit A hereto (referred to individually as a Member and collectively as the Members).

B. The Members have formed a limited liability company under the California Limited Liability Company Act. The articles of organization of the Company filed with the California Secretary of State are hereby adopted and approved by the Members.

C. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the California Limited Liability Company Act.

"°Capital Contribution" means the amount of cash, property or services contributed to the Company.

"Company" means LEVIATHAN, LLC, a California limited liability company.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest' means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, Limited Liability Company, or other entity, whether domestic or foreign.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

## ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 Membership Interests of each Member are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 Subsequent Contributions. No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 Capital Accounts. Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 Interest. No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 Limited Liability. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 Allocations. The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 Distributions. The Company shall have the right to make distributions of cash and property to the Members pro rata based on the relative Membership Interests. The timing and amount of distributions shall be determined by the Members in accordance with California law.

## ARTICLE 4: MANAGEMENT

4.1 Management. The business of the Company shall be managed by THE KRAKEN, LLC, which shall serve as the sole manager of the Company.

4.2 Banking. The Manager(s) are authorized to set up one or more bank accounts and is authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company.

4.3 Officers. The Members by majority are authorized to appoint one or more officers from time to time. The officers shall hold office until their successors are chosen and qualified. Subject to any employment agreement entered into between the officer and the Company, an

officer shall, serve at the pleasure of the Members. The current officers of the Company are listed on Exhibit B.

4.4 Compensation of the Manager(s). Compensation of the Manager(s) of the Company shall be a fee equal to 10% of the net revenue of the Company. Should there be more than one acting manager, this compensation shall be distributed between the managers in accordance with a resolution obtained by majority voting between the members.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 Accounts. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member. The costs of such inspection and copying shall be borne by the Member.

5.2 Records. At all times during the term of existence of the Company, and beyond that term if the Members dooms it necessary, the Manager shall keep or cause to be kept the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member:

(b) A copy of the articles of organization and any amendments;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years; and

(d) An original executed copy or counterparts of this agreement and any amendments.

5.3 Income Tax Returns. Within 45 days after the end of each taxable year, the Manager shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

5.4 Tax Matters. The Manager(s) shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 6: MEMBERSHIP—MEETINGS, VOTING

6.1 Members and Voting Rights. Members shall have the right and power to vote on all matters with respect to which this agreement or California law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under California law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

6.2 Meetings. Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

Meetings may be called by any member or members holding 10% or more of the Membership Interests, for the purpose of addressing any matters on which the Members may vote. A written notice shall be given not less than 10 days nor more than 60 days before the date of the meeting to each member entitled to vote at the meeting. In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by California law, including by conference telephone or similar communications equipment. In addition, notice to any meeting may be waived, and any action which could be taken at a meeting can be approved if a consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7,1 Withdrawal. A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this Section 7.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account.

7.2 Restrictions on Transfer. A Member may transfer Membership Interests to any other Person without the consent of any other Member. A person may acquire Membership Interests directly from the Company upon the written consent of all Members, A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

ARTICLE 8: DISSOLUTION AND WINDING UP

8.1 Dissolution. The Company shall be dissolved upon the first to occur of the following events:

(a) The tote of Members holding a majority of the outstanding Membership Interests to dissolve the Company.

(b) Entry of a decree of judicial dissolution under Section 17351 of the California Corporations Code.

(c) At any time there are no Members, provided that the Company is not dissolved and is not required to be wound up if, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the legal representative of such Member or its assignee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

8.2 No automatic dissolution upon certain events. Neither the death, incapacity, disassociation, bankruptcy nor withdrawal of a Member shall automatically cause a dissolution of the Company.

ARTICLE 9: INDEMNIFICATION

9.1 Indemnification. The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contenders or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or meter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 Expenses. Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

ARTICLE 10: GENERAL PROVISIONS

10.1 Entire Agreement; Amendment. This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

10.2 Governing Law; Severability. This agreement shall be construed and enforced in accordance with the internal laws of the State of California. If arty provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or enforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or enforceability, be severed, and the remaining provisions of this agreement shall remain in effect.

10.3 Benefit. This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.4 Number and Gender. Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this agreement may require.

10.5 No Third-Party Beneficiary. This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

EXHIBIT A-June 18-2021

## MEMBERS

The following persons are the initial Members of the Company, and their ownership is set forth below.

| Name | Membership Interest |
| --- | --- |
| PABLO RUDOMIN | 12.5% |
| ISAAC RUDOMIN | 12.5% |
| THE KRAKEN, LLC | 1% |
| ADRIAN RUDOMIN | 37% |
| DIEGO RUDOMIN | 37% |

EXHIBIT B

## OFFICERS

The following person(s) are elected as officers of the Company:

| Name | Title |
|------|-------|
| Diego Rudomin | Vice President |
| Adrian Rudomin | President |

EXHIBIT C - I

## NEW MEMBER'S CONSENT

The undersigned agrees to be bound as member by the terms of the Operating agreement of THE LEVIATHAN, LLC as if the undersigned was a signatory thereof.

By: _____

EXHIBIT C -2

## NEW MEMBER'S CONSENT

The undersigned agrees to be bound as member by the terms of the Operating agreement of THE LEVIATHAN, LLC as if the undersigned was a signatory thereof.

_____

By:

EXHIBIT D

ACTIONS BY UNANIMOUS WRITTEN CONSENT

OF THE MEMBERS OF

LEVIATHAN, LLC

A California Limited Company

RESOLUTION – JUNE 18 2021

**NEW OPERATING AGREEMENT FOR LEVIATHAN LLC**

**NEW MEMBERSHIP DISTRIBUTION FOR LEVIATHAN LLC**

The undersigned, representing all or a majority of the Members of Leviathan, LLC, a California Limited Company, do hereby adopt the following resolution effective on the 18th day of June, 2021:

WHEREAS, the Members have decided that it is in the best interest of the Company for the Operating Agreement for Leviathan LLC to be amended as follows: The membership distribution of Interest shall be amended to the following:

Adrian Rudomin   37%
Diego Rudomin    37%
Isaac Rudomin    12.5%
Pablo Rudomin    12.5%
The Kraken LLC   1%

WHEREAS, the Members have decided that it is in the best interest of the Company for all other terms for the Operating Agreement for Leviathan LLC to remain, be it thus

RESOLVED, that upon the signing this resolution the Company hereby amends its operating agreement as stated within this resolution, and,

RESOLVED, that upon signing this resolution a new Amended Operating Agreement dated June 18, 2021 containing the terms as defined in this resolution shall be drafted and signed and shall become in full force and effect, and,

FURTHER RESOLVED, that the Manager(s) is(are) hereby authorized and instructed to provide and execute all documents as required to complete all items above.

SIGNATURE PAGE TO FOLLOW:

SIGNATURE PAGE:

ACTIONS BY UNANIMOUS WRITTEN CONSENT

OF THE MEMBERS OF

LEVIATHAN, LLC

A California Limited Company

RESOLUTION – JUNE 18 2021

## NEW OPERATING AGREEMENT FOR LEVIATHAN LLC

## MEMBERSHIP DISTRIBUTION LEVIATHAN LLC

_____

DIEGO RUDOMIN
MEMBER-LEVIATHAN LLC
MEMBER-MANAGER-THE KRAKEN LLC

_____

ADRIAN RUDOMIN
MEMBER-LEVIATHAN LLC
MEMBER-MANAGER-THE KRAKEN LLC

_____

ISAAC RUDOMIN
MEMBER-LEVIATHAN LLC-THE KRAKEN LLC

_____

PABLO RUDOMIN
MEMBER-LEVIATHAN LLC-THE KRAKEN LLC

\

# Exhibit C

<div align="center">**MORTGAGE NOTE**</div>

$2,350,000.00

Dated: As of November 20, 2023
Los Angeles, California

**MORTGAGE NOTE** (hereinafter, this "**Note**") made as of November 20, 2023, by **CHANTILLY ROAD, LLC**, a California limited liability company, having an address at 578 Washington Blvd, Suite 148, Marina Del Rey, CA 90292 (the "**Maker**"), for the benefit of **CSPRF 2 LLC**, a Delaware limited liability company, its successors and/or assigns, as their interests may appear, having offices at 8 The Green, Ste. A, Dover, Delaware 19901 (hereinafter, the "**Payee**").

**FOR VALUE RECEIVED**, Maker promises to pay to the order of Payee, at 8 The Green, Ste. A, Dover, Delaware 19901, or at such other place as Payee may designate to Maker in writing from time to time, the principal sum of **TWO MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($2,350,000.00)**, together with interest thereon at the Interest Rate (as defined below) (or the Default Rate, as defined below, if applicable), calculated in accordance with the terms and conditions set forth in this Note, from and including the date of this Note to the date this Note is paid in full, as follows:

A.     On the date hereof (the "**Closing Date**"), interest on the principal sum of this Note from (and including) the Closing Date to November 30, 2023 at the Interest Rate.

B.     Thereafter, interest only at the Interest Rate on the outstanding Principal Balance (as defined below) shall be due monthly and shall be paid monthly in arrears, commencing on January 1, 2024, and monthly thereafter on the first (1st) day of each month (the "**Payment Date**") until the Maturity Date (as defined below) (each such monthly payment, a "**Monthly Payment**").

C.     Thereafter, on the Maturity Date, the entire outstanding principal balance of this Note, together with all accrued and unpaid interest through the Maturity Date at the Interest Rate, and all other sums payable to the holder of this Note (whether pursuant to this Note or the Deed of Trust or Other Security Documents (as such terms are hereinafter defined)) shall become due and payable.

1.     For the purposes of this Note, these terms shall be defined as follows:

a.     The term "**Applicable Law**" shall mean all applicable existing and future federal, State, local and other laws, orders, ordinances, governmental and administrative rules and regulations, and court orders.

b.     The term "**Business Day**" shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

c.     The term "**Debt**" shall mean all principal, interest and other sums of any nature whatsoever, which may or shall become due to Payee in accordance with the provisions of this Note, the Deed of Trust or Other Security Documents.

d.     The term "**Deed of Trust**" shall mean that certain Deed of Trust and Security Agreement dated as of the date hereof, made by Maker for the benefit of Payee, securing this Note and encumbering the premises located at 1116 Chantilly Road, Los Angeles, California  (the "**Property**").

e.     The term "**Floor Rate**" shall mean a per annum rate equal to Twenty and 00/100 Percent (20.00%).

f.     The term "**Interest Period**" shall mean, initially, the period commencing on (and including) the Closing Date and ending on (and including) the last day of the calendar month in which the Closing Date occurs. Thereafter, each Interest Period shall commence on (and include) the first day of each calendar month immediately following the last day of the previous Interest Period and end on (and include) the last day of such calendar month.

g.     The term "**Interest Rate**" shall mean, for any day, a per annum rate equal to the greater of (a) the Floor Rate or (b) the Spread plus the Prime Rate. Any change in the Interest Rate due to a change in the Prime Rate shall take effect as of the date such change in the Prime Rate occurred.

h.     The term "**Loan**" shall mean the loan from Payee to Maker as of the Closing Date in the principal amount of $2,350,000.00.

i.     The term "**Loan Documents**" shall mean this Note, the Deed of Trust and all and any of the documents now or hereafter executed by Maker and/or others and by or in favor of Payee, which evidences, secures or guarantees all or any portion of the payments due under this Note or otherwise is executed and/or delivered in connection with this Note, the Deed of Trust, guarantees and agreements, including, without limitation, the Pledge Agreement.

j.     The term "**Maturity Date**" shall mean the earlier of (i) August 1, 2024, or (ii) such sooner date, by acceleration or otherwise, as may be applicable pursuant to the terms hereof, at which time the entire Debt shall become due and payable.

k.     The term "**Other Security Documents**" shall mean any of the documents other than this Note or the Deed of Trust, now or hereafter executed by the Maker or others, and by or in favor of Payee, which wholly or partially secure or guarantee payment of this Note, or which otherwise pertain to the Loan, including, without limitation, the Pledge Agreement.

l.     The term "**Person**" shall mean an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

m.     The term "**Pledge Agreement**" shall mean that certain Ownership Interests Pledge and Security Agreement, dated as of the date hereof, by and among Adrian Rudomin, Diego Rudomin, Pablo Rudomin, Isaac Rudomin, The Kraken, LLC, as

- 2 -

"Pledgors" and Lender".

n.    The term "**Prime Rate**" shall mean the annual rate of interest which is the highest prime lending rate of interest most recently in effect (as published in the Money Rates Section in The Wall Street Journal or if The Wall Street Journal fails to publish such rate, such other publication as Lender shall designate in its sole discretion). A certificate made by an officer of Lender stating the Prime Rate in effect on any given day, for the purposes hereof, shall be conclusive evidence of the Prime Rate in effect on such day.  The Prime Rate is a base reference rate of interest adopted by Lender as a general benchmark from which Lender determines the floating interest rates chargeable on various loans to borrowers with varying degrees of creditworthiness and Borrower acknowledges and agrees that Lender has made no representations whatsoever that the Prime Rate is the interest rate actually offered by Lender to borrowers of any particular creditworthiness.  In the event that the concept of the Prime Rate shall no longer exist, then the Prime Rate shall be deemed to be the Prime Rate as last reported in The Wall Street Journal.

o.    The term "**Principal Balance**" shall mean the outstanding principal balance of this Note from time to time.

p.    The term "**Spread**" shall mean Eleven and 50/100 Percent (11.50%).

2.    Any capitalized terms used herein but not defined shall have the meanings ascribed to them in the Deed of Trust or Other Security Documents.

3.    Interest shall be computed on the basis of a year of 360 days and actual days elapsed.

4.    The failure to make any payment required under this Note or the occurrence of any Event of Default (as such term is defined in the Deed of Trust or the Other Security Documents) shall constitute an Event of Default under this Note.

5.    Upon the occurrence of an Event of Default: (a) interest shall accrue hereunder at the Default Rate prior to and subsequent to the entry of a Judgment of Foreclosure and Sale, (b) Payee may, at its option, without any written notice given to the Maker (such notice being expressly waived), DECLARE AND DEMAND this Note and the Debt immediately due and payable and (c) Payee may pursue all rights and remedies available hereunder or under Deed of Trust and the Other Security Documents.  Payee's rights, remedies and powers, as provided in this Note, the Deed of Trust or the Other Security Documents are cumulative and concurrent, and may be pursued singly, successively or together against Maker, any Guarantor (as such term is defined in the Deed of Trust) of the indebtedness evidenced hereby or against any collateral granted or pledged by Maker under any of the Loan Documents or any other collateral security given at any time to secure the payment hereof, all at the sole discretion of Payee.  Additionally, Payee may resort to every other right or remedy available at law or in equity without first exhausting the rights and remedies contained herein, all in Payee's sole discretion. Failure of Payee, for any period of time or on more than one occasion, to DECLARE AND DEMAND this Note and the Debt immediately due and payable shall not constitute a waiver of the right to exercise the same at any time from and after any Event of Default.

6.      A payment shall not be deemed to have been made on any day unless such payment has been received by Payee, at the required place of payment, in U.S. dollars by no later than 1:00 p.m. (New York time) on such day.  Whenever any payment to Payee hereunder would otherwise be due (except by reason of acceleration) on a day that is not a Business Day, such payment shall instead be due on the next succeeding Business Day.  If any installment of principal, interest or other sums due hereunder or under the Deed of Trust or any Other Security Document are not paid on the date on which same are due, the Maker shall pay to the Payee a late charge of ten percent (10.00%) of such unpaid installment as a late payment charge, such late charge to be immediately due and payable without demand by the Payee.  Notwithstanding anything to the contrary, all payments due under this Note, the Deed of Trust and the Loan Documents shall be made by means of wire transfer to the order of Payee, as directed by Payee, and Payee shall have the absolute right to reject any payment not made by wire transfer. In addition, Maker shall pay to Payee the sum of $2,500.00 for any payment which is returned for any reason by Maker's bank unpaid.

7.      Separate and in addition to all other payment obligations of Maker contained herein, Maker shall be required to pay a Loan origination fee to Payee (or Payee's affiliate, at Payee's direction) on the Closing Date equal to $117,500.00 (the "**Loan Origination Fee**").

8.      Maker acknowledges that this Note and Maker's obligations under this Note are and shall at all times continue to be absolute and unconditional in all respects.  This Note, the Deed of Trust and the Other Security Documents set forth the entire agreement and understanding of Payee and Maker.

9.      Maker agrees to pay all costs and expenses of collection incurred by Payee, in addition to principal and interest (including, without limitation, reasonable attorneys' fees and disbursements), and including all costs and expenses incurred in connection with the pursuit by Payee of any of its rights or remedies hereunder or under the Deed of Trust and/or the Other Security Documents or the protection of or realization of collateral or in connection with any of Payee's collection efforts, whether or not any action or proceeding on this Note, on the Deed of Trust and/or the Other Security Documents or any foreclosure proceeding is filed, all such costs and expenses being payable on demand, together with interest at the Default Rate thereon and being secured by the Deed of Trust and the Other Security Documents.

10.     The indebtedness herein evidenced by this Note is secured by the Deed of Trust and the Other Security Documents.

11.     THIS NOTE HAS BEEN EXECUTED AND DELIVERED AT, AND SHALL BE DEEMED TO HAVE BEEN MADE AND PERFORMED IN, THE STATE OF DELAWARE AND, EXCEPT AS OTHERWISE PROVIDED IN HEREIN, THIS NOTE, THE DEED OF TRUST AND EACH OF THE OTHER SECURITY DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

NOTWITHSTANDING THE FOREGOING CHOICE OF LAW:

4858-6295-8207, v. 3

(i)      THE PROCEDURES GOVERNING THE ENFORCEMENT BY PAYEE OF ITS FORECLOSURE AND OTHER REMEDIES AGAINST MAKER UNDER THE MORTGAGE AND UNDER THE OTHER SECURITY DOCUMENTS WITH RESPECT TO THE PREMISES (AS SUCH TERM IS DEFINED IN THE MORTGAGE) OR OTHER ASSETS SITUATED IN THE STATE OF CALIFORNIA, INCLUDING BY WAY OF ILLUSTRATION, BUT NOT IN LIMITATION, ACTIONS FOR FORECLOSURE, FOR INJUNCTIVE RELIEF OR FOR THE APPOINTMENT OF A RECEIVER SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA;

(ii)     PAYEE SHALL COMPLY WITH APPLICABLE LAW IN THE STATE OF CALIFORNIA TO THE EXTENT REQUIRED BY THE LAW OF SUCH JURISDICTION IN CONNECTION WITH THE FORECLOSURE OF THE SECURITY INTERESTS AND LIENS CREATED UNDER THE MORTGAGE AND THE OTHER SECURITY DOCUMENTS WITH RESPECT TO THE PREMISES OR OTHER ASSETS SITUATED IN THE STATE OF CALIFORNIA;

(iii)    PROVISIONS OF FEDERAL LAW AND THE LAW OF THE STATE OF CALIFORNIA SHALL APPLY IN DEFINING THE TERMS HAZARDOUS SUBSTANCES AND ENVIRONMENTAL LAWS (AS SUCH TERMS ARE DEFINED IN THE OTHER SECURITY DOCUMENTS) APPLICABLE TO THE PREMISES; AND

(iv)     THE CREATION, PERFECTION AND PRIORITY OF THE SECURITY INTERESTS AND LIENS CREATED UNDER THE MORTGAGE AND THE OTHER SECURITY DOCUMENTS WITH RESPECT TO THE PREMISES OR OTHER ASSETS SITUATED IN THE STATE OF CALIFORNIA SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA.

NOTHING CONTAINED HEREIN OR ANY OTHER PROVISIONS OF THE MORTGAGE OR OTHER SECURITY DOCUMENTS SHALL BE CONSTRUED TO PROVIDE THAT THE SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA SHALL APPLY TO ANY PARTIES, RIGHTS AND OBLIGATIONS UNDER THIS NOTE, THE MORTGAGE OR THE OTHER SECURITY DOCUMENTS, WHICH, EXCEPT AS EXPRESSLY PROVIDED IN CLAUSES (i), (ii) AND (iii) ABOVE, ARE AND SHALL CONTINUE TO BE GOVERNED BY THE SUBSTANTIVE LAW OF THE STATE OF DELAWARE, EXCEPT AS SET FORTH IN CLAUSES (i), (ii) AND (iii) ABOVE. IN ADDITION, THE FACT THAT PORTIONS OF THIS NOTE, THE MORTGAGE AND THE OTHER SECURITY DOCUMENTS MAY INCLUDE PROVISIONS DRAFTED TO CONFORM TO THE LAW OF THE STATE OF CALIFORNIA IT IS NOT INTENDED, NOR SHALL IT BE DEEMED, IN ANY WAY, TO DEROGATE THE PARTIES' CHOICE OF LAW AS SET FORTH OR REFERRED TO IN THIS NOTE, THE MORTGAGE OR IN THE OTHER SECURITY DOCUMENTS.  THE PARTIES FURTHER AGREE THAT THE PAYEE MAY ENFORCE ITS RIGHTS UNDER THIS NOTE, THE MORTGAGE AND THE OTHER SECURITY DOCUMENTS INCLUDING, BUT NOT LIMITED TO, ITS RIGHTS TO SUE THE MAKER OR TO COLLECT ANY OUTSTANDING INDEBTEDNESS IN ACCORDANCE WITH APPLICABLE LAW.

4858-6295-8207, v. 3

12.    Maker does hereby agree that upon the occurrence of an Event of Default, or upon the failure of Maker to pay the Debt in full on the Maturity Date, Payee shall be entitled to receive and Maker shall pay interest on the entire Debt at the rate of ten percent (10%) above the applicable Interest Rate or at the maximum rate of interest which Maker may by law pay, whichever is lower (the "**Default Rate**"), to be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt, including all periods prior to or subsequent to the entry of a Judgment of Foreclosure and Sale.  This charge shall be added to the Debt and shall be deemed secured by the Deed of Trust.  This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default.

13.    This Note is subject to the express condition that at no time shall Maker be obligated or required to pay interest on the Principal Balance at a rate which could subject Payee to either civil or criminal liability as a result of being in excess of the maximum rate which Maker is permitted by law to contract or agree to pay.  For the purposes of calculating the actual amount of interest paid and or payable, in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to Payee for the use, forbearance or detention of the indebtedness evidenced hereby shall, to the extent permitted by applicable law, be amortized, allocated and spread from the date of disbursement of the proceeds thereof until payment in full of the Loan obligations, so that the actual rate of interest on account thereof is uniform throughout the term hereof.  If, by the terms of this Note, Maker is at any time required or obligated to pay interest on the Principal Balance at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate, and interest payable hereunder shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the Principal Balance.

14.    Intentionally Omitted.

15.    No delay on the part of Payee in exercising any right or remedy under this Note, the Deed of Trust or the Other Security Documents or failure to exercise the same shall operate as a waiver in whole or in part of any such right or remedy.  No notice to or demand on Maker shall be deemed to be a waiver of the obligation of Maker or of the right of Payee to take further action without further notice or demand as provided in this Note, the Deed of Trust and the Other Security Documents.

16.    Each of Payee's rights and remedies under this Note shall be in addition to all of its other rights and remedies under the Deed of Trust, Other Security Documents and applicable law.

17.    **TIME IS OF THE ESSENCE** with regard to Maker's performance of all the terms, covenants and conditions of this Note.

18.    Any provision of this Note, the Deed of Trust or the Other Security Documents that is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof or affecting the validity or enforceability of such provision.

4858-6295-8207, v. 3

19.     All of the provisions of this Note shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

20.     Maker hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal family or household purposes.

21.     Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute and deliver this Note and that the Debt hereunder constitutes a valid and binding obligation of Maker.

22.     All notices to be given under this Note shall be given in the same manner as provided in the Deed of Trust.

23.     This Note, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

24.     Without limiting any other provisions of the Deed of Trust or the Loan Documents, Maker, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby waives valuation, appraisement, presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, lack of diligence, delays in collection or enforcement of this Note, notice of the intention to accelerate, the benefit of all applicable law affording any right or redemption or cure and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note, except as expressly provided herein or in the Deed of Trust or any of the Other Security Documents, and in connection with any suit, action or proceeding brought by Payee on this Note, any and every right it may have to (a) a trial by jury, (b) interpose any counterclaim therein (other than a counterclaim which can only be asserted in a suit, action or proceeding brought by Payee on this Note and cannot be maintained in a separate action), and (c) have the same consolidated with any other or separate suit, action or proceeding, and agrees that their respective liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Payee.  Maker, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, hereby consents to every extension of time, renewal, waiver or modification that may be granted by Payee with respect to the payment or other provisions of this Note, and to the release of any makers, endorsers, guarantors or sureties, and their heirs, legal representatives, successors and assigns, and of any collateral given to secure the payment hereof, or any part hereof, with or without substitution, and agrees that additional makers, endorsers, guarantors or sureties and their heirs, legal representatives, successors and assigns, may become parties hereto without notice to Maker or to any endorser, guarantor or surety and without affecting the liability of any of them.

25.     FOR ANY CLAIM, ACTION, OR DISPUTE ARISING UNDER, OR TO INTERPRET OR APPLY, THIS NOTE OR ANY OTHER SECURITY DOCUMENT, OR TO RESOLVE ANY DISPUTE ARISING UNDER THE FOREGOING OR THE RELATIONSHIP BETWEEN THE PARTIES, MAKER AND PAYEE IRREVOCABLY SUBMIT TO THE NONEXCLUSIVE

- 7 -

JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND THE UNITED STATES DISTRICT COURT LOCATED IN THE STATE OF CALIFORNIA, AND APPELLATE COURTS FROM ANY OF SUCH COURTS.    MAKER AND PAYEE IRREVOCABLY WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO VENUE OF ANY SUCH SUIT, ACTION, OR PROCEEDING BROUGHT IN ANY SUCH COURT, INCLUDING ANY CLAIM THAT ANY SUCH SUIT, ACTION, OR PROCEEDING SO BROUGHT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.    NOTHING IN THE DEED OF TRUST OR OTHER SECURITY DOCUMENTS SHALL BE DEEMED TO PRECLUDE PAYEE FROM BRINGING ANY SUIT, ACTION, OR PROCEEDING RELATING TO ANY OTHER SECURITY DOCUMENT OR THE DEBT IN ANY OTHER JURISDICTION WHERE PAYEE COULD OTHERWISE PROPERLY BRING SUCH SUIT, ACTION, OR PROCEEDING.    MAKER AND PAYEE FURTHER CONSENT AND AGREE TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO MAKER AT THE ADDRESS SET FORTH ON PAGE 1 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

26.    Intentionally Omitted.

27.    The parties intend that each of the Makers (if more than one) shall be fully liable, jointly and severally, for all of the Debt.  Nonetheless, in case a court finds that any Maker is not such a primary obligor with respect to all or any part of such obligations, the Makers expressly waive the benefit of any and all defenses and discharges available to a guarantor, surety, endorser or accommodation party dependent on an obligor's character as such.  Without limiting the generality of the foregoing, the liability of the Makers hereunder shall not be affected or impaired in any way by any of the following acts or things (which the Payee is hereby expressly authorized to do, omit or suffer from time to time without notice to or consent of anyone): (a) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all indebtedness arising under this Note, the Deed of Trust or the Other Security Documents; (b) any extension or renewal of any such indebtedness (whether or not for longer than the original period) or any modification of the interest rate, maturity or other terms of any such indebtedness; (c) any waiver or indulgence granted to either Maker, and any delay or lack of diligence in the enforcement of the indebtedness arising under this Note, the Deed of Trust or the Other Security Documents; (d) any full or partial release of, compromise or settlement with, or agreement not to sue, either Maker or any guarantor or other person liable on any such indebtedness; (e) any release, surrender, cancellation or other discharge of any indebtedness arising under this Note, the Deed of Trust or the Other Security Documents, or the acceptance of any instrument in renewal or substitution for any instrument evidencing any such indebtedness; (f) any failure to obtain collateral security (including rights of setoff) for any indebtedness arising under this Note, the Deed of Trust or the Other Security Documents, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to preserve, protect, insure, care for, exercise or enforce any collateral security for any such indebtedness; (g) any modification, alteration, substitution, exchange, surrender, cancellation, termination, release or other change, impairment, limitation, loss or discharge of any

- 8 -

collateral security for any such indebtedness; (h) any assignment, sale, pledge or other transfer of any of the indebtedness arising under this Note, the Deed of Trust or the Other Security Documents; or (i) any manner, order or method of application of any payments or credits on any indebtedness arising under this Note, the Deed of Trust or the Other Security Documents. Each Maker also hereby waives any right of contribution, subrogation, indemnification or other right arising as a result of any payment made toward the Debt of the other Maker.

28.      Each of the Makers (if more than one) hereby waives, for the benefit of the Payee: (a) any right the Payee, as a condition of payment or performance by either Maker, to (i) proceed against the other Maker or any other person or entity, (ii) proceed against or exhaust any collateral for the Debt held from the other Maker or any other person or entity, (iii) proceed against or have resort to any balance of any deposit account, securities account, or credit on the books of the Payee in favor of the other Maker or any other person or entity, or (iv) pursue any other remedy in the power of the Payee whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the other Maker, including any defense based on or arising out of the lack of validity or the unenforceability of the Debt or any agreement or instrument relating thereto or by reason of the cessation of the liability of the other Maker from any cause other than payment in full of the Debt; (c) any defense based upon any statute or rule of law which provides  that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon the Payee's errors or omissions in the administration of the Debt; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of its obligations hereunder, (ii) the benefit of any statute of limitations affecting its liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Payee protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default thereunder or under this Note, the Deed of Trust or the Other Security Documents, any agreement or instrument related thereto, notices of any renewal, extension or modification of the Debt or any agreement related thereto, notices of any extension of credit to the other Maker and notices of any matters referred to in any guaranty securing this Note and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate sureties, or which may conflict with the terms hereof.

**[Remainder of Page Intentionally Left Blank]**

4858-6295-8207, v. 3

**IN WITNESS WHEREOF**, Maker has duly executed this Note the day and year first above written.

<div style="margin-left: 40%;">

**CHANTILLY ROAD, LLC,**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title: Authorized Signatory

</div>

ACKNOWLEDGMENT

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF CALIFORNIA      )
                               ) ss
COUNTY OF Los Angeles )

On November 16, 2023, before me, Tara Gipson , a Notary Public, personally appeared **ADRIAN RUDOMIN**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

| |
|---|
| **TARA GIPSON**<br>COMM. #2354010<br>Notary Public · California<br>Los Angeles County<br>My Comm. Expires May 6, 2025 |

# Exhibit D

▲ 

**This page is part of your document - DO NOT DISCARD**



# 20230807200



**Pages:
0059**

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**11/21/23 AT 08:00AM**

| | |
|---|---:|
| FEES: | 244.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 469.00 |

▲ 



**L E A D S H E E T**



202311210120083

**00023981907**



014403873

**SEQ:
01**

**SECURE - 8:00AM**



**THIS FORM IS NOT TO BE DUPLICATED**

▲

*E442318*

**2624002904**

RECORDING REQUESTED BY:
OLD REPUBLIC TITLE COMPANY


AND WHEN RECORDED MAIL TO:
Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
ATTN: David S. Kriss, Esq.

2624002904-43

SPACE ABOVE THIS LINE FOR RECORDER'S USE


## Deed of Trust and Security Instrument

**RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:**

Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Attention: David S. Kriss, Esq.

(Space Above For Recorder's Use Only)

Assessor's Parcel No.: 4369-037-001

Title Order No.: 2624002904

Escrow No.: 2624002904

## DEED OF TRUST AND SECURITY INSTRUMENT

**CHANTILLY ROAD, LLC,**

as grantor

(Borrower)

To

**OLD REPUBLIC TITLE COMPANY,** as trustee

(Trustee)

for the benefit of

**CSPRF 2 LLC,** as grantee

(Lender)

Dated:       as of November 20, 2023
County:      Los Angeles

THIS DEED OF TRUST IS TO BE RECORDED AS A "FIXTURE FILING" AS DEFINED IN SECTIONS 9502(a) and 9502(b) OF THE UNIFORM COMMERCIAL CODE OF THE STATE OF CALIFORNIA. IT COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES UNDER THE LAWS OF THE STATE OF CALIFORNIA ON THE REAL PROPERTY IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED ON <u>EXHIBIT "A"</u> ATTACHED HERETO. BORROWER IS THE RECORD OWNER OF THE PROPERTY.

# DEED OF TRUST AND SECURITY INSTRUMENT

**THIS DEED OF TRUST AND SECURITY INSTRUMENT** (as same now exists or may hereinafter be amended, modified, supplemented, extended, renewed, restated or replaced, this **"Security Instrument"**) is made as of November 20, 2023, **CHANTILLY ROAD, LLC,** a California limited liability company, having an address at 578 Washington Blvd, Suite 148, Marina Del Rey, CA 90292 (the **"Borrower"**), to **OLD REPUBLIC TITLE COMPANY,** a California corporation, having an address at 101 North Brand Boulevard, 14th Floor, Glendale, California 91203 (together with its successors and permitted assigns, **"Trustee"**), for the benefit of **CSPRF 2 LLC,** a Delaware limited liability company, its successors and/or assigns, as their interests may appear, having offices at 8 The Green, Ste. A, Dover, Delaware 19901 (hereinafter, the **"Lender"**).

## W I T N E S S E T H :

**WHEREAS,** Borrower is the fee owner of the real property described on *Schedule A* attached hereto (collectively, the **"Premises"**);

**WHEREAS,** Borrower is the maker of that certain Mortgage Note of even date herewith in favor of Lender, as same now exists or may hereinafter be amended, modified, supplemented, extended, renewed, restated or replaced (hereinafter, the **"Note"**) in the maximum principal sum of up to **TWO MILLION THREE HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($2,350,000.00),** together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Security Instrument or any other Loan Documents, including, without limitation, Extension Fee, if any and any protective advances Lender may make hereunder or under the other Loan Documents (including, without limitation, for the payment of operating expenses), together with all attorneys' fees and other costs of enforcement and collection due to Lender with respect to the Loan under the Note, this Security Instrument or any other Loan Documents (said principal sum, interest and all other sums which may or shall become due under the Note or under this Security Instrument, being hereinafter, collectively, the **"Debt"**);

**NOW, THEREFORE,** that Borrower's address for notice hereunder is 578 Washington Blvd, #148, Marina Del Rey, CA 90292, in consideration of the Debt and trust hereinafter mentioned, has irrevocably and unconditionally transferred, assigned, granted, bargained, sold and conveyed, and by these presents does transfer, assign, grant, bargain, sell and convey unto Trustee, and unto the successor or substitute Trustee hereinafter provided, the following property, rights, interests, and estates now owned, or hereafter acquired by Borrower (collectively, the **"Property"**) situated in the State of California, to-wit:

    (a)    the Premises;

    (b)    all buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located on the Premises (hereinafter, collectively, the **"Improvements"**);

(c)     all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights, and development rights, as well as any and all inclusionary air rights, certificates, floor area compensation rights, and/or density bonuses which may have been or may otherwise be created by, through or in connection with the Premises and/or any portion of the Property in accordance with any inclusionary housing or other program regulated by the applicable local, city and/or state or any other applicable municipal or governmental authority, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(d)     all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "**Equipment**"), including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Borrower in and to any of the Equipment that may be subject to any "security interests", as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Property is located (the "**UCC**");

(e)     all awards or payments, including interest thereon, that may heretofore and

- 2 -

hereafter be made with respect to the Property and the Improvements, whether from the exercise of the right of eminent domain or condemnation (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Property and the Improvements;

(f)     all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises and the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "**Leases**") and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements (hereinafter collectively referred to as the "**Rents**") together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)     all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)     the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property; all accounts, escrows, documents, instruments, investment property, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, permits, consents, licenses, management agreements, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Property, or the use, operation, maintenance,

- 3 -

occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "**Intangibles**");

(i)     the Prepaid Interest, as defined in and governed by the Prepaid Interest Agreement (as hereinafter defined), if any;

(j)     all contracts, permits, development rights, plans, specifications, blueprints, and tax abatements;

(k)     all of the right, title, interest and estate of Borrower now owned, or hereafter acquired, in the Premises, the Improvements, the Equipment, the Intangibles, and all other interests described in sub-sections (a) through (j) above, and all present and future estate, right, title, interest, property, possessory interest and claims whatsoever in law as well as in equity of Borrower or any other owner in the Premises, the Improvements, the Equipment, the Intangibles, and all other interests described in sub-sections (a) through (j) above; and

(l)     all proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution, or replacement of any of the foregoing.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns, forever;

IN TRUST, WITH POWER OF SALE, to secure payment to Lender of the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument.

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall indefeasibly pay to Lender the Debt in full at the time and in the manner provided in the Note and this Security Instrument and shall abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents (as hereinafter defined) in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender and Trustee pursuant to the provisions hereof shall survive any such payment or release.

AND Borrower represents and warrants to and covenants and agrees with Lender as follows:

SECTION 1.  **Payment of Debt and Incorporation of Covenants, Conditions and Agreements.**

Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument. This Security Instrument is given pursuant to the Note, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Note and the other Loan Documents, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. In the event of any inconsistency between the provisions of this Security Instrument or any of the other Loan Documents and the provisions of the Note, the provisions of the Note shall control. All the covenants, conditions and agreements contained in the Note and all and any of the loan documents other than the Note or this Security Instrument now or hereafter executed by Borrower or Guarantor in favor of Lender, which wholly or partially secure or guaranty payment of the Note (collectively, the "**Other Security Documents**", and together with the Note and this Security Instrument, collectively, the "**Loan Documents**"), are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Notwithstanding anything to the contrary contained herein or in the Other Security Documents, all payments due under the Note, this Security Instrument and the Other Security Documents shall be made by means of wire transfer to Lender, as directed by Lender, and Lender shall have the absolute right to reject any payment not made by wire transfer.

SECTION 2. **Application of Payments.**

Unless applicable law provides otherwise, all payments received by Lender from Borrower under the Note or this Security Instrument shall be applied by Lender in the following order of priority: (i) amounts payable to Lender by Borrower under Section 6 hereof; (ii) late charges payable under the Note; (iii) interest payable on the Note; (iv) all applicable prepayment premiums, if any; (v) principal of the Note; (vi) interest payable on advances made pursuant to Section 18 hereof; (vii) principal of advances made pursuant to Section 18 hereof; and (viii) any other sums secured by this Security Instrument in such order as Lender, at Lender's option, may determine; provided, however, that Lender may, at Lender option, apply any sums payable pursuant to Section 24 hereof prior to interest on and principal of the Note, but such application shall not otherwise affect the order of priority of application specified in this Section 2.

SECTION 3. **Warranty of Title.**

Borrower warrants that Borrower has good title to the Property, subject to the Permitted Encumbrances, and has the full power, authority and right to execute, deliver and perform its obligations under this Security Instrument and to encumber, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Borrower possesses an unencumbered fee estate in the Property and the Improvements and that it owns the Premises free and clear of all liens, encumbrances and charges whatsoever except for the Permitted

Encumbrances, and that this Security Instrument is and will remain a valid and enforceable second (2nd) lien on and security interest in the Property, subject only to said Permitted Encumbrances. Borrower shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

SECTION 4.  **Insurance.**

(a) Borrower will keep the Property insured against loss or damage by fire, flood (if in flood hazard area) and such other hazards, risks and matters, including, without limitation, business interruption, rental loss, builder's risk, terrorism, public liability, and boiler damage and liability, as Lender may from time to time require in amounts required by Lender, and shall pay the premiums for such insurance (collectively, the **"Insurance Premiums"**) as the same become due and payable. All policies of insurance (collectively, the **"Policies"**) shall be issued by insurers acceptable to Lender and shall contain all applicable standard California non-contribution clauses naming Lender as the person to which all payments made by such insurance company shall be paid. Borrower will assign and deliver the Policies to Lender. Not later than thirty (30) days prior to the expiration date of each of the Policies, Borrower will deliver evidence satisfactory to Lender of the renewal of each of the Policies. Prior to or on the date hereof, Borrower shall deliver evidence satisfactory to Lender that Borrower has paid for the Insurance Premiums covering the period commencing on the date hereof up to and including the Maturity Date, as such term is defined in the Note. All Policies shall be issued by companies approved by Lender and licensed to do business in the state where the Property is located, with an A.M Best Key Rating of at least A.

(b) In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and empowers Lender as attorney-in-fact, coupled with an interest, for Borrower to make proof of loss, to adjust and compromise any claim under insurance policies, to appear in and prosecute any action arising from such insurance policies, to collect and receive insurance proceeds, and to deduct therefrom Lender's expenses incurred in the collection of such proceeds (said insurance proceeds, after such deduction of expenses, being hereinafter the "**Net Proceeds**"); provided, however, that nothing contained in this subsection (b) shall require Lender to incur any expense or take any action hereunder. Borrower further authorizes Lender, at Lender's option, either (i) to hold the Net Proceeds for the account of Borrower to be used to reimburse Borrower for the cost of reconstruction or repair of the Property (hereinafter, the "**Restoration**") or (ii) to apply the Net Proceeds to the payment of the sums secured by this Security Instrument, whether or not then due, in such priority and proportions as Lender in its discretion shall deem proper, but any such repayment shall not be deemed voluntary prepayment for which a prepayment premium is due.

(c) If the Net Proceeds are applied to the payment of the sums secured by this Security Instrument, any such application of proceeds to principal shall neither, extend or postpone

- 6 -

the due dates of the monthly installments to be made pursuant to the Note, nor shall such application change the amounts of such installments. If the Property is sold pursuant to Section 22 hereof or if Lender acquires title to the Property, Lender shall have all of the right, title and interest of Borrower in and to any insurance policies and unearned premiums thereon and in and to the proceeds resulting from any damage to the Property prior to such sale or acquisition.

(d) The excess, if any, of the Net Proceeds remaining after payment of the entire Debt as provided herein shall be paid to Borrower.

(e) Anything in this Section to the contrary notwithstanding in the event of a casualty resulting in damage to the Property, if Lender in its sole discretion makes the Net Proceeds available for Restoration, same shall be made available in accordance with the terms and provisions set forth below and provided that:

(i) Borrower delivers to Lender an opinion of an architect designated by Borrower and reasonably satisfactory to Lender (the "**Supervising Architect**"), together with such other documentation as Lender may reasonably request, evidencing to the satisfaction of Lender that the Restoration of the Property may be completed so as to constitute an architecturally whole and economically feasible building at least equal in value and condition to the Property immediately prior to the casualty;

(ii) no Event of Default has occurred and is continuing hereunder and no default has otherwise occurred under the terms of this Security Instrument, the Note, or any of the Other Security Documents which remains uncured beyond the applicable notice and/or grace period;

(iii) in the event the Net Proceeds are not sufficient in Lender's reasonable opinion to pay in full the Restoration (hereinafter referred to as the "**Work**"), Borrower shall deposit with Lender sufficient funds, if necessary in the reasonable opinion of Lender, such that together with the Net Proceeds, sufficient funds shall be readily available for the Restoration of the Property as nearly as practicable to its value and condition immediately prior to such casualty;

(iv) Borrower delivers to Lender complete plans and specifications (the "**Work Plans and Specs**") for the work to be performed in connection with the Restoration prepared and sealed by an architect reasonably satisfactory to Lender with evidence satisfactory to Lender of the approval of the Work Plans and Specs by all governmental authorities whose approval is required;

(v) Borrower delivers to Lender, in the event that the Work Plans and Specs are prepared by an architect other than the Supervising Architect, written approval of the Work Plans and Specs by the Supervising Architect;

- 7 -

(vi)     Borrower delivers to Lender a signed estimate approved in writing by the Supervising Architect, bearing the Supervising Architect's seal, stating the entire cost of completing the Work; and

(vii)     Borrower delivers to Lender true copies certified by Borrower, or by the Supervising Architect or Borrower's general contractor or, if available, the governmental agency having jurisdiction thereof, of all permits and approvals required by law in connection with the commencement and conduct the Work.

(f) If the Net Proceeds are made available for the Restoration of the Property pursuant to the terms of paragraph (e) above, the costs, if any, to Lender of recovering or paying out such Net Proceeds (including reasonable attorneys' fees and disbursements and reasonable costs incurred by Lender in having the Work inspected and the Work Plans and Specs reviewed by the Supervising Architect) shall be promptly paid to Lender on demand.  In the event that the terms and conditions of paragraph (e) above have been satisfied in full, then the Net Proceeds shall be disbursed by Lender as the Work progresses in accordance with customary construction loan advance procedures.

(g) Upon occurrence of an Event of Default under this Security Instrument, or upon the failure by Borrower promptly to commence or diligently to continue the Work, Lender may apply all or any portion of the Net Proceeds to the payment of the sums secured by this Security Instrument, whether or not then due, in such priority and proportions as Lender in its discretion shall deem proper.

(h) If at any time the Net Proceeds which are to be applied to the Restoration of the Property will be insufficient, in the reasonable judgment of Lender, to pay the entire unpaid cost of the Restoration, Borrower shall pay the deficiency, or make provision satisfactory to Lender for the payment thereof, prior to receiving any part of the Net Proceeds.  Any balance of the Net Proceeds not required for the Restoration, upon completion of the Work and the reimbursement of Borrower in full of the payment of the Work shall, at Lender's option, (i) be retained by Lender and applied to the sums secured by this Security Instrument, whether or not then due without premium or penalty, or (ii) be returned to Borrower

SECTION 5.  **Payment of Taxes, etc.**

Borrower shall pay all taxes, assessments, water rates, frontage charges and sewer rents, now or hereafter levied or assessed or imposed against the Property or any part thereof (collectively, the "**Taxes**") and all ground rents, maintenance charges, other governmental impositions and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or hereafter levied or assessed or imposed against the Property or any part thereof (collectively, the "**Other Charges**") as same become due and payable.  Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent.  Borrower shall not suffer and shall promptly cause to be paid and discharged any lien

- 8 -

or charge whatsoever which may be or become a lien or charge against the Property and shall promptly pay for all utility services provided to the Property. Borrower shall furnish to Lender receipts for the payment of the Taxes, Other Charges and said utility services prior to the date the same shall become delinquent.

SECTION 6.   **Intentionally Omitted.**

SECTION 7.   **Condemnation**

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, whether direct or indirect, of the Property or any part thereof, and Borrower shall appear in and prosecute any such action or proceeding unless otherwise directed by Lender in writing. Borrower authorizes Lender, at Lender's option, as attorney-in-fact, coupled with an interest, for Borrower, to commence, appear in and prosecute, in Lender's or Borrower's name, any action or proceeding relating to any condemnation or other taking of the Property, whether direct or indirect, and to settle or compromise any claim in connection with such condemnation or other taking. The proceeds of any award, payment or claim for damages, direct or consequential, in connection with any condemnation or other taking, whether direct or indirect, of the Property or any part thereof, or for conveyances in lieu of condemnation, are hereby assigned to and shall be paid to Lender.

(b)     Borrower authorizes Lender to apply such awards, payments, proceeds or damages, after the deduction of Lender's expenses incurred in the collection of such amounts, at Lender's option, either (i) to restoration or repair of the Property, or (ii) to payment of the sums secured by this Security Instrument, whether or not then due, in the order of application set forth in Section 2 hereof, with the balance, if any, to Borrower. Borrower agrees to execute such further evidence of assignment of any awards, proceeds, damages or claims arising in connection with such condemnation or taking as Lender shall require.

(c)     Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Mortgage, and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority

- 9 -

but shall be entitled to receive out of the award interest at the rate or rates provided herein and in the Note. Lender may apply any such award or payment to the reduction or discharge of the Debt whether or not then due and payable. Any reduction of the Debt pursuant to the terms of this Section 7 shall not be deemed a prepayment of the Debt and no prepayment consideration, if any, shall be due. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive said award or payment, or a portion thereof sufficient to pay the Debt.

SECTION 8.  **Intentionally Omitted.**

SECTION 9.  **Maintenance of Property.**

Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Equipment shall not be removed, demolished or altered (except for normal replacement of the Equipment and ordinary course of business repairs of the Improvements) without the consent of Lender. Borrower shall promptly comply with all laws, orders and ordinances affecting the Property or the use thereof. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated, or which may be affected by any proceeding of the character referred to in Section 7 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Premises. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof without the prior written consent of Lender. If under applicable zoning provisions the use of all of the Property is or shall become a nonconforming use, Borrower will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Premises.

SECTION 10.  **Transfer of Encumbrance of the Property.**

(a) Borrower acknowledges that Lender has examined and relied on the creditworthiness of Borrower and experience of Borrower in owning and operating properties such as the Property in agreeing to make the loan secured hereby, and that Lender will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the

- 10 -

repayment of the Debt, Lender can recover the Debt by a sale of the Property. Borrower shall not, without the prior written consent of Lender, which consent may be withheld in Lender's sole discretion, have the right to sell, transfer, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Property or any part thereof or permit the Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

(b) A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this Section 10 shall be deemed to include (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Borrower, any Guarantor (hereinafter defined), or any general partner of Borrower or Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or an interest in any entity directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock by which any of such corporation's stock shall be vested in a party or parties who are not now stockholders; (iv) if Borrower, any Guarantor or any general partner of Borrower or any Guarantor is a limited or general partnership or joint venture, the change, removal or resignation of a general partner or managing partner or the direct or indirect transfer of the partnership interest of any general partner or managing partner; (v) if Borrower, any Guarantor or any member of Borrower or any Guarantor is a limited liability company, the change, removal or resignation of a member or manager or the transfer of an interest of any member or manager (or an interest in any entity directly or indirectly controlling such limited liability company by operation of law or otherwise) or the creation or issuance of new limited liability company membership interests by which any of such corporation's membership interests shall be vested in a party or parties who are not now members or any division of such limited liability company into one (1) or more entities and (vi) any direct or indirect pledge hypothecation, assignment, transfer or other encumbrance of any ownership interest in Borrower; and (vii) any change in the Property Manager (as defined in the Property Management Agreement).

(c) Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of this Security Instrument as so modified by the proposed transferee, payment of a transfer fee, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Borrower's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property without Lender's consent. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property

SECTION 11. **Estoppel Certificates**

    (a)    After request by Lender, Borrower, within ten (10) days, shall furnish Lender or those making requests by or on behalf of or through Lender with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

    (b)    After request by Lender, Borrower, within ten (10) days, will furnish Lender with estoppel certificates from any lessees under the Leases as required by their respective Leases.

SECTION 12. **Changes in the Laws Regarding Taxation.**

    If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereof, if any. In the event Lender is advised by counsel chosen by it that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

SECTION 13. **No Credits on Account of the Debt.**

    Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

SECTION 14. **Documentary Stamps.**

    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Security Instrument, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. In additional, Borrower will be responsible for and shall pay

- 12 -

at closing all taxes, charges, stamps, fees and expenses necessary to record this Security Instrument with the Recording Office of Los Angeles County, California State.

SECTION 15. **Usury Laws.**

This Security Instrument and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of either this Security Instrument or the Note, Borrower is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under the same shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note.

SECTION 16. **Book and Records**

    (a)    The Borrower (and Guarantors, if any) shall keep proper books, records and accounts with respect to the operation of the Property in accordance with generally accepted accounting principles and shall furnish to the Lender (i) within ninety (90) days after the end of each fiscal year of Borrower and at any other time upon Lender's request, financial statements for the operation of the Property, including a balance sheet, a statement of income and expenses of the Property and a statement of changes in financial position, each in reasonable detail and certified by Borrower (or a principal of Borrower if Borrower is not an individual) under penalty of perjury, to be true and complete, and, if Lender shall require audited by an independent certified public accountant; (ii) within thirty (30) days following the close of each calendar quarter, quarter-annual financial statements (including a certified rent roll) in form satisfactory to the Lender, which shall disclose in reasonable detail all earnings and expenses with respect to the operation of the Property certified by Borrower (or a principal of Borrower if Borrower is not an individual) under penalty of perjury, to be true and complete; (iii) together with the foregoing financial statements and at any other time upon Lender's request, a rent schedule for the Property in form acceptable to Lender, certified by Borrower (or a principal of Borrower if Borrower is not an individual) under penalty of perjury, to be true and complete, showing the name of each tenant, the space occupied, the Lease expiration date, the rent payable, the rent paid and any other information requested by Lender; (iv) upon Lender's request, financial statements for any principal of Borrower and Guarantor in the form set

- 13 -

forth above; (v) upon Lender's request, an accounting of all security deposits held in connection with any Lease of any part of the Property, including the name and identification number of the accounts in which such security deposits are held, name and address of the financial institutions in which such security deposits are held and the name of the person to contact at such financial institutions, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions; and (vi) such other financial information as Lender may request.

(b)      Upon the death of any Guarantor who is an individual, Borrower shall give prompt written notice to Lender (i.e., at least within thirty (30) days following his or her death), setting forth the date of death, the state and county where the deceased Guarantor's estate is being administered, and, if then known, the name(s) and address(es) of the executor(s) or administrator(s) appointed to administer the estate of such deceased Guarantor.

SECTION 17. **Performance of Other Agreements.**

Borrower shall observe and perform each and every material term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property.

SECTION 18. **Further Acts, etc.**

Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Trustee or for filing, registering or recording this Security Instrument. Borrower, within ten (10) days after request, will execute and deliver and hereby authorizes Lender (in the event Borrower fails to do so) to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 18.

SECTION 19. **Recording of This Security Instrument, etc.**

- 14 -

Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all filing, registration or recording fees, recordation taxes, privilege taxes, and all expenses (including, but not limited to, attorney's fees) incurred with respect to the preparation, execution and acknowledgement of this Security Instrument, any deed of trust supplemental hereto, any security instrument with respect to the Property, and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law so to do.  Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Security Instrument.

SECTION 20. **Prepayment**

The Debt may not be prepaid in whole or in part except in accordance with the terms and conditions contained in the Note.

SECTION 21. **Events of Default**

The Debt shall become immediately due and payable at the option of Lender upon any one or more of the following events (each being an "**Event of Default**", and, collectively, "**Events of Default**"):

(a)    if any portion of the Debt is not paid when the same is due and payable;

(b)    if any of the Taxes or Other Charges are not paid when the same are due and payable;

(c)    if the Policies are not kept in full force and effect, or if the Policies are not assigned and delivered to Lender upon request;

(d)    if Borrower violates or does not comply with any of the provisions of Sections 3, 7, 8, 9, 10, 11, 14, 19, 35 or 36;

(e)    if any representation or warranty of Borrower, or of any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "**Guarantor**"), made herein or in any such guaranty, or in any certificate, report, financial statement or other instrument or document

- 15 -

furnished to Lender shall have been false or misleading in any material respect when made;

(f)    if Borrower or any Guarantor shall make an assignment for the benefit of creditors or if Borrower shall generally not be paying its debts as they become due;

(g)    if a receiver, liquidator or trustee of Borrower or of any Guarantor shall be appointed or if Borrower or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or any Guarantor or if any proceeding for the dissolution or liquidation of Borrower or of any Guarantor shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or such Guarantor, upon the same not being discharged, stayed or dismissed within thirty (30) days;

(h)    if Borrower shall be in default under any other mortgage or security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(i)    if the Property becomes subject to any mechanic's, materialman's liens or other lien other than a lien for local real estate taxes and assessments not then due and payable and such lien shall remain undischarged of record (by payment, bonding or otherwise) within ten (10) days;

(j)    if Borrower fails to cure promptly any violations of laws or ordinances affecting or which may be interpreted to affect the Property;

(k)    if Borrower causes the Property and/or the ownership interests in Borrower (whether direct or indirect) to be used as collateral for any additional financing not set forth hereunder;

(l)    if Guarantor or any member of Borrower is arrested in connection with a felony criminal offense or the death or incapacity of any Guarantor;

(m)    intentionally omitted;

(n)    except as permitted in this Security Instrument, the actual or threatened alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender;

(o)    if, upon application by Lender to two (2) or more fire insurance companies which are lawfully doing business in the State of California and which are issuing policies of fire insurance upon buildings situated within the area wherein the Property is situated, such companies shall refuse to issue such policies;

(p)    if Borrower or any Guarantor shall become in default beyond any applicable grace periods, under the terms of any other loan or agreement with Security Instrument;

(q)    intentionally omitted;

(r)    in the event of any materially adverse change in the financial conditions of Borrower or any Guarantor;

(s)    Borrower consummates a transaction which would cause this Security Instrument or Lender's exercise of its rights under this Security Instrument, the Note or the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA (as defined below) or result in a violation of a State statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA, the Code, a State statute or other similar law;

(t)    if Borrower shall be in default under any other term, covenant or condition of the Note, this Security Instrument or the Other Security Documents; and

(u)    if Borrower shall be in default under any term, covenant or condition of that certain Promissory Note (the "**Senior Note**") dated January 27, 2022 between Borrower and CIVIC FINANCIAL SERVICES, LLC (the "**Senior Lender**"), as lender in the principal amount of $15,505,000.00, and/or that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing between Borrower and Senior Lender dated January 27, 2022 (the "**Senior DOT**"; together with the Senior Note, hereinafter, collectively, the "**Senior Loan**").

SECTION 22. **Remedies of Lender.**

(a) Upon the occurrence of any Event of Default, (x) Borrower will pay, from the date of that Event of Default, and until the entire Debt is paid in full, whether prior to or subsequent to the entry of a judgment of foreclosure and sale and the satisfaction of any deficiency judgment, interest on the unpaid principal balance of the Note at the Default Rate (as defined in the Note); and (y) Trustee may take such action, without notice or demand, as it deems advisable to protect

- 17 -

and enforce its rights against Borrower and in and to the Property by Lender itself or otherwise, including, without limitation, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

      (i)     declare the entire Debt to be immediately due and payable;

      (ii)    institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete foreclosure of this Security Instrument in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner; notwithstanding the foregoing, upon default of this Security Instrument or the Note, or other obligation secured thereby, Lender shall have the right to sell the Property by power of sale hereby granted pursuant to any statute or law authorizing nonjudicial foreclosure.

      (iii)   with or without entry, pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien of this Security Instrument for the balance of the Debt not then due;

      (iv)   sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to the power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

      (v)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, or in any of the Other Security Documents;

      (vi)   recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument;

      (vii)  apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Borrower, any Guarantor or of any person, firm or other entity liable for the payment of the Debt;

(viii)   enforce Lender's interest in the Leases and Rents and enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, and thereupon Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (B) complete any construction on the Property in such manner and form as Lender deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Property; (D) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents; and (E) apply the receipts from the Property to the payment of Debt, after deducting therefrom all expenses (including, without limitation, attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments insurance and other charges in connection with the Property, as well as just and compensation for the services of Lender, its counsel, agents and employees; or

(ix)   pursue such other rights and remedies as may be available at law or in equity or under the UCC.

In the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien on the remaining portion of the Property.

(b)   The proceeds of any sale made under or by virtue of this Section 22, together with any other sums which then may be held by Lender under this Security Instrument, whether under the provisions of this Section 22 or otherwise, shall be applied by Lender to the payment of the Debt in such priority and proportion as Lender in its sole discretion shall deem proper.

(c)   Lender may adjourn from time to time any sale by it to be made under or by virtue of this Security Instrument by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)   Upon the completion of any sale or sales pursuant hereto in accordance with all applicable laws, Lender, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the

- 19 -

property and rights sold. Any sale or sales made under or by virtue of this Section 22, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Borrower.

(e)     Upon any sale made under or by virtue of this Section 22, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Lender may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Lender is authorized to deduct under this Security Instrument and the Other Security Documents.

(f)     No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of this Security Instrument upon the Property or any part thereof, or any liens, rights, powers or remedies of Lender hereunder, but such liens, rights, powers and remedies of Lender shall continue unimpaired as before.

(g)     Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section 22 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(h)     Lender may resort to any remedies and the security given by the Note, this Security Instrument or in any of the Other Security Documents in whole or in part, and in such portions and in such order as determined by Lender's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, this Security Instrument or in any of the Other Security Documents. The failure of Lender to exercise any right, remedy or option provided in the Note, this Security Instrument or any of the Other Security Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, this Security Instrument or any of the Other Security Documents. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default with respect to Borrower, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated. All costs and expenses incurred by Lender in exercising its rights and remedies under this Section

- 20 -

22 (including, without limitation, attorneys' fees and disbursements), shall be paid by Borrower upon notice from Lender, with interest at the Default Rate and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Security Instrument.

(i)    The interests and rights of Lender under the Note, this Security Instrument or any of the Other Security Documents shall not be impaired by any indulgence, including, without limitation, (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Guarantor or surety of any of the Debt.

(j)    **Environmental Compliance**.  If an Event of Default exists, Lender may, at Lender's election and by or through Trustee or otherwise, exercise any and all of the following rights, remedies and recourses:

(i)    With or without notice, and without releasing Borrower from any obligation hereunder, to cure any Event of Default and, in connection therewith, Lender or its agents, acting by themselves or through a court appointed receiver, may, subject to the rights of tenants, enter upon the Property or any part thereof and perform such acts and things as Lender deems reasonably necessary to inspect, investigate, assess, and protect the security hereof, including without limitation of any of its other rights:  (a) to obtain a court order to enforce Lender's right to enter and inspect the Property under California Civil Code Section 2929.5, to which the decision of Lender as to whether there exists a release or threatened release of a Hazardous Materials (as defined in any Environmental Indemnity of even date herewith given by Borrower and Guarantor in favor of Lender relating to Property) in onto the Property shall be deemed reasonably and conclusive as between the parties hereto; and (b) to have a receiver appointed under California Code of Civil Procedure Section 564 to enforce Beneficiary's right to enter and inspect the Property for Hazardous Materials.  All costs and expenses incurred by Beneficiary with respect to the audits, tests, inspections, and examinations which Beneficiary or its agents or employees may conduct, including the fees of the engineers, laboratories, contractors, consultants, and attorneys, shall be paid by Grantor.  All costs and expenses incurred by Trustee and Lender pursuant to this subparagraph (j) (including, without limitation, court costs, consultant fees and reasonable attorney fees, whether incurred in litigation or not and whether before or after judgment) shall bear interest at the greater of ten percent (10%) per annum or the "Default Rate" (as specified in the Note), from the date they are incurred until said sums have been paid.

(ii)    To seek a judgment that Borrower has breached its covenants, representations and/or warranties with respect to the environmental matters set forth in the Environmental Indemnity, by commencing and maintaining an action or actions in any court of competent jurisdiction for breach of contract pursuant to California Code of Civil Procedure Section 736, whether commenced prior to foreclosure of the Property, and to seek the recovery of any and all costs, damages, expenses, fees, penalties, fines, judgments, indemnification payments to third parties, and other out-of-pocket costs or expenses actually incurred by Beneficiary

- 21 -

(collectively, the "**Environmental Costs**") incurred or advanced by Lende relating to the cleanup, remediation or other response action required by applicable law or to which Lender believes necessary to protect the Property, it being conclusively presumed between Lender and Borrower that all such Environmental Costs incurred or advanced by Lender relating to the cleanup, remediation, or other responsive action for the Property were made by Lender in good faith. All Environmental Costs incurred by Lender under this subparagraph (including, without limitation, court costs, consultant fees and attorneys' fees, whether incurred in litigation or not and whether before or after judgment) shall bear interest at the Default Rate from the date of expenditure until said sums have been paid. Lender shall be entitled to bid, at the sale of the Property held under the Ownership Interests Pledge and Security Agreement dated as of the date hereof, the amount of said costs, expenses and interest in addition to the amount of the other obligations hereby secured as a credit bid, the equivalent of cash.

Borrower acknowledges and agrees that notwithstanding any term or provision contained herein or in the Loan Documents, the Environmental Costs shall be exceptions to any limited recourse or exculpatory provision of the Loan Documents, and Borrower shall be fully and personally liable for the Environmental Costs hereunder, and such liability shall not be limited to the original principal amount of the obligations secured by this Security Instrument, and Borrower's obligations shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance, or any other transfer of the Property or this Deed of Trust. For the purposes of any action brought under this subparagraph, Borrower hereby waives the defense of laches and any applicable statute of limitations.

(iii)    To waive its lien against the Property or any portion thereof, whether fixtures or personal property, to the extent such property is found to be environmentally impaired in accordance with California Code of Civil Procedure Section 726.5 and to exercise any and all rights and remedies of an unsecured creditor against Borrower and all of Borrower's assets and property for the recovery of any deficiency and Environmental Costs, including, but not limited to, seeking an attachment order under California Code of Civil Procedure Section 483.010. As between Lender and Borrower, for purposes of California Code of Civil Procedure Section 726.5, Borrower shall have the burden of providing that Borrower or any related party (or any affiliate or agent of Borrower or any related party) was not in any way negligent in permitting the release or threatened release of Hazardous Materials. Borrower acknowledges and agrees that notwithstanding any term or provision contained herein or in the Loan Documents, all judgments and awards entered against Borrower shall be exceptions to any nonrecourse or exculpatory provision of the Loan Documents, and Borrower shall be fully and personally liable for all judgments and awards entered against Borrower hereunder and such liability shall not be limited to the original principal amount of the obligations secured by this Security Instrument and Borrower's obligations shall survive the foreclosure, deed in lieu of foreclosure, release, reconveyance, or any other transfer of the Property or this Security Instrument. For the purposes of any action brought under this subparagraph, Borrower hereby waives the defense of laches and any applicable statute of limitations.

- 22 -

SECTION 23. **Sale of Property; Multiple Collateral.**

(a) If the Property consists of two or more distinct parcels and this Security Instrument is foreclosed, whether pursuant to the power of sale herein granted to Lender, or otherwise, the Property, or any interest therein, may, at the discretion of Lender, be sold in bulk, in one or more parcels or in several interests or portions and in any order or manner as the Lender may elect and specify in the notice of sale.

(b) If the indebtedness secured by this Security Instrument is also secured by one or more other security instruments on property consisting of more than one functionally separate and distinct property and an Event of Default has occurred and is continuing under this Security Instrument or any such other deed of trust which is cross-defaulted with this Security Instrument, upon a foreclosure of this Security Instrument and such other security instruments, whether pursuant to a power of sale or otherwise, the Property, or any interest therein, and the property encumbered by such other security instruments may, at the discretion of Lender, be sold in the order designated by Lender in the notice of sale.

SECTION 24. **Right to Cure Defaults.**

Upon the occurrence of any Event of Default, or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Security Instrument or collect the Debt, and the cost and expense thereof (including attorneys' fees), with interest, shall constitute a portion of the Debt and shall be due and payable to Lender within ten (10) Business Days demand therefor. All such costs and expenses incurred by Lender in remedying such Event of Default or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from the date that such cost or expense was incurred by Lender to the date of payment to Lender, as provided in Section 16 hereof. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Other Security Documents and shall be immediately due and payable upon demand by Lender therefor.

SECTION 25. **Late Payment Charge.**

If any portion of the Debt is not paid when due, Borrower shall pay to Lender upon demand an amount equal to ten percent (10%) of such unpaid portion of the Debt, to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such amount shall be secured by this Security Instrument and the Other Security Documents.

SECTION 26. **Prepayment After Event of Default.**

If following the occurrence of any Event of Default, Borrower shall tender payment of an amount sufficient to satisfy the Debt in whole or in part at any time prior to a foreclosure sale of the Property, and if at the time of such tender prepayment of the principal balance of the Note is not permitted by the Note, Borrower shall, in addition to the entire Debt, also pay to Lender a sum equal to interest which would have accrued on the principal balance of the Note at the interest rate set forth in the Note from the date of such tender to the earlier of (i) the Maturity Date as defined in the Note, or (ii) the first day of the period during which prepayment of the principal balance of the Note would have been permitted together with a prepayment consideration equal to the prepayment consideration which would have been payable as of the first day of the period during which prepayment would have been permitted. If at the time of such tender prepayment of the principal balance of the Note is permitted, such tender by Borrower shall be deemed to be a voluntary prepayment of the principal balance of the Note, and Borrower shall, in addition to the entire Debt, also pay to Lender the applicable prepayment consideration specified in the Note.

SECTION 27. **Reasonable Use and Occupancy.**

In addition to the rights which Lender may have herein, upon the occurrence of any Event of Default, Lender, at its option, may require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower or may require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

SECTION 28. **Right of Entry.**

Subject to the rights of tenants and upon no less than one (1) Business Day prior notice (unless an Event of Default shall then exist), Lender and its agents shall have the right to enter and inspect the Property at all times.

SECTION 29. **Appointment of Receiver.**

Lender, upon the occurrence of an Event of Default or in any action to foreclose this Security Instrument or in any non-judicial foreclosure proceeding commenced pursuant to the California Statutes or upon the actual or threatened waste to any part of the Property, shall be entitled to the appointment of a receiver without notice and without regard to the value of the Property as security for the Debt, or the solvency or insolvency of any person liable for the payment of the Debt.

SECTION 30. **Security Instrument.**

This Security Instrument is both a real property deed of trust and a "Security Instrument" within the meaning of the UCC. The Property includes both real and personal property

- 24 -

and all other rights and interests, whether tangible or intangible in nature, including the Intangibles, of Borrower in the Property. Borrower, by executing and delivering this Security Instrument, has granted and hereby grants to Lender, as security for the Debt, a security interest in the Property to the full extent that the Property may be subject to the UCC (said portion of the Property so subject to the UCC being called in this Section 30 the "**Collateral**"). Upon the occurrence and during the existence of an Event of Default, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender, Borrower shall at its expense assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender. Borrower shall pay to Lender within ten (10) days after written demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Borrower hereby gives and grants to Lender a continuing lien on, security interest in and, during the existence of an Event of Default, right of set-off against all moneys, securities and other property of Borrower and the proceeds thereof, now on deposit or now or hereafter delivered, remaining with or in transit in any manner to Lender, its correspondents, participants or its agents from or for Borrower, whether for safekeeping, custody, pledge, transmission, collection or otherwise or coming into possession of Lender in any way, and also, any balance of any individual deposit account and credits of Borrower with, and any and all claims of Borrower against Lender, at any time existing, as collateral security for the payment of the Debt and all of the other obligations of the Borrower under this Security Instrument, including fees, contracted with or acquired by Lender, whether joint, several, absolute, contingent, secured, matured or unmatured (for the purposes of this Section 30, collectively, the "**Liabilities**"), hereby authorizing Lender at any time or times during the continuance of an Event of Default, without prior notice, to apply such balances, credits or claims, or any part thereof, to the Liabilities in such amounts as it may select, whether contingent, unmatured or otherwise, and whether any collateral security therefor is deemed adequate or not. The collateral security described herein shall be in addition to any collateral security described in any separate agreement executed in connection with this Security Instrument.

SECTION 31. **Actions and Proceedings.**

Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of

Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property. Lender shall, at its option, be subrogated to the lien of any deed of trust or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

SECTION 32. **Waiver of Jury Trial and Counterclaim.**

EACH OF LENDER (BY ITS ACCEPTANCE HEREOF) AND BORROWER, TO THE FULLEST EXTENT PERMITTED BY LAW, DOES HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS AGREEMENT OR ANY CONDUCT, ACT OR OMISSION OF LENDER, TRUSTEE OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.    BORROWER HEREBY WAIVES THE RIGHT TO ASSERT A COUNTERCLAIM IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY LENDER (OTHER THAN COMPULSORY COUNTERCLAIMS).

SECTION 33. **Marshalling and Other Matters.**

Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

SECTION 34. **Recovery of Sums Required To Be Paid.**

Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

SECTION 35. **Hazardous Materials.**

Borrower represents and warrants that, to Borrower's knowledge, (a) there are no "Hazardous Materials" (as such quoted term is hereinafter defined) on the Property in violation of

- 26 -

applicable environmental laws, and (b)no owner or occupant nor any prior owner or occupant of the Property, has received any notice or advice from any governmental agency or any source whatsoever with respect to Hazardous Materials on, from or affecting the Property which has not been cured or remediated in compliance with all applicable environmental laws.   Borrower covenants that the Property shall be kept free of Hazardous Materials, and neither Borrower nor any occupant of the Property shall use, transport, store, dispose of or in any manner deal with Hazardous Materials on the Property.  Borrower shall comply with and ensure compliance by all occupants of the Property with, all applicable federal, state and local laws, ordinances, rules and regulations, and shall keep the Property free and clear of any liens imposed pursuant to such laws, ordinances, rules and regulations.  In the event that Borrower receives any notice or advice from any governmental agency or any source whatsoever with respect to Hazardous Materials on, from or affecting the Property, Borrower shall immediately notify Lender.  Borrower shall conduct and complete all investigations, studies, sampling, and testing, and all remedial actions necessary to clean up and remove all Hazardous Materials from the Property in accordance with all applicable federal, state and local laws, ordinances, rules and regulations.  The term **"Hazardous Materials"** as used in this Security Instrument shall include, without limitation, (i) petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; (ii) explosives; (iii) flammable materials; (iv) radioactive materials; (v) polychlorinated biphenyls ("PCBs") and compounds containing them; (vi) lead and lead-based paint; (vii) asbestos or asbestos-containing materials in any form that is or could become friable; (viii) underground or above-ground storage tanks, whether empty or containing any substance; (ix) mold (defined as the presence of any form of (a) multicellular fungi that live on plant or animal matter and an indoor environment (including without limitation Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor, and Stachybotrys chartarum (SC) often found in water damaged building materials), (b) spores, scents or byproducts produced or released by fungi, including mycotoxins and (c) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living); (x) any substance the presence of which on the Property is prohibited by any federal, State or local authority; (xi) any substance that requires special handling; and (xii) any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any applicable environmental law.  The obligations and liabilities of Borrower under this Section 35 shall survive any entry of a judgment of foreclosure or the delivery of a deed in lieu of foreclosure of this Security Instrument.

SECTION 36. **Indemnification.**

Borrower shall protect, defend, indemnify and save harmless Lender and Trustee from and against all liabilities, obligations, claims, damages (other than consequential damages, except to the extent alleged or imposed upon Lender by a third party), penalties, causes of action, costs and expense (including without limitation attorneys' fees and expenses), imposed upon or incurred by or asserted against Lender or Trustee by reason of (a) ownership of this Security Instrument, the Property or any interest therein or receipt of any Rents; (b) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any

- 27 -

part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any failure on the part of Borrower to perform or comply with any of the terms of this Security Instrument; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (f) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Real Estate, Broker and Barter Exchange Transactions, which may be required in connection with this Security Instrument, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Security Instrument is made; (g) any claim for brokerage fees or other consideration from any broker in connection with the loan secured by this Security Instrument, except to the extent, if any, Lender may have agreed pursuant to a separate agreement to compensate the broker engaged by Borrower; (h) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials, from, or affecting the Property; (i) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Materials; (j) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Materials; or (k) any violation of laws, orders, regulations, requirements, or demands of government authorities, which are based upon or in any way related to such Hazardous Materials including, without limitation, the costs and expenses of any remedial action, attorney and consultant fees, investigation and laboratory fees, court costs, and litigation expenses. Any amounts payable to Lender or Trustee by reason of the application of this Section 36 shall become due within ten (10) days after written demand and shall bear interest at the Default Rate from the date such written demand is received until paid. The obligations of Borrower under this Section 36 shall survive any entry of judgment of foreclosure or delivery of a deed in lieu of foreclosure of this Security Instrument.

SECTION 37. **Notices.**

Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower, the Borrower's successors or assigns provided for in this Security Instrument or in the Note or pursuant to the California Statutes in a proceeding to foreclose this Security Instrument by power of sale shall be given in writing by sending such notice by a recognized overnight courier with postage, freight and any other charges paid, with a receipt therefor, addressed to Borrower at Borrower's address stated herein or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given in writing by sending such notice by a recognized overnight courier, with postage, freight and other charges paid, with a receipt therefor, addressed to Lender at Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein, with a copy of same given in the manner herein provided to Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, New York 10017, Attn.: David S. Kriss, Esq. Except for any notice deemed under applicable law to have been given at a different time, any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender on the earlier

- 28 -

of (a) the first day after such notice is deposited with a courier in a manner designated herein or (b) the day such notice is actually received. Notices to Borrower and/or Lender may be given by counsel for the respective party.

SECTION 38. **Authority.**

(a) Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Security Instrument, and to mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, hypothecate and assign the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

(b) Borrower represents and warrants that Borrower is not a "foreign person" within the meaning of 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

SECTION 39. **Consent to Jurisdiction.**

**THE PARTIES HAVE ELECTED TO HAVE THIS SECURITY INSTRUMENT AND THEIR RIGHTS AND OBLIGATIONS HEREUNDER GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS. THE PARTIES HERETO HEREBY DECLARE THAT IT IS THEIR INTENTION THAT THIS AGREEMENT SHALL BE REGARDED AS MADE UNDER THE LAWS OF THE STATE OF CALIFORNIA AND THAT THE LAWS OF SAID STATE SHALL BE APPLIED IN INTERPRETING ITS PROVISIONS IN ALL CASES WHERE LEGAL INTERPRETATION SHALL BE REQUIRED. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES (A) TO BE SUBJECT TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND OF THE FEDERAL COURTS SITTING IN THE STATE OF CALIFORNIA, AND (B)(1) TO THE EXTENT SUCH PARTY IS NOT OTHERWISE SUBJECT TO SERVICE OF PROCESS IN THE STATE OF CALIFORNIA, TO APPOINT AND MAINTAIN AN AGENT IN THE STATE OF CALIFORNIA AS SUCH PARTY'S AGENT FOR ACCEPTANCE OF LEGAL PROCESS AND NOTIFY THE OTHER PARTY OR PARTIES OF THE NAME AND ADDRESS OF SUCH AGENT AND (2) THAT SERVICE OF PROCESS MAY, TO THE FULLEST EXTENT PERMITTED BY LAW, ALSO BE MADE ON SUCH PARTY BY PREPAID CERTIFIED MAIL WITH A PROOF OF MAILING RECEIPT VALIDATED BY THE UNITED STATE POSTAL SERVICE CONSTITUTING EVIDENCE OF VALID SERVICE, AND THAT SERVICE MADE PURSUANT TO (B)(1) OR (2) ABOVE SHALL, TO THE FULLEST EXTENT PERMITTED BY LAW, HAVE THE SAME LEGAL FORCE AND EFFECT AS IF SERVED UPON SUCH PARTY PERSONALLY WITHIN THE STATE OF CALIFORNIA. THE INVALIDITY, ILLEGALITY OR UNENFORCEABILITY OF ANY**

**PROVISION OF THIS SECURITY INSTRUMENT SHALL NOT AFFECT OR IMPAIR THE VALIDITY, LEGALITY OR ENFORCEABILITY OF THE REMAINDER OF THIS SECURITY INSTRUMENT, AND TO THIS END, THE PROVISIONS OF THIS SECURITY INSTRUMENT ARE DECLARED TO BE SEVERABLE.**

THIS DEED OF TRUST HAS BEEN EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF DELAWARE AND, EXCEPT AS OTHERWISE PROVIDED IN HEREIN, THIS DEED OF TRUST, THE NOTE AND EACH OF THE OTHER SECURITY DOCUMENTS SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE DELAWARE GENERAL OBLIGATIONS LAW).

NOTWITHSTANDING THE FOREGOING CHOICE OF LAW:

(i)    THE PROCEDURES GOVERNING THE ENFORCEMENT BY BENEFICIARY AND/OR TRUSTEE OF ITS FORECLOSURE, POWER OF SALE, AND OTHER REMEDIES AGAINST BORROWER UNDER THIS DEED OF TRUST, THE NOTE AND UNDER THE OTHER SECURITY DOCUMENTS WITH RESPECT TO THE PREMISES OR OTHER ASSETS SITUATED IN THE STATE OF CALIFORNIA, INCLUDING BY WAY OF ILLUSTRATION, BUT NOT IN LIMITATION, ACTIONS FOR FORECLOSURE, FOR INJUNCTIVE RELIEF OR FOR THE APPOINTMENT OF A RECEIVER SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA;

(ii)    BENEFICIARY AND TRUSTEE SHALL COMPLY WITH APPLICABLE LAW IN THE STATE OF CALIFORNIA TO THE EXTENT REQUIRED BY THE LAW OF SUCH JURISDICTION IN CONNECTION WITH THE FORECLOSURE AND/OR POWER OF SALE OF THE SECURITY INTERESTS AND LIENS CREATED UNDER THIS DEED OF TRUST, THE NOTE AND THE OTHER SECURITY DOCUMENTS WITH RESPECT TO THE PREMISES OR OTHER ASSETS SITUATED IN THE STATE OF CALIFORNIA; AND

(iii)    PROVISIONS OF FEDERAL LAW AND THE LAW OF THE STATE OF CALIFORNIA SHALL APPLY IN DEFINING THE TERMS HAZARDOUS SUBSTANCES AND ENVIRONMENTAL LAWS (AS SUCH TERMS ARE DEFINED IN THE OTHER SECURITY DOCUMENTS) APPLICABLE TO THE PREMISES.

NOTHING CONTAINED HEREIN OR ANY OTHER PROVISIONS OF THIS DEED OF TRUST, THE NOTE OR OTHER SECURITY DOCUMENTS SHALL BE CONSTRUED TO PROVIDE THAT THE SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA SHALL APPLY TO ANY PARTIES, RIGHTS AND OBLIGATIONS UNDER THE NOTE, THIS DEED OF TRUST OR THE OTHER SECURITY DOCUMENTS, WHICH,

EXCEPT AS EXPRESSLY PROVIDED IN CLAUSES (i), (ii) AND (iii) OF THIS SECTION 54, ARE AND SHALL CONTINUE TO BE GOVERNED BY THE SUBSTANTIVE LAW OF THE STATE OF DELAWARE. IN ADDITION, THE FACT THAT PORTIONS OF THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS MAY INCLUDE PROVISIONS DRAFTED TO CONFORM TO THE LAW OF THE STATE OF CALIFORNIA IT IS NOT INTENDED, NOR SHALL IT BE DEEMED, IN ANY WAY, TO DEROGATE THE PARTIES' CHOICE OF LAW AS SET FORTH OR REFERRED TO IN THE NOTE, THIS DEED OF TRUST OR IN THE OTHER SECURITY DOCUMENTS.    THE PARTIES FURTHER AGREE THAT THE BENEFICIARY AND TRUSTEE MAY ENFORCE ITS RIGHTS UNDER THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS INCLUDING, BUT NOT LIMITED TO, ITS RIGHTS TO SUE THE BORROWER OR TO COLLECT ANY OUTSTANDING INDEBTEDNESS IN ACCORDANCE WITH APPLICABLE LAW.

SECTION 40. **Participation/Assignment of Interests in this Security Instrument**

Borrower acknowledges that Lender may sell and assign this Security Instrument, any participation interests or other types of interests in this Security Instrument to one or more domestic or foreign banks, insurance companies, pension funds, trusts or other institutional lenders or other persons, parties or investors (including, but not limited to, grantor trusts, owner trusts, special purpose corporations, REMICs, real estate investment trusts or other similar or comparable investment vehicles as may be selected by Lender in its sole and absolute discretion) on terms and conditions satisfactory to Lender in its sole and absolute discretion. Borrower grants to Lender, and shall cause each Guarantor and other person or party associated or connected with this Security Instrument or the Collateral therefore to grant to Lender the right to distribute on a confidential basis financial and other information concerning Borrower, each such Guarantor and other person or party and the property encumbered by this Security Instrument and any other pertinent information with respect to this Security Instrument to any party who has purchased a participation interest in this Security Instrument who has expressed an interest in purchasing any such interest in this Security Instrument.

Lender may provide to any actual or potential purchaser, transferee, assignee, servicer, participant or investor or any rating agency, all documents and information which Lender now has or may hereafter acquire relating to the Loan, Borrower, Guarantor any other party to the Loan or the Property which shall have been furnished by or on behalf of Borrower, Guarantor or any other party to the Loan, as Lender in its discretion determines is desirable. Borrower shall cooperate with Lender with the same, including providing such information and documents as Lender may reasonably request.

Lender, without in any way limiting Lender's other rights under the Loan Documents, in its sole and absolute discretion, shall have the right, at any time, with respect to all or any portion of

- 31 -

the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided. Without limiting the foregoing, Lender may (i) cause the Note and the Security Instrument to be split into a first and second mortgage loan, (ii) create one or more senior and subordinate notes (i.e., an A/B or A/B/C structure), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (iv) otherwise sever the Loan into two (2) or more loans secured by mortgages and by a pledge of partnership or membership interests (directly or indirectly) in Borrower (i.e., a senior loan/mezzanine loan structure), in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes. Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any material economic term of the Loan, or (ii) materially increase the obligations, or decrease the rights, of Borrower under the Loan Documents; provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. If requested by Lender, Borrower (and Borrower's constituent members, if applicable, and Guarantors) shall execute within five (5) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance. At Lender's election, each note comprising the Loan may be subject to one or more securitizations. Lender shall have the right to modify the Note and/or Notes and any components in accordance herewith, provided that such modification shall comply with the terms hereof, it shall become immediately effective.

In connection with any actions taken by Lender in accordance with this Section 40, Lender shall be permitted, without the consent of Borrower, to appoint a servicer and/or an administrative agent (collectively, the "Agent"), which may or may not be an affiliate of Lender, as the agent of Lender under this Agreement and the other Loan Documents to take such action on Lender's behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to Agent by Lender in a separate agreement between Lender and Agent, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement and the Loan Documents, an Agent shall not have any duties or responsibilities, except those expressly set forth herein or therein, or any fiduciary relationship with Lender or any other lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any Loan Document or otherwise exist against an Agent.

SECTION 41. **Intentionally Omitted.**

SECTION 42. **Remedies of Borrower.**

In the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case whereby law or under the Note, this Security Instrument or the Other Security Documents, it has an obligation to act promptly, Lender shall not be liable for any monetary damages, and Borrower's remedies shall be limited to injunctive relief or declaratory judgment. Under no circumstances shall Lender and/or any of its parents, affiliates, subsidiaries or other related parties and/or any of their respective officers, directors, shareholders, agents, and/or employees (all of the foregoing being collectively referred to as the "Lender Parties") have any personal liability in connection with the Note, this Security Instrument and/or any of the other Security Documents or anything, matter or circumstance related thereto.

SECTION 43. **Sole Discretion of Lender.**

Wherever pursuant to this Security Instrument, Lender and/or Trustee exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender and/or Trustee, as applicable, the decision of Lender and/or Trustee, as applicable, to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender and/or Trustee, as applicable, and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

SECTION 44. **Non-Waiver.**

The failure of Lender and/or Trustee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender and/or Trustee to comply with any request of Borrower or Guarantors to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (b) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument, or the Other Security Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. During the continuance of an Event of Default, Lender and/or Trustee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender and Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender and/or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender and Trustee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

SECTION 45. **Security Deposits**

Borrower shall establish a rent security account with a financial institution designated by lender

- 33 -

to which shall be transferred and maintained all security deposits in connection with the Leases affecting the Property. Upon an Event of Default under this Security Instrument, Lender shall be permitted to utilize the security deposits in accordance with the applicable underlying leases.

SECTION 46. **No Oral Change.**

This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

SECTION 47. **Liability.**

If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of Borrower, Lender and Trustee and their respective successors and assigns forever.

SECTION 48. **Inapplicable Provisions.**

If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

SECTION 49. **Headings, etc.**

The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

SECTION 50. **Duplicate Originals.**

This Security Instrument may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

SECTION 51. **Definitions.**

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "**each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein**", the word "**Lender**" shall mean "**Lender and any subsequent holder of the Note**", the word "**person**" shall include an individual, corporation, limited liability company, partnership, trust,

unincorporated association, government, governmental authority, and any other entity, and the words "**Property**" shall include any portion of the Property and any interest therein. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

SECTION 52. **Intentionally Omitted.**

SECTION 53. **Publicity.**

Borrower agrees that Lender may issue press releases concerning its financing of the Property pursuant to the Note, this Security Instrument and the Other Security Documents. Further, if Lender is financing any construction at the Property, whether pursuant to the Note, this Security Instrument or the Other Security Documents, Lender shall be entitled to maintain a sign of reasonable dimension and location at the construction site advertising and promoting such financing.

SECTION 54. **ERISA.**

(a)     Borrower is not an employee benefit plan (as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time ("**ERISA**")) whether or not subject to ERISA or a plan or other arrangement within the meaning of Section 4975 of Internal Revenue Code of 1986 (as amended, as it may be further amended from time to time, and any successor statutes thereto, and all applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form) (the "**Code**") (each, a "**Plan**") and none of the assets of Borrower constitute or will constitute, by virtue of the application of 29 C.F.R. §2510.3-101(f) as modified by section 3(42) of ERISA, assets of a Plan within the meaning of section 29 C.F.R. Section 2510.3-101, as modified by section 3(42) of ERISA, or similar law ("**Plan Assets**"). In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA and (b) transactions by or with Borrower are not subject to State statutes regulating investment of, and fiduciary obligations with respect to, governmental plans similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Security Instrument.

(b)     During the term of the Loan or of any obligation or right hereunder, Borrower shall not be a Plan and none of the assets of Borrower shall constitute Plan Assets.

- 35 -

(c)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, and represents and covenants that (i) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to State statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(1) Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(2) Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2); or

(3) Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e).

SECTION 55. **Joint and Several Obligation.**

Notwithstanding anything to the contrary, the representations, warranties, covenants and/or agreements made by Borrower (should the Borrower consist of one or more individuals or entities), herein and/or in any of the other Security Documents and the liability of the Borrower hereunder or thereunder, is joint and several.

SECTION 56. **Purpose of Loan.**

The Borrower represents to Lender that the loan evidenced by the Note and secured by this Security Instrument ("**Loan**") is for business or commercial purposes only and not for personal, family, consumer or household purposes. Borrower acknowledges that Lender has made the Loan to Borrower in reliance upon the above representation by Borrower. The above representation by Borrower will survive the closing and repayment of the Loan.

SECTION 57. **Patriot Act.**

Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Borrower and the Property, including those relating to money laundering and terrorism. The Lender shall have the right to audit the Borrower's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the

- 36 -

Borrower and the Property, including those relating to money laundering and terrorism. In the event that the Borrower fails to comply with the Patriot Act or any such requirements of governmental authorities, then the Lender may, at its option, cause the Borrower to comply therewith and any and all reasonable costs and expenses incurred by the Lender in connection therewith shall be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable. For purposes hereof, the term **"Patriot Act"** means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

Neither the Borrower nor any partner in the Borrower or member of such partner nor any owner of a direct or indirect interest in the Borrower (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is not currently under investigation by any governmental authority for alleged criminal activity. For purposes hereof, the term **"Patriot Act Offense"** means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term **"Government Lists"** means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control (**"OFAC"**), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Governmental Lists".

SECTION 58. **Entire Agreement.**

The Note, this Security Instrument, and the Other Security Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt (as such term is defined in the Note) and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, this Security Instrument and the Other Security Documents, there are not, and were not, and no persons

are or were authorized by Lender to make any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, this Security Instrument and the Other Security Documents. The Borrower further recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the Borrower relied to its detriment upon such "oral modification of the loan document". For that reason, and in order to protect the Lender from such allegations in connection with the transactions contemplated by this Security Instrument and in the Note and Other Security Documents, the Borrower acknowledges that this Security Instrument, the Note, the Other Security Documents, and all instruments referred to in any of them can be extended, modified or amended only in writing executed by the Lender and that none of the rights and benefits of the Lender can be waived permanently except in a written document executed by the Lender and Borrower. The Borrower further acknowledges the Borrower's understanding that no officer or administrator of the Lender has the power or the authority from the Lender to make an oral extension or modification or amendment of any such instrument or agreement on behalf of the Lender.

SECTION 59. **Maximum Principal Amount Secured.**

Notwithstanding anything to the contrary contained in this Security Instrument, the Note or the other Loan Documents, the maximum amount of principal indebtedness secured by this Security Instrument at the time of execution hereof or which under any contingency may become secured by this Security Instrument at any time hereafter is **$2,350,000.00**, plus (a) taxes, charges or assessments which may be imposed by law upon the Property, (b) premiums on insurance policies covering the Property and (c) expenses incurred in upholding the lien of this Security Instrument, including, but not limited to (1) the expenses of any litigation to prosecute or defend the rights and lien created by this Security Instrument, (2) any amount, cost or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority and (3) interest at the Default Rate or at the Interest Rate (in each case, as defined in the Note).

SECTION 60. **Single Purpose Entity.**

Borrower's organizational documents shall provide that until such time that the Debt is paid in full that:

        (a)    Borrower has not owned, does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership, management or operation of the Property.

(b)    Borrower has not engaged, does not engage, and will not engage in any business other than the ownership, management and operation of the Property and Borrower will conduct and operate its business as presently conducted and operated.

(c)    Borrower has not entered and is not a party to and will not enter into or be a party to any contract or agreement with any affiliate of Borrower, any constituent party of Borrower or any affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d)    Borrower has not incurred and will not incur any indebtedness other than (i) the Loan and the Senior Loan (as hereinbefore defined) and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding one percent (1%) of the original principal amount of the Loan at any one time; provided that any indebtedness incurred pursuant to sub-clause (ii) shall be (x) not more than sixty (60) days past due and (y) incurred in the ordinary course of business. No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Property.

(e)    Borrower has not made and will not make any loans or advances to any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof) (including any affiliate or constituent party) (a "**Person**"), and has not acquired and shall not acquire obligations or securities of its affiliates.

(f)    Borrower is and will remain solvent and Borrower has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g)    Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless Lender has consented, amend, modify or otherwise change its partnership certificate,

- 39 -

partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents.

(h) Borrower has maintained and will maintain all of its accounts, books, records, financial statements and bank accounts separate from those of its affiliates and any other Person. Borrower's assets have not been and will not be listed as assets on the financial statement of any other Person; provided, however, that Borrower's assets may be included in a consolidated financial statement of its affiliates if (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliates or any other Person, and (ii) such assets shall be listed on Borrower's own separate balance sheet. Borrower has and will file its own tax returns (to the extent Borrower is required to file any such tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has maintained and shall maintain its books, records, resolutions and agreements as official records.

(i) Borrower has been and will be, and has held and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Borrower or any constituent party of Borrower), has corrected and shall correct any known misunderstanding regarding its status as a separate entity, has conducted and shall conduct business in its own name, has not identified and shall not identify itself or any of its affiliates as a division or part of the other, and has maintained and shall maintain and utilize separate stationery, invoices and checks bearing its own name.

(j) Borrower has maintained and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k) Neither Borrower nor any constituent party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(l) Borrower has not commingled and will not commingle the funds and other assets of Borrower with those of any affiliate or constituent party or any other Person and has held and will hold all of its assets in its own name.

- 40 -

(m)    Borrower has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party or any other Person.

(n)    Borrower has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Borrower will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)    Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all the representations, warranties and covenants contained within the Loan Documents, and (ii) all the organizational documents of Borrower.

(p)    Borrower has not permitted and will not permit any affiliate or constituent party independent access to its bank accounts.

(q)    Borrower has paid and shall pay the salaries of its own employees (if any) from its own funds and has and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations.

(r)    Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred.

(s)    Borrower has not, and without the unanimous consent of all of its members or managers will not, take any action that might reasonably be expected to cause Borrower to become insolvent.

(t)    Borrower has allocated and will allocate fairly and reasonably any shared expenses, including shared office space.

(u)    Notwithstanding any provision of the operating agreement or any amendment thereto, except in connection with the Loan or any prior mortgage financing that has been fully paid and discharged in full prior to the date hereof, Borrower has not pledged and will not pledge its assets for the benefit of any other Person.

(v)    Borrower either (i) has no, and will have no, obligation to indemnify its officers, directors, managers, members, shareholders or partners, as the

- 41 -

case may be, or (ii) if it has any such obligation, such obligation is fully subordinated to the Loan and will not constitute a claim against Borrower if cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation.

(w)     Borrower will consider the interests of Borrower's creditors in connection with all limited liability company actions.

(x)     Except as provided in the Loan Documents, Borrower has not and will not have any of its obligations guaranteed by any affiliate.

(y)     Borrower shall not be divided into one (1) or more than one (1) entity.

## SECTION 61. **Single Asset Real Estate.**

Borrower hereby represents and warrants that the Property constitutes "single asset real estate" as defined in, and pursuant to, Section 101(51B) of the United States Bankruptcy Code.

## SECTION 62. **Intentionally Omitted.**

## SECTION 63. **Cross Default.**

This Security Instrument, the Note, and the Loan Documents are cross defaulted with any other loan made by Borrower to Lender, including, but not limited to, the Senior Loan (the "Cross Default Loans").   Upon the occurrence of an Event of Default hereunder, Borrower shall be permitted to exercise all remedies under the Security Instrument, the accompanying note and the loan documents of the Cross Default Loans. Upon the occurrence of an Event of Default under any of the Cross Default Loans, Lender shall be permitted to exercise all remedies under this Security Instrument, the Note and Loan Documents.

## SECTION 64. **Savings Clause.**

Lender hereby irrevocably agrees that the obligations of Borrower under this Security Instrument and the Note are limited to the maximum amount that would not render Borrowers obligations subject to avoidance under applicable fraudulent conveyance provisions of the United States Bankruptcy Code.   Borrower hereby represents that the Property, based on an appraisal thereof, is sufficient to secure the Debt. By virtue of the contribution of the Property to the lien of this Security Instrument, Borrower hereby represents that it is solvent as of the date hereof.

## SECTION 65. **Lien Priority.**

Subject to Permitted Encumbrances, this Security Instrument shall be a second (2nd) lien against the Property (subordinate only to the lien of the Senior Loan).

- 42 -

SECTION 66. **Deed of Trust Provisions.**

(a) Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's satisfaction. Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for gross negligence or willful misconduct, and hereby waives any statutory fee and agrees to accept compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Borrower and to Lender. Lender may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor, trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender. The procedure provided for in this Section 66 for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

(b) Borrower shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

(c) With the approval of Lender, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Lender) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Note, this Security Instrument or the Other Security Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trusts and powers hereof and to perform any duty hereunder either directly or through his agents or attorneys, (iii) to select and employ, in and about the execution of his duties hereunder, suitable accountants, engineers and other experts, agents and attorneys-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Lender may instruct Trustee to take to protect or enforce Lender's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Property for debts contracted for or liability or damages incurred in the management or operation of the Property except with respect to gross negligence or willful misconduct. Trustee shall have the right to rely on any instrument, document, or signature

authorizing or supporting an action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to compensation for such of Trustee's services hereunder as shall be rendered.

(d) All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

(e) Should any deed, conveyance, or instrument of any nature be required from Borrower by any Trustee or substitute trustee to more fully and certainly vest in and confirm to the Trustee or substitute trustee such estates rights, powers, and duties, then, upon request by the Trustee or substitute trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Borrower.

(f) Any substitute trustee appointed pursuant to any of the provisions hereof shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trusts of its or his predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Lender or of the substitute trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute trustee so appointed in the Trustee's place.

SECTION 67. **Representations, Warranties and Covenants Concerning Loan.**

**Borrower represents, warrants and covenants as follows:**

(a) Organization and Existence. Borrower is duly organized and validly existing as a limited liability company in good standing under the laws of the State of California, as applicable, and ill al other jurisdictions in which Borrower is transacting business. Borrower has the power and authority to execute, deliver and perform the obligations imposed on it under the Loan Documents to which it is a party and to consummate the transactions contemplated by the Loan Documents.

(b) Authorization. Borrower has taken all necessary actions for the authorization of the borrowing on account of the Loan and for the execution and delivery of the Loan Documents to which it is a party, including, without limitation, that those holders of direct or indirect interests in Borrower whose approval is required by the terms of Borrower's organizational documents have duly approved the transactions contemplated by the Loan Documents and have authorized execution and delivery thereof by the respective signatories. No other consent by any local, state or federal agency is required in connection with the execution and delivery of the Loan Documents

- 44 -

by Borrower and Guarantor. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

(c) <u>Valid Execution and Delivery</u>. All of the Loan Documents requiring execution by Borrower have been duly and validly executed and delivered by Borrower.

(d) <u>Enforceability</u>. All of the Loan Documents to which Borrower is a party constitute valid, legal and binding obligations of Borrower and are fully enforceable against Borrower in accordance with their terms by Lender and its successors, transferees and assigns, subject only to bankruptcy laws and general principles of equity.

(e) <u>No Conflict/Violation of Law</u>. The execution, delivery and performance by Borrower of the Loan Documents to which Borrower is a party will not cause or constitute a default under or conflict with the organizational documents of Borrower, any Guarantor or any member of Borrower or any Guarantor. The execution and delivery by Borrower of the Loan Documents to which Borrower is a party and the performance by Borrower of the obligations imposed on Borrower thereunder will not cause Borrower to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Borrower is a party or by which Borrower is bound. The execution and delivery by Guarantor of the Loan Documents to which Guarantor is a party and the performance by Guarantor of the obligations imposed on Guarantor thereunder will not cause Guarantor to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Guarantor is a party or by which Guarantor is bound.

(f) <u>Compliance with Applicable Laws and Regulations</u>. All of the Improvements and the use of the Property comply in all material respects with, and shall be in compliance in all material respects with, all applicable laws, zoning health, fire and subdivision ordinances (including, without limitation, parking requirements), rules, regulations, covenants and restrictions now or hereafter affecting or otherwise relating to the ownership, construction, occupancy (as applicable), use or operation of the Property, including all applicable laws, ordinances, rules and regulations, covenants and restrictions pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use, and Borrower has not received any notice of any violation of any of the foregoing. To the best of Borrower's knowledge after independent investigation, all certifications, permits, licenses, authorizations and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property have been obtained and are in full force and effect and Borrower shall take all actions necessary to file, keep and maintain all such certification, permits, licenses, authorizations and approvals current and in full force and effect at all times and to obtain any other certifications, permits, licenses, authorizations and approvals that may hereafter be required for the legal use, occupancy and operation of the Property.

(g) <u>Consents Obtained</u>. All consents, approvals, authorizations, orders or filings

with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Borrower have been obtained or made.

(h) No Litigation. There are no pending actions, suits or proceedings, arbitrations or governmental investigations against the Borrower, any Guarantor or the Property: (i) except as previously fully disclosed in writing by Borrower to Lender on a certification delivered by Borrower to Lender on the date hereof; and (ii) an adverse outcome of which would adversely affect in any material respect the value of the Property or the Borrower's performance under the Note, this Security Instrument or the other Loan Documents or the Guarantor's performance under the Loan Documents to which the Guarantor is a party.

(i) Second Lien. Upon the execution by the Borrower and the recording of this Security Instrument, and upon the filing of UCC-1 financing statements in the State of California and in the County of Los Angeles, the Lender will have a valid second (2nd) lien on the Property and a valid security interest in the Equipment subject to no liens, charges or encumbrances other than the Permitted Exceptions.

(j) ERISA. Borrower is not a party to, subject to, or has any obligations in respect of any employee benefit plan or any multi-employee plan.

(k) No Other Obligations. The Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Borrower is a party or by which the Borrower or the Property is otherwise bound, other than unsecured obligations incurred in the ordinary course of the operation of the Property (and Borrower is not in default of any of such obligations) and other obligations under this Security Instrument and the other Loan Documents.

(l) Fraudulent Conveyance. The Borrower has: (1) not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor; and (2) received equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan contemplated by the Loan Documents, the fair saleable value of the Borrower's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed the Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of the Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than the Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. The Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute too small of an amount of capital to carry out its business as conducted or as proposed to be conducted. The Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of the Borrower).

(m)Investment Company Act.  The Borrower is not: (1) an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended or (2) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(n)  Access/Utilities.  The Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities.  All public utilities necessary to the continued use and enjoyment of the Property as presently used and enjoyed are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property.

(o)  Taxes Paid.  Borrower has filed all federal, state, county and municipal tax returns required to have been filed by Borrower, and has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Borrower, and Borrower has no knowledge of any basis for additional assessment with respect to such taxes.

(p)  Single Tax Lot.  The Property consists of a single tax lot; no portion of said tax lot covers property other than the Property or a portion of the Property and no portion of the Property lies in any other tax lot.

(q)  Special Assessments.  Except as disclosed in the title insurance policy insuring the lien of this Security Instrument, there are no pending or, to the knowledge of the Borrower, proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to the knowledge of the Borrower, are there any contemplated improvements to the Property that may result in such special or other assessments.

(r)  Flood Zone.  The Property is not located in a flood hazard area as defined by the Federal Insurance Administration.

(s)  Seismic Exposure.  The Property is not located in Zone 3 or Zone 4 of the "Seismic Zone Map of the U.S.".

(t)  Misstatements of Fact.  No statement of fact made in the Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  To the best of Borrower's knowledge, there is no fact presently known to the Borrower which has not been disclosed which adversely affects, nor as far as the Borrower can foresee, might adversely affect the business, operations or condition (financial or otherwise) of the representing party.

(u)  Condition of Improvements.  The Property has not been damaged by fire, water, wind or other cause of loss which has not been fully restored or repaired.

(v)  No Insolvency or Judgment.  Neither Borrower, nor any member of Borrower, nor any Guarantor of the Loan is currently (a) the subject of or a party to any completed or pending

- 47 -

bankruptcy, reorganization or <u>insolvency</u> proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court of the state or district in which the Property is located or in any other court located in the United States.

(w)<u>No Condemnation</u>. No part of any property subject to this Security Instrument has been taken in condemnation or other like proceeding nor is any proceeding pending, or to the best of Borrower's knowledge, threatened or known to be contemplated for the partial or total condemnation or taking of the Property.

(x) <u>No Labor or Materialmen Claims</u>. All parties furnishing labor and materials have been paid in full, and except for such liens or claims <u>insured</u> against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmens' liens or claims outstanding for work, labor or materials affecting the Property, whether prior to, equal with or subordinate to the lien of this Security Instrument.

(y) <u>No Purchase Options</u>. No tenant, person, party, firm, corporation or other entity has an option to purchase the Property, any portion thereof or any interest therein.

(z) <u>Intentionally Omitted</u>.

(aa)    <u>Forfeiture</u>. There has not been and shall never be committed by Borrower any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(bb)    The Property contains a single-family residence.

(cc)    <u>No Defense/Default</u>. The Note, this Security Instrument and the other Loan Documents are not subject to any right of rescission, offset, abatement, set-off, counterclaim or defense, including the defense of usury, nor would the operation of any of the terms of the Note, this Security Instrument and the other Loan Documents, or the exercise of any right thereunder, render this Security Instrument unenforceable, in whole or in part, or subject to any <u>right</u> of rescission, offset, abatement, set-off, counterclaim or defense, including the defense of usury. The Loan complies with or is exempt from all applicable usury laws. No default, breach, violation or event of acceleration exists under this Security Instrument or any other Loan Documents.

(dd)    <u>No Agency, Partnership or Joint Venture</u>: Lender is not the agent or representative of Borrower, and Borrower is not the agent or representative of Lender. Borrower and Lender intend and agree that the relationship between them shall be solely that of creditor and debtor. Neither any provision in any of this Agreement nor any act or <u>omission</u> of Lender or Borrower shall be construed to create a partnership or joint venture between Borrower and Lender. This Agreement shall not make Lender liable to materialmen, contractors, craftsmen, laborers or others for goods delivered to or services performed by them upon the Project, or for debts or claims accruing to such parties against Borrower and there is no contractual relationship,

- 48 -

either expressed or implied, between Lender and any materialmen, subcontractors, craftsmen, laborers, or any other person supplying any work, labor.

SECTION 68. **Request For Notice**.  In accordance with California Civil Code Section 2924b, Borrower requests that copies of all notices of default and copies of all notices of sale under this Security Instrument be mailed to Borrower at the address set forth on the introductory paragraph hereto as provided by law.

SECTION 69. **California State Provisions.**

Additional Remedies Provisions.  Upon the occurrence and continuance of an Event of Default, Beneficiary shall have the following remedies under this Deed of Trust, in addition to any other remedies stated in this Deed of Trust (all of which are cumulative and nonexclusive):

A.      Judicial Action.  Bring an action in any court of competent jurisdiction to foreclose this Deed of Trust or to obtain specific performance of any covenant or agreement contained herein or in the other Loan Documents.

B.      Foreclosure By Power of Sale.

(i)      Should Beneficiary elect to foreclose by exercise of the power of sale herein contained, Beneficiary shall deliver to Trustee a written declaration of default and demand for sale, and shall deposit with Trustee this Deed of Trust and the Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(ii)      Upon receipt of notice from Beneficiary, Trustee shall cause to be recorded, published and delivered to Borrower such notice of default and election to sell as is then required by law.  Trustee shall, without demand on Borrower, after lapse of such time as may then be required by law and after recordation of such notice of default and after notice of sale having been given as required by law, sell the Property at the time and place of sale fixed by it in said notice of sale, either as a whole, or in separate lots or parcels or items and in such order as Beneficiary may direct Trustee so to do, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale.  Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matter or fact shall be conclusive proof of the truthfulness thereof.  Any person, including without limitation Borrower, Trustee or Beneficiary, may purchase at such sale, and Borrower hereby covenants to warrant and defend the title of such purchaser or purchasers.

(iii)      Subject to applicable law, Trustee may postpone the sale of all or any portion of the Property by public announcement at the time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently

- 49 -

noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

C.      Unified Sale of Real Property, Fixtures and Personal Property.  Notwithstanding any other provisions of this Deed of Trust, Beneficiary may elect to proceed against any or all of the real property, personal property and fixtures constituting the Property in any manner permitted under UCC Section 9501(4)(a) or any successor statute thereof; and if the Beneficiary elects to proceed in the manner permitted under UCC Section 9501(4)(a)(ii) or any successor statute thereof, Beneficiary may further elect to proceed by judicial or nonjudicial foreclosure with respect to all or any of the real property, personal property and fixtures covered hereby, as designated by Beneficiary, and Beneficiary or the Trustee (as applicable) are hereby authorized and empowered to conduct any such sale of any real property, personal property and fixtures in accordance with the procedures applicable to real property.  Where the Property consists of real property and personal property, any reinstatement of the Debt secured hereby, following an Event of Default and an election by the Beneficiary to accelerate the maturity of said obligation, which is made by Borrower or any other person or entity permitted to exercise the right of reinstatement under Section 2924c of the California Civil Code or any successor statute, shall not invalidate, rescind or otherwise affect any sale, disposition or other proceeding held or conducted with respect to any personal property or fixtures prior to such reinstatement.

D.      Receiver.  Borrower waives any right to any hearing or notice of hearing prior to the appointment of a receiver.  Such receiver and his agents shall be empowered (i) to take possession of the Property and any businesses conducted by Borrower or any other person thereon and any business assets used in connection therewith and, if the receiver deems it appropriate, to operate the same, (ii) to exclude Borrower and Borrower's agents, servants, and employees from the Property, (iii) to collect the rents, issues, profits, and income therefrom, (iv) to complete any construction which may be in progress, (v) to do such maintenance and make such repairs and alterations as the receiver deems necessary, (vi) to use all stores of materials, supplies, and maintenance equipment on the Property and replace such items at the expense of the receivership estate, (vii) to pay all taxes and assessments against the Property, all premiums for insurance thereon, all utility and other operating expenses, and all sums due under any prior or subsequent encumbrance, and (viii) generally to do anything which Borrower could legally do if Borrower were in possession of the Property.  All reasonable expenses incurred by the receiver or his agents shall constitute a part of the Debt.  Any revenues collected by the receiver shall be applied first to the expenses of the receivership, including attorneys' fees incurred by the receiver and by Beneficiary, together with interest thereon at the Default Rate from the date incurred until repaid, and the balance shall be applied toward the Debt or in such other manner as the court may direct.  Unless sooner terminated with the express consent of Beneficiary or by court order, any such receivership will continue until the Debt has been discharged in full, or until title to the Property has passed after foreclosure sale and all applicable periods of redemption have expired.  Beneficiary's rights hereunder include its rights under California Code of Civil Procedure Section 564, as such section may be amended from time to time.

E.    UCC.  Exercise any or all rights and remedies granted to a secured party upon default under the UCC, in such order and in such manner as Beneficiary, in its sole discretion but subject to applicable law, may determine, including, without limiting the generality of the foregoing: (i) the right to take possession of the personal property or any part thereof, and to take such other measures as Beneficiary may deem necessary for the care, protection and preservation of the personal property, and (ii) the right to require Borrower at its expense to assemble the personal property and make it available to Beneficiary at a convenient place acceptable to Beneficiary.  Any notice of sale, disposition or other intended action by Beneficiary with respect to the personal property sent to Borrower in accordance with the provisions hereof at least five (5) business days prior to such action, shall constitute commercially reasonable notice to Borrower.

F.    Action for Breach of Contract.  In accordance with California Code of Civil Procedure Section 736, as such section may be amended from time to time, Beneficiary may bring an action for breach of contract against Borrower for breach of any "environmental provision" (as such term is defined in such section) made by Borrower herein or in any other of the Loan Documents, for the recovery of damages and/or for the enforcement of the environmental provision.

G.    Waiver of Security.  In accordance with California Code of Civil Procedure Section 726.5, as such Section may be amended from time to time, Beneficiary may waive the security of this Deed of Trust as to any parcel of the Property that is "environmentally impaired" or is an "affected parcel" (as such terms are defined in such Section), and as to any personal property attached to such parcel, and thereafter may exercise against Borrower, to the extent permitted by such Section 726.5 and subject to paragraph 57 hereof, the rights and remedies of an unsecured creditor, including reduction of Beneficiary's claim against Borrower to judgment, and any other rights and remedies permitted by law.  In the event the Beneficiary elects, in accordance with California Code of Civil Procedure Section 726.5, to waive all or part of the security of this Deed of Trust and proceed against Borrower on an unsecured basis, the valuation of the real property, the determination of the environmentally impaired status of such security and any cause of action for a money judgment shall, at the request of Beneficiary, be referred to a referee in accordance with California Code of Civil Procedure Sections 638 et seq.  Such referee shall be an M.A.I. appraiser selected by Beneficiary and approved by Borrower, which approval shall not be unreasonably withheld or delayed.  The decision of such referee shall be binding upon both Borrower and Beneficiary, and judgment upon the award rendered by such referee shall be entered in the court in which such proceeding was commenced in accordance with California Code of Civil Procedure Sections 644 and 645.  Borrower shall pay all reasonable costs and expenses incurred by Beneficiary in connection with any proceeding under California Code of Civil Procedure Section 726.5, as such section may be amended from time to time.

H.    Credit Bids.  At any sale or disposition of any or all of the Property held or made under the power of sale granted in this Deed of Trust or in connection with judicial proceedings, or by virtue of a judgment and decree of foreclosure and sale, if Beneficiary is the purchaser at such sale or disposition Beneficiary shall have the right to offset its bid at such sale to the extent

of the Debt, including the portion of the Debt attributable to the expenses of sale, costs of any action and other sums for which Borrower is obligated to pay or reimburse Beneficiary or Trustee under this Deed of Trust.

Deed of Trust Not to Secure Indemnities or Guaranty Obligations. Notwithstanding anything in this Deed of Trust to the contrary, this Deed of Trust is not intended to, and by the express provisions hereof, does not secure (a) any environmental (i) covenant, (ii) obligation or (iii) indemnity of Borrower made or provided in that certain Environmental Indemnity Agreement executed in connection with the Loan, or (b) the obligations of any (i) guarantor of the Loan or (ii) third party indemnitor under the Environmental Indemnity Agreement or under any other indemnity.

Additional Waivers.

A.      Borrower has read and hereby approves the Note, this Deed of Trust, the other Loan Documents and all other agreements and documents relating thereto. Borrower acknowledges that it has been represented by counsel of its choice to review this Deed of Trust, the Note, the other Loan Documents and all other documents relating thereto and said counsel has explained and Borrower understands the provisions thereof.

B.      Borrower hereby expressly waives diligence, demand, presentment, protest and notice of every kind and nature whatsoever (unless as otherwise required under this Deed of Trust or the other Loan Documents) and waives any right to require Beneficiary to enforce any remedy against any guarantor of the Loan, endorser or other person whatsoever prior to the exercise of its rights and remedies hereunder or otherwise. To the extent enforceable under applicable law, Borrower waives any right to require Beneficiary to: (i) proceed or exhaust any collateral security given or held by Beneficiary in connection with the Debt; (ii) give notice of the terms, time and place of any public or private sale of any real or personal property security for the Debt or other guaranty of the Debt; or (iii) pursue any other remedy in Beneficiary's power whatsoever.

C.      Until the entire Debt shall have been paid in full, Borrower: (i) shall not have any right of subrogation to any of the rights of Beneficiary against any guarantor of the Loan, maker or endorser; (ii) waives any right to enforce any remedy which Beneficiary now has or may hereafter have against any other guarantor of the Loan, maker or endorser; and (iii) waives any benefit of, and any other right to participate in, any collateral security for the Debt or any guaranty of the Debt now or hereafter held by Beneficiary.

D.      No portion of the Debt shall be or be deemed to be offset or compensated by all or any part of any claim, cause of action, counterclaim, or cross-claim, whether liquidated or unliquidated, that Borrower may have or claim to have against Beneficiary. Borrower hereby waives, to the fullest extent permitted by applicable laws, the benefits of California Code of Civil Procedure 431.70.

Environmental Addendum. Without limitation of any of Beneficiary's other rights, Beneficiary may: (i) obtain a court order to enforce Beneficiary's right to enter and inspect the Property under California Civil Code §2929.5, to which the decision of Beneficiary as to whether Beneficiary reasonably believes that there is a substantial likelihood that there exists any Hazardous Materials on or about the Property in violation of any applicable laws, or a breach by Borrower of any environmental provision of this Deed of Trust or any of the other Loan Documents, will be deemed reasonable and conclusive as between the parties; and (ii) have a receiver be appointed pursuant to California Code of Civil Procedure §564 to enforce Beneficiary's right to enter and inspect the Property for the purpose set forth above. Borrower and Beneficiary agree that: (1) this paragraph is intended as Beneficiary's written request for information and Borrower's written response concerning the environmental condition of the Property as provided in California Code of Civil Procedure §726.5; and (ii) each representation, warranty or covenant, or indemnity made by Borrower in this Deed of Trust or in the other Loan Documents that relates to the environmental condition of the Property is intended by Borrower and Beneficiary to be an "environmental provision" for the purposes of California Code of Civil Procedure §736 and will survive the payment of the Indebtedness and the termination or expiration of this Deed of Trust and will not be affected by Beneficiary's acquisition of any interest in the Property whether by full credit bid at foreclosure, deed in lieu of foreclosure, or otherwise. If there is any transfer of any portion of Borrower's interest in the Property, any successor-in-interest to Borrower agrees by its succession to that interest that the written request made pursuant to this paragraph will be deemed remade to the successor-in-interest without any further or additional action on the part of Beneficiary and that by assuming the Debt secured by this Deed of Trust or by accepting the interest of Borrower subject to the lien of this Deed of Trust, the successor remakes each of the representations and warranties in this Deed of Trust and agrees to be bound by each covenant in this Deed of Trust, including but not limited to any indemnity provision

**[SIGNATURE PAGE TO FOLLOW]**

**IN WITNESS WHEREOF**, Borrower has executed this Security Instrument the day and year first above written.

**CHANTILLY ROAD, LLC,**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                                               ) ss
COUNTY OF  Los Angeles    )

On November 16, 2023, before me, Tara Gipson , a Notary Public, personally appeared **ADRIAN RUDOMIN**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

TARA GIPSON
COMM. #2354010
Notary Public - California
Los Angeles County
My Comm. Expires May 6, 2025

# TRUE COPY CERTIFICATION

(Government Code 27361.7)

_____ Glendale _____, **California**

Place of Execution (City and State)

I certify under penalty of perjury that this material is a true copy of the original material contained in this document.

*Adrian Rudomin*

eRecording Partners Network

*1-10-23*

**Date**

**By:**_____

Signature of Declarant

Miguel Casias

Type or Print Name

# EXHIBIT A

The land referred to is situated in the County of Los Angeles, City of Los Angeles, State of California, and is described as follows:

Lot 1 of Tract No. 13333, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 289 Pages 18 to 20 inclusive of Maps, in the Office of the County Recorder of said County.

APN:    4369-037-001

# Exhibit E

# GUARANTY

**THIS GUARANTY** (this "**Guaranty**") is made as of November 20, 2023, by each of **ADRIAN RUDOMIN** ("AR"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **DIEGO RUDOMIN** ("DR"), an individual having an address at 1339 Appleton Way, Venice, California 90291, **PABLO RUDOMIN** ("PR"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **ISAAC RUDOMIN**, an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292 ("IR"; together with AR, DR, PR, hereinafter, individually and collectively and jointly and severally, as the case may be, the "Guarantor"), in favor of **CSPRF 2 LLC,** a Delaware limited liability company, having offices at 8 The Green, Ste. A, Dover, Delaware 19901 (together with its successors and assigns, the "**Lender**").

## W I T N E S S E T H :

A.      WHEREAS, **CHANTILLY ROAD, LLC**, a California limited liability company has obtained a loan in the principal amount of $2,350,000.00 (the "**Loan**") from Lender, which Loan shall be disbursed in accordance with and subject to the disbursement procedures and conditions set forth in the DOT (as defined herein);

B.      WHEREAS, the Loan is evidenced by that certain Mortgage Note, dated as of the date hereof (the "**Note**"), executed by Borrower and payable to the order of Lender in the stated principal amount of $2,350,000.00, and secured by that certain second priority (2nd) Deed of Trust and Security Agreement, dated as of the date hereof, by and among Borrower and Lender (the "**DOT**"), encumbering certain real property situated in Los Angeles County, State of California, as more particularly described on Exhibit A attached hereto and incorporated herein by this reference, together with the buildings, structures and other improvements now or hereafter located thereon (said real property, buildings, structures and other improvements being hereinafter collectively referred to as the "**Property**"), and by other documents and instruments;

C.      WHEREAS, for purposes herein, the Note, the DOT, and such other documents and instruments related to the Loan, as the same may be from time to time amended, consolidated, renewed or replaced, being collectively referred to herein as the "**Loan Documents**";

D.      WHEREAS, initially capitalized terms not otherwise defined herein shall have the meanings given to such terms in the DOT; and

E.      WHEREAS, Guarantor is an owner, either directly or indirectly, of a beneficial interest in Borrower, the extension of the Loan to Borrower is of substantial benefit to Guarantor, and, therefore, Guarantor desires to enter into this Guaranty in favor of Lender.

NOW, THEREFORE, to induce Lender to extend the Loan to Borrower, and in consideration of the foregoing promises and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Guarantor hereby covenants and agrees for the benefit of Lender, as follows:

1.      **Guaranty**.  The Guarantor hereby absolutely, unconditionally and irrevocably

guarantees to Lender the full and punctual payment of claims of every nature and description of Lender against Borrower and any and every obligation and liability of Borrower to Lender of whatsoever nature and howsoever evidenced, whether now existing or hereafter incurred, whether originally contracted with Lender, or subsequently acquired by Lender, in whole or part, whether direct or indirect, absolute or contingent, secured or not secured, matured or not matured, including, but not limited to those payments, obligations and liabilities contained in the Note, and other Loan Documents, whether at maturity or earlier by reason of acceleration or otherwise and whether denominated as damages, principal, interest, fees or otherwise, together with all pre- and post-maturity interest thereon (including, without limitation, amounts that, but for the initiation of any proceeding under any insolvency or bankruptcy law, would become due), all of which (together with all costs and expenses in connection with the enforcement of this Guaranty as hereinafter set forth) are hereinafter referred to as the "**Guaranteed Obligations**".

The Guarantor also agrees to pay any and all costs and expenses (including, without limitation, all reasonable fees and disbursements of counsel) which may be paid or incurred by Lender in connection with the enforcement of this Guaranty (collectively, the "**Enforcement Costs**"). The foregoing shall not in any manner impair or release the Debt (as defined in the DOT) evidenced by the Note, the DOT, and other Loan Documents or otherwise impair or derogate from the Lender's ability to enforce its rights under the Note, the DOT, and other Loan Documents.

2.    **Guaranty Absolute.**    The Guarantor guarantees that the Debt (as defined in the DOT) will be paid strictly in accordance with the terms of the DOT or any requirement of law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Lender with respect thereto. The liability of the Guarantor hereunder shall be absolute and unconditional irrespective of:

(a)    any lack of validity or enforceability of the Note, the DOT, the other Loan Documents or any other agreement between Lender and the Borrower relating thereto;

(b)    any change in the time, manner, place of payment of the indebtedness under, or in any other term of, or any other amendment or waiver of, or any consent to, departure from, any agreement between the Borrower and Lender, including, without limitation, the Note, the DOT or the other Loan Documents;

(c)    the insolvency of, or voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization or other similar proceedings affecting, the Borrower or any of its assets; or

(d)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Borrower in respect of the Debt or of the Guarantor in respect of this Guaranty.

No payment made by the Guarantor, any other guarantor or any other Person or entity, or received or collected by the Lender from the Guarantor, any other guarantor or any other Person or entity by virtue of any action or proceeding or set off or application at any time in reduction of or in payment of the Debt shall be deemed to modify, release or otherwise affect the liability of Guarantor under this Guaranty. Notwithstanding any such payments received or

Guaranty

2

collected by the Lender in connection with the Debt, Guarantor shall remain liable for the balance of the Guaranteed Obligations until the Debt is paid in full.  This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of the Debt or any portion thereof is rescinded or must otherwise be returned by the Lender upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Lender shall not be required to inquire into the powers of the Borrower or any of its members, partners, managers or other agents acting or purporting to act on its behalf, and monies, advances, renewals or credits described in the Loan Documents in fact borrowed or obtained from Lender in professed exercise of such powers shall be deemed to form part of the debts and liabilities hereby guaranteed, notwithstanding that such borrowing or obtaining of monies, advances, renewals, or credits shall be in excess of the powers of the Borrower, or of its members, partners, managers or other agents aforesaid, or be in any way irregular, defective or informal.

3.    **Dealing with the Borrower and Others.**

(a)    The Guaranteed Obligations shall not be released, discharged, limited or in any way affected by anything done, suffered or permitted by Lender in connection with any monies or credit advanced by Lender to the Borrower or any security therefor, including any loss of or in respect of any security received by Lender from the Borrower or others.  It is agreed that Lender, without releasing, discharging, limiting or otherwise affecting in whole or in part the obligations and liabilities hereunder, may, without limiting the generality of the foregoing:

(i)    grant time, renewals, extensions, indulgences, releases and discharges to the Borrower and any other Person or entity guaranteeing payment of or otherwise liable with respect to the Debt (each such Person and/or entity, an "**Obligor**");

(ii)    take or abstain from taking security or collateral from the Borrower or any Obligor or from perfecting security or collateral of the Borrower or any Obligor;

(iii)    accept compromises from the Borrower or any Obligor;

(iv)    apply all monies at any time received from the Borrower or any Obligor upon such part of the Guaranteed Obligations as Lender may see fit; or

(v)    otherwise deal with the Borrower or any Obligor as Lender may see fit.

(b)    Lender shall not be bound or obliged to exhaust recourse against the Borrower or any other Obligor or any security, guarantee, indemnity, deed of trust or collateral it may hold or take any other action before being entitled to payment from the Guarantor hereunder; and

(c)    Any account settled by or between Lender and the Borrower shall be

Guaranty

3

accepted by the Guarantor as conclusive evidence that the balance or amount thereby appearing due to Lender is so due.

4.      **Reinstatement of Obligations**. If at any time all or any part of any payment made by Guarantor or received by Lender from Guarantor under or with respect to this Guaranty is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Borrower or Guarantor), then the obligations of Guarantor hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous payment made by Guarantor, or receipt of payment by Lender, and the obligations of Guarantor hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment by Guarantor had never been made.

5.      **Waivers by Guarantor**. To the extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of (as a defense or otherwise):

(a)      Any right to require Lender to proceed against Borrower or any other Person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power or under any other agreement before proceeding against Guarantor hereunder;

(b)      The defense of the statute of limitations in any action hereunder;

(c)      Any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other Person or Persons;

(d)      Any failure on the part of Lender to ascertain the extent or nature of any property (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of the Note and/or the other obligations of Borrower under the Loan Documents whether held by Lender or by any person or entity on Lender's behalf or for Lender's account (the "**Collateral**") or any insurance or other rights with respect thereto, or the liability of any party liable for the Loan Documents or the obligations evidenced or secured thereby;

(e)      Demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notices of any kind, or the lack of any thereof, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of any Guarantor or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender;

(f)      Any defense based upon an election of remedies by Lender;

(g)      Any right or claim of right to cause a marshalling of the assets of Guarantor;

Guaranty

(h)    Any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Guaranty;

(i)    Any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower or the Property, regardless of whether Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower, of the condition of the Property and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder;

(j)    Any lack of notice of disposition or of manner of disposition of any Collateral;

(k)    Failure to properly record any document or any other lack of due diligence by Lender in creating or perfecting a security interest in or collection, protection or realization upon any Collateral or in obtaining reimbursement or performance from any person or entity now or hereafter liable for the Loan Documents or any obligation secured thereby;

(l)    The inaccuracy of any representation or other provision contained in any Loan Document;

(m)    Any sale or assignment of the Loan Documents, or any interest therein;

(n)    Any sale or assignment by Borrower of any Collateral, or any portion thereof or interest therein, whether or not consented to by Lender;

(o)    Any invalidity, irregularity or unenforceability, in whole or in part, of any one or more of the Loan Documents;

(p)    Any lack of commercial reasonableness in dealing with any Collateral;

(q)    Any deficiencies in any Collateral or any deficiency in the ability of Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed;

(r)    An assertion or claim that the automatic stay provided by 11 U.S.C. § 362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter acquired, which Lender may have against Guarantor or any Collateral;

(s)    Any modifications of the Loan Documents or any obligation of Borrower relating to each Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory,

common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise;

(t)    Any change in the composition of Borrower, including, without limitation, the withdrawal or removal of Guarantor from any current or future position of ownership, management or control of Borrower;

(u)    The release of Borrower or of any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law, Lender's voluntary act or otherwise; and

(v)    Any action, occurrence, event or matter consented to by Guarantor under Section 10(h) hereof, under any other provision hereof, or otherwise.

6.    **Additional Waivers**.

(a)    In addition to all the other waivers agreed to and made by Guarantor as set forth in this Guaranty, Guarantor hereby waives all rights and defenses that Guarantor may have because Borrower's debt is secured by real property. This means, among other things:

(i)    Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower.

(ii)    If Lender forecloses on any real property serving as collateral pledged by Borrower:

(1)    The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(2)    Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property. Guarantor further hereby waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against the principal.

(b)    Without limiting the generality of any of the waivers contained in this Guaranty, Guarantor also waives (i) any defense based upon Lender's election to waive its lien as to all or any security for the Loan pursuant to any applicable law, and (ii) any and all benefits which might otherwise be available to Guarantor.

(c)    Without limiting the generality of any of the waivers contained in this Guaranty, Guarantor also waives any defense based upon any statute or rule of law which provides

that the obligation of a surety must be neither larger in amount nor in any other respects more burdensome than that of a principal. In this regard, Guarantor acknowledges that Lender's recourse against Borrower for any of the obligations guaranteed hereby may be restricted impaired or prohibited by reason of Lender's election of remedies or other protections afforded debtors under New York law and agrees that no such restriction, impairment or prohibition shall have any effect on Guarantor's obligations to pay and perform the obligations guaranteed hereby under this Guaranty.

7.      **Suretyship Waivers**. Guarantor understands and acknowledges that if Lender forecloses judicially or nonjudicially against any real property serving as security for the Note, that foreclosure could impair or destroy any ability that Guarantor may have to seek reimbursement, contribution or indemnification from Borrower or others based on any right Guarantor may have of subrogation, reimbursement, contribution or indemnification for any amounts paid by Guarantor under this Guaranty. Guarantor further understands and acknowledges that in the absence of this provision, the potential impairment or destruction of Guarantor's rights, if any, may entitle Guarantor to assert a defense to this Guaranty. By executing this Guaranty, Guarantor freely, irrevocably and unconditionally: (i) waives and relinquishes that defense, and agrees that Guarantor will be fully liable under this Guaranty, even though Lender may foreclose judicially or nonjudicially against any real property serving as security for the Note; (ii) agree that Guarantor will not assert that defense in any action or proceeding that Lender may commence to enforce this Guaranty; (iii) acknowledge and agree that the rights and defenses waived by Guarantor under this Guaranty include any right or defense that Guarantor may have or be entitled to assert; and (iv) acknowledges and agrees that Lender is relying on this waiver in making the Loan, and that this waiver is a material part of the consideration that Lender is receiving for making the Loan.

8.      **Remedies**. A separate action may be brought to enforce the provisions hereof, which shall in no way be deemed to be an action on the Note, whether or not any Loan has been repaid and whether or not Lender would be entitled to a deficiency judgment following a judicial foreclosure, trustee's sale or sale under the applicable Uniform Commercial Code.

9.      **Representations and Warranties.** The Guarantor hereby represents and warrants to Lender that:

(a)      the Guarantor is not insolvent (as such term is defined in the debtor/creditor laws of the State of New York);

(b)      the execution, delivery and performance of this Guaranty will not (i) make Guarantor insolvent (as such term is defined in the debtor/creditor laws of the State of New York), or (ii) violate any provision of any requirement of law or contractual obligation of Guarantor and will not result in or require the creation or imposition of any lien on any of the properties or revenues of Guarantor pursuant to any requirement of law or contractual obligation of Guarantor;

(c)      the Guarantor has all requisite power and authority to execute, deliver and perform his obligations under this Guaranty;

Guaranty

4865-2972-4799, v. 2

(d)    the execution, delivery of this Guaranty and the performance by the Guarantor of his obligations hereunder does not and will not contravene, violate or conflict with any requirement of law, and does not and will not contravene, violate or conflict with, or result in a breach of or default under, the operating agreement of Borrower, or any contractual obligation to which Guarantor or his assets is or are subject, and does not require or result in the creation or imposition of any lien in favor of any person or entity other than Lender;

(e)    the execution and delivery hereof and the performance by the Guarantor of his obligations hereunder does not and will not contravene, violate or conflict with, or result in a breach of or default under, any indenture, security instrument, deed of trust, ground lease, contract, assignment, agreement or other instrument to which the Borrower or the assets of the Borrower are subject;

(f)    no consent of any other party (including, without limitation, any partner, or any creditor of the Guarantor or Borrower) is required that has not been obtained by the Guarantor; and

(g)    this Guaranty has been duly executed and delivered by Guarantor and is the legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, moratorium, insolvency, reorganization or similar laws affecting creditors' rights generally.

Guarantor warrants and represents that Guarantor is fully aware of the financial condition of Borrower and is executing and delivering this Guaranty based solely upon Guarantor's own independent investigation of all matters pertinent hereto, and that Guarantor is not relying in any manner upon any representation or statement of Lender.  Guarantor warrants, represent and agree that Guarantor is in a position to obtain, and Guarantor hereby assumes full responsibility for obtaining, any additional information concerning the financial condition of Borrower and any other matter pertinent hereto, and that Guarantor is not relying upon Lender to furnish, and shall have no right to require Lender to obtain or disclose, any information with respect to the indebtedness or obligations guaranteed hereby, the financial condition or character of Borrower or the ability of Borrower to pay the indebtedness or perform the obligations guaranteed hereby, the existence of any collateral or security for any or all of such indebtedness or obligations, the existence or nonexistence of any other guaranties of all or any part of such indebtedness or obligations, any actions or non-action on the part of Lender, Borrower or any other person or entity, or any other matter, fact or occurrence whatsoever. By executing this Guaranty, Guarantor acknowledges and knowingly accepts the full range of risks encompassed within a contract of indemnity or guaranty.

10.    **General Provisions**.

(a)    <u>Full Recourse</u>. All of the terms and provisions of this Guaranty are recourse obligations of Guarantor and not restricted by any limitation on personal liability.

(b)    <u>Unsecured Obligations</u>. Guarantor hereby acknowledges that Lender's appraisal of the Property is such that Lender is not willing to accept the consequences of the inclusion of Guarantor's guaranty set forth herein among the obligations secured by the DOT, and

Guaranty

8

the other Loan Documents and that Lender would not make the Loan but for the unsecured personal liability undertaken by Guarantor herein.

(c)    <u>Survival</u>. This Guaranty shall be deemed to be continuing in nature and shall remain in full force and effect and shall survive the payment of the indebtedness evidenced and secured by the Loan Documents and the exercise of any remedy by Lender under the DOT, or any of the other Loan Documents, including, without limitation, any foreclosure or deed in lieu thereof, even if, as a part of such remedy, the Loan are paid or satisfied in full.

(d)    <u>No Subrogation; No Recourse Against Lender</u>. Notwithstanding the satisfaction by Guarantor of any liability hereunder, no Guarantor shall have any right of subrogation, contribution, reimbursement or indemnity whatsoever or any right of recourse to or with respect to the assets or property of Borrower or to any Collateral until the expiration of ninety-one (91) days following payment of the Loan in full. In connection with the foregoing, Guarantor expressly waives, until the expiration of ninety-one (91) days following payment of the Loan in full, any and all rights of subrogation to Lender against Borrower, and Guarantor hereby waives any rights to enforce any remedy which Lender may have against Borrower and any right to participate in any Collateral. In addition to and without in any way limiting the foregoing, Guarantor hereby subordinates any and all indebtedness of Borrower now or hereafter owed to Guarantor to all indebtedness of Borrower to Lender, and agrees with Lender that Guarantor shall not demand or accept any payment of principal or interest from Borrower, shall not claim any offset or other reduction of Guarantor's obligations hereunder because of any such indebtedness and shall not take any action to obtain any of the Collateral. Further, no Guarantor shall have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Guaranty or under the provisions of any of the Loan Documents.

(e)    <u>Reservation of Rights</u>. Nothing contained in this Guaranty shall prevent or in any way diminish or interfere with any rights or remedies, including, without limitation, the right to contribution, which Lender may have against Borrower, Guarantor or any other party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified at Title 42 U.S.C. § 9601 et seq.), as it may be amended from time to time, or any other applicable federal, state or local laws, all such rights being hereby expressly reserved.

(f)    <u>Financial Statements; Compliance Certificate</u>. Guarantor hereby agrees, as a material inducement to Lender to make the Loan to Borrower, to furnish to Lender promptly upon demand by Lender current and dated financial statements detailing the assets and liabilities of Guarantor as required by the DOT, certified by Guarantor, in form and substance acceptable to Lender. Guarantor hereby warrants and represents unto Lender that any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Guarantor did or will at the time of such delivery fairly and accurately present the financial condition of Guarantor in all material respects.

(g)    <u>Rights Cumulative; Payments</u>. Lender's rights under this Guaranty shall be in addition to all rights of Lender under the Note, the DOT, and the other Loan Documents. Further, payments made by Guarantor under this Guaranty shall not reduce in any respect Borrower's obligations and liabilities under the Note, the DOT, and the other Loan Documents.

Guaranty

4865-2972-4799, v. 2

(h)    <u>No Limitation on Liability</u>. Guarantor hereby consents and agrees that Lender may at any time, and from time to time, without further consent from Guarantor, do, make, grant, consent or agree to any of the following, and the liability of Guarantor under this Guaranty shall be unconditional and absolute and shall in no way be impaired or limited by any of the following, whether with or without notice to Borrower or Guarantor or with or without consideration: (i) release and surrender the Collateral or any portion thereof; (ii) substitute for any Collateral held by or on behalf of Lender other collateral of like kind, or of any kind; (iii) make overadvances or increase the amount of the Loan; (iv) extend the time for performance required by any of the Loan Documents or extend or renew the Note; (v) sue upon or foreclose the Note, the DOT, or any of the other Loan Documents; (vi) sell or transfer the Property subsequent to foreclosure; (vii) release Borrower, Guarantor or any other person or entity from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the other Loan Documents by operation of law, Lender's voluntary act or otherwise; (viii) agree to modify the terms of any one or more of the Loan Documents; (ix) sell, assign or otherwise transfer the Note, the DOT, and/or any other Loan Documents or any interest therein; or (x) take or fail to take any action of any type whatsoever. No such action which Lender shall take or fail to take in connection with the Loan Documents or any Collateral, nor any course of dealing with Borrower or any other person, shall limit, impair or release any of Guarantor's obligations hereunder, affect this Guaranty in any way or afford Guarantor any recourse against Lender. Nothing contained in this section shall be construed to require Lender to take or refrain from taking any action referred to herein.

(i)    <u>Entire Agreement; Amendment; Severability</u>. This Guaranty contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements, whether written or oral, between the parties respecting such matters; and Guarantor and Lender acknowledge that there are no contemporaneous oral agreements with respect to the subject matter hereof. This Guaranty may not be changed, modified or amended, except by a writing executed by the parties hereto; and no obligation of Guarantor can be released or waived by Lender or any agent of Lender, except by a writing duly executed by Lender. A determination that any provision of this Guaranty is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Guaranty to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

(j)    <u>Governing Law; Binding Effect; Waiver of Acceptance</u>. This Guaranty shall be governed by and construed in accordance with the substantive laws of the State of California without giving effect to its principles of choice of law or conflicts of law, except to the extent that the applicability of any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling. This Guaranty shall bind Guarantor and the heirs, executors, legal representatives, successors and assigns of Guarantor and shall inure to the benefit of Lender and the officers, directors, shareholders, agents and employees of Lender and their respective heirs, successors and assigns. This Guaranty shall in no event be impaired by any change which may arise by reason of the death of Borrower or Guarantor, if individuals, or by reason of the dissolution of Borrower or Guarantor, if Borrower or Guarantor is a corporation, partnership, limited liability company or similar entity. Guarantor has executed this Guaranty individually and not as a partner of Borrower or any other Guarantor or guarantor. This Guaranty is assignable by Lender, and any full or partial assignment hereof by Lender shall operate

Guaranty

10

to vest in the assignee all rights and powers herein conferred upon and granted to Lender and so assigned by Lender. Guarantor expressly waives notice of transfer or assignment of this Guaranty and acknowledge that the failure by Lender to give any such notice shall not affect the liabilities of Guarantor hereunder. Notwithstanding the foregoing, Guarantor shall not assign any of its rights or obligations under this Guaranty. Guarantor hereby waives any acceptance of this Guaranty by Lender, and this Guaranty shall immediately be binding upon Guarantor.

(k)    <u>Notices</u>. All notices given pursuant to this Guaranty shall be sufficient if mailed either by (i) postage prepaid, certified or registered mail, return receipt requested, (ii) by delivery to a nationally recognized overnight delivery service, or (iii) telecopy to:

|  |  |
|---|---|
| **If to Guarantor:** | Adrian Rudomin<br>578 Washington Boulevard, Apt. 148,<br>Marina Del Ray, California 90292 |
|  | Pablo Rudomin<br>578 Washington Boulevard, Apt. 148,<br>Marina Del Ray, California 90292 |
|  | Isaac Rudomin<br>578 Washington Boulevard, Apt. 148,<br>Marina Del Ray, California 90292 |
|  | Diego Rudomin<br>1339 Appleton Way,<br>Venice, California 90291 |
| **with a copy to:** | SIMONE & ROOS, LLP<br>5627 Sepulveda Boulevard, Suite 206<br>Sherman Oaks, California 91411 |
| **If to Lender:** | **CSPRF 2 LLC**<br>8 The Green, Ste. A,<br>Dover, Delaware 19901<br>Attn.: David Blatt |
| **with a copy to:** | Kriss & Feuerstein LLP<br>360 Lexington Avenue, Suite 1200<br>New York, New York 10017<br>Attn: David S. Kriss, Esq. |

Notices shall be deemed given: (w) if served in person, when served; (x) if telecopied, on the date of transmission if before 3:00 p.m. (New York time) on a Business Day and after such time on the next Business Day; provided, however, that in both instances a hard copy of such notice also is sent pursuant to (y) or (z) below; (y) if by overnight courier, on the first (1st) Business Day after delivery to the courier; or (z) if by U.S. Mail, certified or registered mail, return receipt requested on the fourth (4th) day after deposit in the mail postage prepaid. Any party

may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address(es).

(l)  <u>No Waiver; Time of Essence; Business Day</u>. The failure of any party hereto to enforce any right or remedy hereunder, or to promptly enforce any such right or remedy, shall not constitute a waiver thereof nor give rise to any estoppel against such party nor excuse any of the parties hereto from their respective obligations hereunder. Any waiver of such right or remedy must be in writing and signed by the party to be bound. This Guaranty is subject to enforcement at law or in equity, including actions for damages or specific performance. Time is of the essence hereof. The term "**business day**" as used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York are authorized by law to be closed.

(m)  <u>Captions for Convenience; Pronouns</u>. The captions and headings of the sections and paragraphs of this Guaranty are for convenience of reference only and shall not be construed in interpreting the provisions hereof. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; and the singular shall include the plural and vice versa.

(n)  <u>Attorneys' Fees</u>. In the event it is necessary for Lender to retain the services of an attorney or any other consultants in order to enforce this Guaranty, or any portion thereof, Guarantor agrees to pay to Lender any and all costs and expenses, including, without limitation, attorneys' fees, incurred by Lender as a result thereof and such costs, fees and expenses shall be included in the Liabilities and Costs.

(o)  <u>Successive Actions</u>. A separate right of action hereunder shall arise each time Lender acquires knowledge of any matter indemnified or guaranteed by Guarantor under this Guaranty. Separate and successive actions may be brought hereunder to enforce any of the provisions hereof at any time and from time to time. No action hereunder shall preclude any subsequent action, and Guarantor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

(p)  <u>Intentionally Omitted</u>.

(q)  <u>Reliance</u>. Lender would not make the Loan to Borrower without this Guaranty. Accordingly, Guarantor intentionally and unconditionally enters into the covenants and agreements as set forth above and understands that, in reliance upon and in consideration of such covenants and agreements, the Loan shall be made and, as part and parcel thereof, specific monetary and other obligations have been, are being and shall be entered into which would not be made or entered into but for such reliance.

(r)  <u>**WAIVER OF JURY TRIAL**</u>**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED**

Guaranty

12

TO, THE SUBJECT MATTER OF THIS GUARANTY OR THE RELATIONSHIP THAT IS BEING ESTABLISHED, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR PARTIES, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, GUARANTOR AND LENDER (BY ITS ACCEPTANCE HEREOF) EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR ACKNOWLEDGES THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INCLUDE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. GUARANTOR ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT LENDER HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS GUARANTY AND THAT LENDER WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS WITH GUARANTOR. GUARANTOR FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED, IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS GUARANTY, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS GUARANTY.

(s)    **VENUE**. THE GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY DELAWARE STATE OR FEDERAL COURT OR IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY, THE NOTE, THE DOT, THE PLEDGE AGREEMENT OR ANY OTHER LOAN DOCUMENT DELIVERED IN CONNECTION HEREWITH OR THEREWITH AND THE GUARANTOR HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH DELAWARE STATE COURT, OR TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.    THE GUARANTOR HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT HE MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.    TO THE EXTENT PERMITTED BY LAW, THE GUARANTOR ALSO IRREVOCABLY CONSENTS TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES (CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND POSTAGE PREPAID) OF SUCH PROCESS TO HIM AT HIS ADDRESS SPECIFIED IN SECTION 10 HEREOF OR IN THE MANNER SET FORTH IN SECTION 37 OF THE DOT FOR THE GIVING OF NOTICE.    THE GUARANTOR AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR

Guaranty

13

**PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

(t)      <u>Litigation</u>. In the event of any litigation over this Guaranty: (a) if that litigation is heard in the Commercial Division, New York State Supreme Court, then the parties consent and agree to application of the Court's accelerated procedures, Uniform Rules for the Supreme and County Courts (Rules of Practice for the Commercial Division, Section 202.70(g), Rule 9); and (b) the parties shall promptly enter into and submit to the court (with a request to be "**so-ordered**") a Stipulation and Order for the Production and Exchange of Confidential Information in the form promulgated by the New York City Bar Association Committee on State Courts of Superior Jurisdiction.

(u)      <u>Waiver by Guarantor</u>. Guarantor covenants and agrees that, upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Borrower, neither Guarantor shall seek or cause Borrower or any other person or entity to seek a supplemental stay or other relief, whether injunctive or otherwise, pursuant to 11 U.S.C. § 105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law, (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights of Lender against Guarantor or any Collateral by virtue of this Guaranty or otherwise.

(v)      <u>Counterparts</u>. This Guaranty may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages. Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

(w)      <u>Secondary Market Transactions</u>. The terms and provisions of Section 40 of the DOT are hereby incorporated herein by this reference.

(x)      <u>Joint and Several Liability</u>. The liability of all persons and entities who are in any manner obligated hereunder to Lender as Guarantor shall be joint and several.

(y)      <u>Payment of Money Only</u>. Guarantor acknowledges that this Guaranty is an "**instrument for the payment of money only,**" within the meaning of New York Civil Practice Law and Rules Section 3213. Thus, Lender is entitled to move for summary judgment in lieu of complaint when enforcing this Guaranty.

<div align="center">

**INTENTIONALLY LEFT BLANK
SIGNATURE PAGE TO FOLLOW**

</div>

Guaranty

4865-2972-4799, v. 2

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date and year set forth above.

GUARANTOR:

_____
**ADRIAN RUDOMIN**, an individual

_____
**DIEGO RUDOMIN**, an individual

_____
**PABLO RUDOMIN**, an individual

_____
**ISAAC RUDOMIN**, an individual

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of the date and year set forth above.

**GUARANTOR:**

_____

**ADRIAN RUDOMIN**, an individual

_____

**DIEGO RUDOMIN**, an individual



Pablo Rudomin (Nov 28, 2023 17:18 CST)

**PABLO RUDOMIN**, an individual

Isaac Rudomin (Nov 28, 2023 17:14 CST)

**ISAAC RUDOMIN**, an individual

Notary Acknowledgment Continued on Next Page

## ACKNOWLEDGMENT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA        )
                           ) ss
COUNTY OF _Los Angeles_ )

On November 16, 2023, before me, _Tara Gipson_, a Notary Public, personally appeared **ADRIAN RUDOMIN**, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_Tara Gipson_
Notary Public

TARA GIPSON
COMM. #2354010
Notary Public · California
Los Angeles County
My Comm. Expires May 6, 2025
NRO1

ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the
> individual who signed the document to which this
> certificate is attached, and not the truthfulness,
> accuracy, or validity of that document.

STATE OF CALIFORNIA          )
                             ) ss
COUNTY OF _Los Angeles_  )

On November 16, 2023, before me, _Tara Gipson_, a Notary Public,
personally appeared **DIEGO RUDOMIN**, who proved to me on the basis of satisfactory evidence
to be the person whose name is subscribed to the within instrument, and acknowledged to me that
he executed the same in his authorized capacity, and that by his signature on the instrument the
person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

TARA GIPSON
COMM. #2354010
Notary Public · California
Los Angeles County
My Comm. Expires May 6, 2025

# Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

STATE OF ___Virginia___

COUNTY OF ___Chesterfield___

On ___November 28, 2023___ before, me ___Lauren N. Fridley___ a Notary Public, appeared___Pablo Rudomin &___

___Isaac Rudomin___ who proved to me on the basis of satisfactory evidence to be the person(s),

whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the

same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s)

or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Virginia of the United States of America that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

_(Signature of Notary)_

Commission 7699515

Expires ___06/30/2024___

Notary Public of Chesterfield County, Virginia

Seal

LAUREN N FRIDLEY
ELECTRONIC
NOTARY
PUBLIC
REG # 7699515
EXPIRES
6/30/2024
COMMONWEALTH OF VIRGINIA

Completed via Remote Online Notarization using two-way Audio/Video technology

# Exhibit F

## OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT

THIS OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT (this "Agreement") is made as of the ____ day of November, 2023, by and among, **ADRIAN RUDOMIN** ("AR"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **DIEGO RUDOMIN** ("DR"), an individual having an address at 1339 Appleton Way, Venice, California 90291, **PABLO RUDOMIN** ("PR"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **ISAAC RUDOMIN** ("IR"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, and **THE KRAKEN, LLC**, a California limited liability company  having an address at 578 Washington Blvd, #148, Marina Del Rey, CA 90292 ("KRAKEN"; together with AR, DR, PR and IR, hereinafter, individually and collectively and jointly and severally, as the case may be, the "Pledgor"), and **CSPRF 2 LLC,** a Delaware limited liability company, having offices at 8 The Green, Ste. A, Dover, Delaware 19901 ("Lender").

WHEREAS, pursuant to the terms of the Mortgage Note (the "Note"), the Deed of Trust and Security Agreement (the "Deed of Trust"), and any and all other security documents and guarantees securing Borrower's obligations under the Note (collectively herein, the "Loan Documents") of even date herewith between CHANTILLY ROAD, LLC, a California limited liability company  (the "Borrower"), and Lender, Lender has agreed to make that certain secured loan to the Borrower in the principal amount of $2,350,000.00 (the "Loan"), as evidenced and secured by all of the obligations under and in connection with the Loan Documents, on the condition that Pledgor pledge all interest, right and title to their respective membership interests (as set forth on Schedule A annexed hereto and made a part hereof) in LEVIATHAN, LLC, a California limited liability company ("Issuer"), being the sole member of Borrower (the "Obligations"); and

WHEREAS, Pledgor are the members of the Issuer;

WHEREAS, Issuer is the sole member of Borrower; and

WHEREAS, in order to induce Lender to make the Loan, it is a condition precedent under the Loan Documents that Pledgor shall have (a) granted to Lender the security interests, and undertaken the obligations, set forth in this Agreement, and (b) executed and delivered to Lender this Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Pledge of Collateral.  Pledgor hereby irrevocably and unconditionally pledges and assigns to Lender, and irrevocably and unconditionally grants to Lender a security interest in, all of Pledgor's right, title, and interest in and to the following (the "Collateral"):

    (a)  the Pledged Interests (hereinafter defined) together with all rights to Distributions (hereinafter defined) or other payments arising therefrom or relating thereto, and

all options, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributable in respect of or in exchange for any or all of the Pledged Interests;

(b)  to the extent not covered by subparagraph (a), all rights to receive all income, gain, profit, loss, or other items allocated, allocable, distributed, or distributable to Pledgor under the Organizational Documents (hereinafter defined) of the Issuer, and all general intangibles, accounts, investment property, payment intangibles, supporting obligations, other contract rights or rights to the payment of money, and all proceeds, as each of the foregoing terms is defined in the UCC (hereinafter defined), arising out of, or in connection with, the membership interest in Issuer;

(c)  all of Pledgor' ownership interest in any capital accounts in the Issuer;

(d)  all of Pledgor' voting, consent, management, management removal and replacement, and approval rights, and/or rights to control or direct the affairs of the Issuer, inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement of the Issuer dated June  18, 2021, and any amendments thereto, as the same may be amended or amended and restated from time to time (collectively, the "Operating Agreement");

(e)  any additional ownership interests of, and any ownership interests exchangeable for or convertible into and warrants, options, and other rights to purchase or otherwise acquire shares of ownership interests of, the Issuer, or entity which is the successor of the Issuer, from time to time acquired by Pledgor in any manner (all of which interests shall be deemed to be part of the Pledged Interests), and any certificates or other instruments representing such additional interests, warrants, options, and other rights, and all Distributions and other property or proceeds from time to time received, receivable, or otherwise distributed or distributable in respect of or in exchange for any or all of such additional shares, warrants, options, or other rights.  Pledgor agrees that Lender may from time to time attach as Schedule A hereto an updated list of the Collateral at the time pledged to Lender hereunder (although the failure to so update Schedule A shall not limit the pledge of such additional interests to Lender); and

(f)  to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing Collateral.  For purposes of this Agreement, the term "proceeds" includes whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to Pledgor from time to time with respect to any of the Collateral.

2.  Certain Definitions.  Capitalized terms used herein without definition shall have the respective meanings provided therefor in the Loan Documents.  Terms (whether or not capitalized) used herein and not defined in the Loan Documents or otherwise defined herein that are defined in the Uniform Commercial Code as in effect in the State of California or other applicable jurisdiction (the "UCC") have such defined meanings

- 2 -

herein, unless the context otherwise indicates or requires.  In addition, the following terms used herein shall have the following meanings:

(a)     "Article 8 Matter" means any action, decision, determination or election by the Issuer or its members that the membership interest in the Issuer be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

(b)     "Business Day" means a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

(c)     "Contractual Obligation" means, as to any Person, any contract, agreement, or undertaking, regardless of how characterized, oral or written, to which such Person is a party, or by which such Person or such Person's property is bound, or to which such Person or such Person's property is subject.

(d)     "Distributions" means any distribution of property (including cash) (regardless of whether from cash flow, capital transactions, or otherwise) on account of a Pledged Interest, or any other distribution or payment on or in respect of any membership interest or the redemption or repurchase thereof.

(e)     "Governmental Authority" means any national, state, or local government, any political subdivision thereof, or any other governmental, quasi-governmental, judicial, public, or statutory instrumentality, authority, body, agency, bureau, or entity or any arbitrator with authority to bind a Person at law, and any agency, authority, department, commission, board, bureau, or instrumentality of any of them.

(f)     "Legal Requirements" means all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any Governmental Authority having or claiming jurisdiction with respect thereto, including, but not limited to, all orders and directives of any Governmental Authority having or claiming jurisdiction with respect thereto.

(g)     "Lien" means any lien, encumbrance, security interest, mortgage, restriction, charge or encumbrance of any kind.

(h)     "Loan Collateral" means the "Collateral" as defined in the Deed of Trust (as defined in the Note) and includes the Collateral hereunder.

(i)     "Organizational Documents" means for any corporation, partnership, trust, limited liability company, limited liability partnership, unincorporated association, business or other legal entity, the agreements pursuant to which such entity has been established or organized, its affairs are to be governed, and its business is to be conducted, as such documents may be amended from time to time.

- 3 -

(j)     "Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(k)     "Pledged Interests" means the ownership interests or membership interest now or hereafter listed on Schedule A hereto or which would be listed on an updated Schedule A at any time of reference, together with all related rights of the holder thereof pursuant to the Organizational Documents of the Issuer.

3.     Security for the Secured Obligations.  This Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), of the following (the "Secured Obligations"):

(a)     the Obligations, including all obligations and liabilities of every nature of the Borrower now or hereafter existing under or arising out of or in connection with the Loan Documents and all renewals or extensions thereof, whether for principal, interest, fees, expenses, indemnities, or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created, or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer, or otherwise, and all obligations of every nature of the Pledgor now or hereafter existing under this Agreement; and

(b)     the obligations of Pledgor hereunder.

4.     Delivery of Collateral.

(a)     If at any time the Pledged Interests are evidenced by one or more certificates, Pledgor shall deliver to Lender any original certificate evidencing the Pledged Interests (the "Certificate"), in suitable form for transfer by delivery or, as applicable, accompanied by any necessary endorsement or duly executed instruments of transfer or assignment, in blank, all in form and substance satisfactory to Lender.

(b)     Lender shall have the right, at any time after the occurrence of an Event of Default, in its discretion and without notice to Pledgor, to transfer to or to register (if not already so registered) in the name of Lender or any of its nominees any or all of the Collateral.  In addition, Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

5.     Representations and Warranties.  Pledgor hereby represents and warrants as follows:

- 4 -

(a)    <u>Organization; Address of Pledgor</u>.  Kraken is the type of entity, organized in the jurisdiction, and has the address set forth with respect to Kraken in the introductory paragraph to this Agreement, and with respect to AR, DR, PR and IR has the address as set forth in the introductory paragraph to this Agreement.

(b)    <u>No Conflict</u>.  The execution, delivery, and performance by Pledgor of this Agreement will not (i) violate any provision of any Legal Requirement applicable to Pledgor, or any order, judgment, or decree of any Governmental Authority binding on Pledgor, (ii) result in a breach of, or constitute with due notice or lapse of time or both, a default under any Contractual Obligation of Pledgor, (iii) result in or require the creation or imposition of any Lien upon any of Pledgor' properties or assets, except pursuant to this Agreement, (iv) require the approval or consent of any Person under any Contractual Obligation of Pledgor, except for the approvals or consents described on <u>Schedule B</u> hereto, which approvals or consents have been obtained, and true and complete copies of which have been furnished to Lender, or (v) conflict with any provision of Issuer's organizational documents and/or Pledgor' organizational documents, as applicable.

(c)    <u>Binding Obligation</u>.  The execution, delivery and performance of this Agreement and the transactions contemplated hereby is within the authority of Pledgor, has been duly authorized by all necessary proceedings, and is the legally valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws or equitable principles generally.

(d)    <u>Description of Collateral</u>.  The Pledged Interests are being certificated pursuant to this Agreement and are fully paid and non-assessable.  The Pledged Interests constitute all of the issued and outstanding ownership interests of the Issuer owned beneficially or of record by Pledgor.  Neither Pledgor nor any other Person holds, or has any right to the issuance of, any options or other rights to purchase, and is not party to any other agreement with respect to and does not hold or have the right to any property that is now or hereafter convertible into, or that requires the issuance or sale of, any ownership interests of the Issuer.  No Person other than Pledgor owns any ownership interests of any type in the Issuer.  Other than the Certificates delivered to Lender pursuant to this Agreement, there currently exist no certificates, instruments or writings representing the Pledged Interests.  However, to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Lender.

(e)    <u>Ownership of Collateral</u>.  (i)  Pledgor is the legal and beneficial owner of, and has good and marketable title to, the Collateral, and is the record owner of the Pledged Interests, free and clear of, and subject to no, pledges, Liens, security interests, charges, options, restrictions or other encumbrances, except the pledge and security interest created by this Agreement; (ii) Pledgor has the legal capacity to execute, deliver and perform Pledgor' obligations under this Agreement and to pledge and grant a security interest in all of the Collateral of which it is the legal

or beneficial owner pursuant to this Agreement; (iii) except for authorizations and consents which have already been obtained, no authorization, consent of or notice to any party that has not been obtained is required in connection with the execution, delivery, performance, validity or enforcement of this Agreement, including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer by Lender pursuant to the terms hereof; and (iv) Lender's filing of UCC-1 financing statements with the Secretary of State of the State of California results in the perfection of Lender's security interest in the Pledged Interests, and such portion of the other Collateral in which a security interest may be perfected by filing such UCC-1 form or financing statement.

(f)    <u>Governmental Authorizations</u>.  No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required for either (i) the pledge by Pledgor of the Collateral pursuant to this Agreement and the grant by Pledgor of the security interest granted hereby, (ii) the execution, delivery, or performance of this Agreement by Pledgor, or (iii) the exercise by Lender of the voting or other rights in respect of the Collateral provided for in this Agreement (except as may be required in connection with a disposition of Collateral by laws affecting the offering and sale of securities generally).

(g)    <u>Article 8</u>.  Pledgor acknowledges and agrees that the terms of the Pledged Interests and the Organizational Documents of the Issuer do and will provide that the Pledged Interests shall constitute a "security" within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof), as in effect from time to time in the State of California, and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Pledgor acknowledges and agrees that the Pledged Interests, and any and all Certificates which have been delivered to Lender on the date hereof, constitute and each will constitute a "certificated security" (as defined in the UCC). Pledgor therefor covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, the Operating Agreement as in effect on the date hereof. However, the Pledged Interests are not and will not be investment company securities within the meaning of Section 8-103 of the UCC.  The Pledged Interests (i) will not become "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (ii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC).

(h)    <u>Creation, Perfection and Priority of Security Interest</u>.  This Agreement constitutes an authenticated record, and Lender is authorized at any time and from time to time to file any and all UCC financing statements and take such other actions determined by Lender to be necessary or desirable to perfect its security interest in the Collateral.

4863-0173-5550, v. 2

(i)  <u>No Other Financing Statements</u>.  Other than the UCC financing statements filed by Lender describing the Collateral, there is no financing statement (or similar statement or registration under the laws of any jurisdiction) now on file or registered in any public office covering any interest of Pledgor or any other Person in the Collateral.

(j)  <u>Other Information</u>.  All information heretofore, herein or hereafter supplied to Lender by Pledgor with respect to the Collateral in writing is accurate and complete in all material respects.

6.  <u>Assurances and Covenants of Pledgor</u>.

(a)  <u>Transfers and Other Liens</u>.  Pledgor shall not:

(i)  sell, assign (by operation of law or otherwise), pledge, or hypothecate or otherwise dispose of, or grant any option with respect to, any of the Collateral, except to Lender pursuant to this Agreement; or

(ii)  create or suffer to exist any Lien upon or with respect to any of the Collateral, except for the Lien created hereunder.

(b)  <u>Covenants of Pledgor</u>.  Pledgor covenants and agrees, with respect to itself and the Pledged Interests, that so long as any Secured Obligation is outstanding:

(i)  Pledgor shall not vote for, or agree or consent to, the sale, transfer, pledge or encumbrance of the Pledged Interests while the Loan is outstanding.

(ii)  Pledgor shall not vote for, or agree or consent to, the discontinuance of the business or the dissolution or liquidation of the Issuer or the Borrower.

(iii)  Pledgor shall not vote for, or agree or consent to, any material modifications to the Organizational Documents of the Issuer or the Borrower.

(iv)  Pledgor shall provide Lender with copies of any modifications made to the Organizational Documents of the Issuer or the Borrower within thirty (30) days after the date such modifications are made.

(v)  Pledgor shall not enter into any agreements which restrict, limit or otherwise impair the transferability of the Pledged Interests.

(vi)  Pledgor shall be the sole members of the Issuer and the sole holder of membership interests in the Issuer and shall not resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Issuer or any change in the management of the Issuer.

(vii)  Pledgor shall cause the Issuer to remain the sole member of the Borrower and the sole holder of the membership interest in the Borrower and shall

refrain from causing Issuer to resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Borrower or any change in the management and/or control of the Borrower.

(c)     Additional Collateral.    Pledgor shall pledge hereunder, immediately upon Pledgor' acquisition (directly or indirectly) thereof, any and all additional ownership interests of Pledgor in the Issuer.

(d)     Pledge Amendments.    Pledgor shall, upon obtaining any additional ownership interests or other securities required to be pledged hereunder promptly (and in any event within five (5) Business Days) deliver to Lender such documents as Lender may require to confirm the pledge hereunder of such additional collateral; provided that the failure of Pledgor to execute any such additional documents with respect to any additional Pledged Interests pledged pursuant to this Agreement shall not impair the security interest of Lender therein or otherwise adversely affect the rights and remedies of Lender hereunder with respect thereto.

(e)     Taxes and Assessments.    Pledgor shall pay promptly when due all taxes, assessments, and governmental charges or levies imposed upon, and all claims against, the Collateral, except to the extent the validity thereof is being contested in good faith and by appropriate proceedings and in which reserves or other appropriate provisions have been made or provided therefor; provided that Pledgor shall in any event pay such taxes, assessments, charges, levies, or claims not later than five (5) days prior to the date of any proposed sale under any judgment, writ, or warrant of attachment entered or filed against Pledgor or any of the Collateral as a result of the failure to make such payment.

(f)     Further Assurances.    Pledgor shall from time to time, at the expense of Pledgor, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary and that Lender may request, in order to give full effect to this Agreement and to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral, provided that such further instruments, documents and action are consistent with this Agreement.

(g)     Warranty of Title to Collateral.    Pledgor covenants that Pledgor will defend its rights and title in the Collateral against the claims and demands of all Persons whomsoever.  Pledgor further covenants that Pledgor will have title to and right to pledge and grant a security interest in the Collateral hereafter pledged or in which a security interest is granted to Lender hereunder and will likewise defend its rights therein.

(h)     Good Standing.    Pledgor will at all times be duly formed and is, and will at all times be, validly existing, in good standing and qualified to do business in each jurisdiction where required.  Pledgor will at all times have all requisite power to

own its property and conduct its business as now conducted and as presently contemplated.

7.  <u>Voting Rights, Dividends, Etc.</u>

(a)  So long as no Event of Default shall have occurred:

(i)  Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement and the Loan Documents; provided, however, that any and all such rights shall remain subject to the provisions of <u>Section 7(b)</u> hereof;

(ii)  Subject to the terms and conditions of this Agreement and the Loan Documents, if applicable, Pledgor shall be entitled to receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all Distributions, paid in respect of the Collateral; provided, however, if any such property is distributed in the form of shares of membership interest in the Issuer, such membership interest shall be pledged, and any certificates representing such membership interest delivered, to Lender (collectively, "<u>Collateral Payments and Distributions</u>").

(b)  After the occurrence of an Event of Default:

(i)  all rights of Pledgor to exercise the voting, management, and other consensual rights which it would otherwise be entitled to exercise pursuant to <u>Section 7(a)(i)</u> shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to exercise such voting, management, and other consensual rights;

(ii)  all rights of Pledgor to receive the Collateral Payments and Distributions which Pledgor would otherwise be authorized to receive and retain pursuant to <u>Section 7(a)(ii)</u> shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to receive and hold as Collateral such Collateral Payments and Distributions; and

(iii)  all Collateral Payments and Distributions which are received by Pledgor contrary to the provisions of paragraph (ii) of this <u>Section 7(b)</u> shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor, and shall forthwith be paid over to Lender as Collateral in the same form as so received (with any necessary endorsements).

(c)  In order to permit Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant to <u>Section 7(b)(i)</u> and to receive all Collateral Payments and Distributions which it may be entitled to receive under <u>Section 7(a)(ii)</u> or <u>Section 7(b)(ii)</u>, (i) Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to Lender all such proxies, dividend

- 9 -

payment orders, and other instruments as Lender may from time to time request, and (ii) without limiting the effect of the immediately preceding clause (i), Pledgor hereby grants to Lender an irrevocable proxy to vote the Pledged Interests and to exercise all other rights, powers, privileges, and remedies to which a holder of the Pledged Interests would be entitled (including, without limitation, giving or withholding written consents of members, calling special meetings of members, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Interests on the record books of the Issuer) by any other Person (including the Issuer or any officer or agent thereof), provided, however, Lender shall not exercise any rights granted under such proxy except upon the occurrence of an Event of Default.

(d)     Notwithstanding any of the foregoing, Pledgor agrees that this Agreement shall not in any way be deemed to obligate Lender to assume any of Pledgor' obligations, duties, expenses, or liabilities unless Lender otherwise expressly agrees to assume any or all of said obligations, duties, expenses, or liabilities in writing.

8.     <u>Lender Appointed Attorney-in-Fact</u>.  Pledgor hereby irrevocably appoints Lender as Pledgor' attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, exercisable after the occurrence of an Event of Default, from time to time in Lender's discretion to take any action and to execute any instrument that Lender may in good faith deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)     to receive, endorse, and collect any instruments made payable to Pledgor representing any dividend or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same; and

(c)     to file any claims or take any action or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

9.     <u>Standard of Care</u>.  The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and except as specifically set forth herein shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral, it being understood that Lender shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relating to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, (b) taking any necessary steps (other than steps taken in accordance with the standard of care set forth above to maintain possession of the Collateral) to preserve

rights against any parties with respect to any Collateral, (c) taking any necessary steps to collect or realize upon the Secured Obligations or any guaranty therefor, or any part thereof, or any of the Collateral, or (d) initiating any action to protect the Collateral against the possibility of a decline in market value. In no event shall the standard of care imposed upon Lender hereunder exceed the minimum applicable standard of care imposed under Section 9-207 of the UCC.

10.    <u>Waiver of Defenses; Secured Obligations Not Affected</u>.

(a)    Pledgor hereby waives and agrees, not to assert or take advantage of any defense, for itself or on behalf of Borrower or Issuer (whether directly or indirectly), based on: (i) except for a breach of the standard of care set forth in <u>Section 9</u>, any lack of diligence by Lender in collection, protection or realization upon any Loan Collateral; (ii) the failure to make or give notice of presentment and demand for payment, or failure to make or give protest and notice of dishonor or of default to Pledgor or to any other party with respect to the Secured Obligations; (iii) any exculpation of liability of any party contained in the Loan Documents; (iv) the failure of Lender to perfect any security or to extend or renew the perfection of any security; (v) any valuation, stay, moratorium law or other similar law now or hereafter in effect or any right to require the marshalling of assets of Pledgor; (vi) any fraudulent, illegal or improper act by the Issuer, Borrower or Pledgor; (vii) all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any agreement, express or implied, or now or hereafter accorded by applicable law to any party; (viii) the right to a trial by jury in any manner related to this Agreement; and (ix) to the fullest extent permitted by law, any other legal, equitable or suretyship defenses whatsoever to which Pledgor or Issuer might otherwise be entitled, it being the intention that the obligations of Pledgor hereunder shall be absolute, unconditional and irrevocable.

(b)    All rights and remedies of Lender hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of, shall remain in full force and effect without regard to, and shall not be impaired by, any of the following, whether or not Pledgor shall have notice or knowledge thereof:

(i)    any lack of validity or enforceability of this Agreement or the Loan Documents or any other agreement or instrument relating to any of the foregoing;

(ii)    Pledgor have or had no legal existence or legal capacity or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from Pledgor by operation of law or for any other reason;

(iii)    the acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Pledgor, or for any other reason;

- 11 -

(iv)    any exercise or nonexercise, or any waiver, by Lender of any right, remedy, power or privilege under or in respect of any of the Obligations or any security therefor (including this Agreement);

(v)    any change in the time, manner, or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment, waiver, or modification of or any consent to any departure from the Loan Documents or any provision thereof;

(vi)    any exchange, release, or nonperfection of any interest in any Collateral, or any release or amendment or waiver of or consent to any departure from any guaranty, for all or any of the Obligations, or the taking of additional security for, or any other assurances of payment of, any of the Obligations; or

(vii)    any other circumstances (other than payment in full of the Secured Obligations) that might otherwise constitute a defense available to, or a discharge of, Issuer.

11.    <u>Events of Default</u>. An "<u>Event of Default</u>" shall exist if any of the following occurs:

(a)    The occurrence of an "*Event of Default*", as such term is defined in the Note and the other Loan Documents;

(b)    if any representation or warranty of Pledgor made herein, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(c)     Pledgor' failure to pay any fees, costs or other amounts as and when required to be paid under this Agreement within five (5) days after demand by Lender;

(d)    Except with respect to (i) the payment of money and (ii) the matters herein before and hereafter specified in this Section 11, if Pledgor shall default in the observance or performance of any covenant or agreement contained in this Agreement for ten (10) days after the giving by the Lender to Pledgor of notice thereof (<u>provided, however,</u> if such default cannot reasonably be cured within such ten (10) day period, then Pledgor shall have such additional time as is reasonable under the circumstances, so long as Pledgor commence such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion, provided that in no event shall such additional time period exceed sixty (60) days); or

(e)    Any transfer made by Pledgor in violation of the provisions of this Agreement or any breach or violation by Pledgor of the provisions of Sections 4(a) or 6 (b)(iii), either of which shall be an immediate Event of Default hereunder without notice or opportunity to cure.

12.    <u>Remedies</u>.

- 12 -

(a)     If any Event of Default shall have occurred, then Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement, and Lender may also in its sole discretion, without notice except as specified below, sell the Collateral or any part thereof in one or more parts at public or private sale, at any recognized exchange or broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable.  Lender may be the purchaser of any or all of the Collateral at any such sale, and Lender shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Lender at such sale. Notwithstanding anything herein to the contrary, Pledgor shall have a right of redemption prior to a UCC sale of the Collateral in accordance herewith. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor, and Pledgor hereby waive all rights of redemption which such Pledgor now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted which might otherwise have been applicable subsequent to a UCC sale of the Collateral in accordance herewith. In addition, Pledgor hereby waive all rights of stay, and/or appraisal which Pledgor now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree.

(b)     Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as from time to time amended (the "Securities Act"), and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledge that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act) and,

- 13 -

notwithstanding such circumstances, Pledgor agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

(c)     If Lender determines to exercise its right to sell any or all of the Collateral, then, upon Lender's written request, Pledgor shall, and Pledgor shall cause the Issuer to (and/or cause the Issuer to cause the Borrower to), furnish to Lender such information as Lender may request of Pledgor concerning Pledgor and the Collateral.

(d)     Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agree that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

    (i)      Intentionally Omitted.

    (ii)     The foreclosure sale is conducted in accordance with the laws of the State of New York,

    (iii)    Not less than five (5) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale,

    (iv)     The foreclosure sale is conducted by an auctioneer licensed in the State of California and is conducted either (A) online via a teleconference or videoconference platform reasonably acceptable to Lender or (B) in front of the New York Supreme Court located in New York City, such other New York State Court having jurisdiction over the Collateral, Lender's office (located in New York City), or Lender's agent's office (including Lender's attorney) (located in New York City), in each case on any Business Day between the hours of 9 a.m. and 5 p.m.  Further, Pledgor hereby waive, for itself and on behalf of Borrower or Issuer, whether directly or indirectly, any offsets, counterclaims or defenses to the commercial reasonableness of a foreclosure sale arising directly or indirectly from the existence and/or spread of the Coronavirus Disease (COVID-19) or any related strain or mutation thereof,

    (v)      The notice of the date, time and location of the foreclosure sale is published in a widely circulated newspaper in California once a week for four (4) consecutive weeks prior to the date of the foreclosure sale, and

    (vi)     Lender sends notification of the foreclosure sale to all secured parties against Pledgor identified as a result of a search of the UCC financings

statements in the filing offices located in the State of California conducted not earlier than thirty (30) days before such notification date.

Notwithstanding Pledgor' agreement that any foreclosure sale conducted in accordance with the foregoing provisions shall be considered a commercially reasonable sale, the foregoing description of potential foreclosure sale procedures and the agreement of Pledgor that such procedures are commercially reasonable shall create no implication that a foreclosure sale conducted using different procedures is commercially unreasonable. As used herein the term "foreclosure sale" shall be deemed to include a public auction as such term is used in the UCC.

13. <u>Application of Proceeds</u>. Except as expressly provided elsewhere in this Agreement, all proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and/or then, or at any time thereafter, applied in full or in part by Lender against, the Secured Obligations in the following order of priority:

FIRST: To the payment of all costs and expenses of such sale, collection, or other realization, including compensation to Lender and its agents, the fees and expenses and disbursements of Lender's counsel, and all other expenses, liabilities, and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder and all advances made by Lender hereunder for the account of the Pledgor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder, all in accordance with <u>Section 14</u>;

SECOND: To the payment in full of the Secured Obligations, in the manner provided for in the Loan Documents; and

THIRD: To the payment to or upon the order of Pledgor, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

14. <u>Indemnity and Expenses</u>.

(a)    Pledgor agree to indemnify Lender from and against any and all claims, losses, and liabilities in any way relating to, growing out of, or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses, or liabilities result from Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.

(b)    Pledgor shall pay to Lender upon demand the amount of any and all costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Collateral, (ii) the exercise or enforcement of

- 15 -

any of the rights of Lender hereunder, or (iii) the failure by Pledgor to perform or observe any of the provisions hereof.

15.   Continuing Security Interest.  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the payment in full of all Secured Obligations and the Borrower has no further obligations under the Loan Documents, (b) be binding upon Pledgor and Pledgor' legal representatives, successors and assigns, and (c) inure, together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors, transferees and assigns.  Upon the payment in full of all Secured Obligations and the cancellation or termination of the Loan Documents, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Pledgor.  Upon any such termination Lender will, at Pledgor' expense, execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination, and Pledgor shall be entitled to the return, upon Pledgor' request and at Pledgor' expense, against receipt and without recourse to Lender, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

16.   Amendments, Etc.  No amendment, modification, termination, or waiver of any provision of this Agreement, and no consent to any departure by Pledgor from the terms and conditions hereof, shall in any event be effective as to Pledgor unless the same shall be in writing and signed by Lender and, in the case of any such amendment or modification, by Pledgor.  Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

17.   Failure or Indulgence Not Waiver; Remedies Cumulative.  No failure or delay on the part of Lender in the exercise of any power, right, or privilege hereunder shall impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right, or privilege preclude any other or further exercise thereof or of any other power, right, or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

18.   Severability.  In case any provision in or obligation under this Agreement shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19.   Headings.  Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

20.   Counterparts.  This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically

- 16 -

attached to the same document.  Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

21.     <u>Marshalling</u>.  Lender shall not be required to marshal any present or future security for (including, but not limited to, this Agreement and the Collateral), or other assurances of payment of, the Secured Obligations or any of them, or to resort to such security or other assurances of payment in any particular order.  All of Lender's rights hereunder and in respect of such security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent lawfully permissible, Pledgor hereby agree that Pledgor will not invoke any law, doctrine, or principle relating to the marshalling of collateral that might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that Pledgor lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

22.     <u>Notices, Etc</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission followed by telephonic confirmation or similar writing) and shall be given to such party as follows: (i) to Lender, to the address set forth in the Loan Documents, and (ii) to Pledgor, to the following address:

        Adrian Rudomin
        578 Washington Boulevard, Apartment 148,
        Marina Del Ray, California 90292

        Pablo Rudomin
        578 Washington Boulevard, Apartment 148,
        Marina Del Ray, California 90292

        Isaac Rudomin
        578 Washington Boulevard, Apartment 148,
        Marina Del Ray, California 90292

        Diego Rudomin
        1339 Appleton Way,
        Venice, California 90291

        with a copy in like manner to:

        Simone & Roos, LLP
        5627 Sepulveda Blvd., Suite 206
        Sherman Oaks, California 91411
        Attn: Martin Simone, Esq.

Any such addressee may change its address for such notices to any other address in the United States as such addressee shall have specified by written notice given as set forth above.

4863-0173-5550, v. 2

Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when such facsimile is transmitted to the facsimile number specified in this Section and the appropriate facsimile confirmation is received, (ii) if given by mail, on the earlier of actual receipt or three (3) Business Days after such communication is deposited in the mail with first class certified or registered mail, postage prepaid, addressed as aforesaid, (iii) if given by a nationally recognized overnight carrier, one (1) Business Day after such communication is deposited with such carrier with delivery charges prepaid, or (iv) if given by any other means, when delivered at the address specified in this Section.

23.    <u>Delay Not Waiver</u>.  No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right.  No waiver by Lender in any instance shall constitute a waiver in any other instance.

24.    <u>Irrevocable Proxy</u>.  With respect to Article 8 Matters and all other matters, including without limitation, the rights, remedies and powers granted by this Agreement, and to the extent applicable, Pledgor hereby irrevocably grant and appoint Lender, from the date of this Agreement until the payment in full of the Secured Obligations and the termination of all obligations of the Issuer under the Loan Documents, exercisable whether or not there has been an Event of Default hereunder or under the Loan Documents, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead, to vote the Pledged Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this <u>Section 24</u> shall include the right to sign Pledgor' name (as the holder of a membership interest in the Issuer) to any consent, certificate or other document relating to an Article 8 Matter and the related Pledged Interests that applicable law may permit or require and to cause the Pledged Interests to be voted in accordance with the preceding sentence. Pledgor hereby represent and warrant that there are no other proxies and powers of attorney with respect to an Article 8 Matter.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.

THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

25.    <u>Miscellaneous</u>.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Lender to enforce any provision shall not preclude Lender from enforcing any such provision thereafter.

(b)    Pledgor hereby authorize Lender to file one or more financing statements describing all or part of the Collateral, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law.  Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the

- 18 -

sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Pledgor is an organization, the type of organization and any organizational identification number issued to Pledgor. Pledgor agree to furnish any such information to Lender promptly upon request.

(c)     This Agreement shall be governed by and construed according to the internal laws of the State of Delaware.  Pledgor and Lender hereby irrevocably (i) submit to the non-exclusive jurisdiction of any United States Federal or State court sitting in the State of Delaware, in any action or proceeding arising out of or relating to this Agreement, and (ii) waive to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.  Service of process by Lender in connection with such action or proceeding shall be binding on Pledgor if sent to Pledgor by registered or certified mail at its address specified above.

26.     <u>WAIVER OF JURY TRIAL</u>.  TO THE EXTENT ALLOWED BY APPLICABLE LAW, PLEDGOR AND LENDER EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING ON OR ARISING OUT OF THIS AGREEMENT.

[Remainder of page intentionally left blank; signature pages follow]

4863-0173-5550, v. 2

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**

_____
**ADRIAN RUDOMIN**, an individual

_____
**DIEGO RUDOMIN**, an individual

_____
**PABLO RUDOMIN**, an individual

_____
**ISAAC RUDOMIN**, an individual

**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adian Rudomin
Title:   Authorized Signatory

**LENDER:**

**CSPRF 2 LLC,**
a Delaware limited liability company

By: _____
Name:  David Blatt
Title:   Authorized Signatory

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**


_____
**ADRIAN RUDOMIN**, an individual


_____
**DIEGO RUDOMIN**, an individual

✗   _____
**PABLO RUDOMIN**, an individual

✗   _____
**ISAAC RUDOMIN**, an individual


**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adian Rudomin
Title:   Authorized Signatory


**LENDER:**

**CSPRF 2 LLC,**
a Delaware limited liability company


By:   _____
Name:   David Blatt
Title:   Authorized Signatory

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**

_____

**ADRIAN RUDOMIN**, an individual

_____

**DIEGO RUDOMIN**, an individual

_____

**ADRIAN RUDOMIN**, an individual, as agent for
**PABLO RUDOMIN**, an individual

_____

**ADRIAN RUDOMIN**, an individual, as agent for
**ISAAC RUDOMIN**, an individual

**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adian Rudomin
Title:  Authorized Signatory

**LENDER:**

**CSPRF-2 LLC,**
a Delaware limited liability company

By: _____
Name: David Blatt
Title:  Authorized Signatory

## JOINDER AND CONSENT OF THE ISSUER

The undersigned hereby (a) joins in the above Agreement for the sole purpose of consenting to the terms thereof; (b) agrees to cooperate fully and in good faith with the Lender and Pledgor in carrying out this Agreement (including, without limitation, by admitting Lender or its transferee (including from a secured party's sale) as a substituted member); (c) waives any transfer or other restrictions existing pursuant to Contractual Obligations, Organizational Documents, or otherwise (other than under any applicable securities laws), which otherwise might apply to the granting of the pledges and security interests hereunder, or to the exercise by the Lender of the rights and remedies provided in this Agreement or applicable law, at law or in equity, so as to, among other things, permit (x) Pledgor to enter into and perform Pledgor's obligations under this Agreement, and (y) the Lender's exercise of the Lender's rights and remedies hereunder and under applicable law, at law or in equity; (d) represents and warrants that the (i) Issuer has elected to have its membership interest deemed to be "securities" for the purposes of Articles 8 and 9 of the UCC, and any and all Certificates being delivered to Lender pursuant to the Agreement are each a "certificated security" (as defined by the UCC), (ii) Lender is duly noted in the Issuer's books and records as the sole pledgee of the Collateral, and (iii) Issuer will not recognize any transferee or pledgee of the Collateral other than Lender or pursuant to the exercise of Lender's rights and remedies under this Agreement; and (e) agrees to comply with any "instructions" (as defined in Section 8-102(a)(12) of the UCC) originated by the Lender in conformity with this Agreement without further consent of the Pledgor, including, without limitation, instructions regarding the transfer, redemption or other disposition of the Collateral or the proceeds thereof, including any Distributions with respect thereto (this clause (e) shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the above Agreement).

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the undersigned has caused this Joinder and Consent to be executed as an instrument under seal of the date first above written.

ISSUER:

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

## SCHEDULE A

### Pledged Interests

| PLEDGOR | ISSUER | INTERESTS PLEDGED |
|---|---|---|
| **Adrian Rudomin** | LEVIATHAN, LLC, a California limited liability company | 37% membership interest |
| **Diego Rudomin** | LEVIATHAN, LLC, a California limited liability company | 37% membership interest |
| **Pablo Rudomin** | LEVIATHAN, LLC, a California limited liability company | 12.5% membership interest |
| **Isaac Rudomin** | LEVIATHAN, LLC, a California limited liability company | 12.5% membership interest |
| **The Kraken, LLC** | LEVIATHAN, LLC, a California limited liability company | 1% membership interest |

4863-0173-5550, v. 2

## SCHEDULE B

## Consents

# Exhibit G

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 1                                     37% Membership Interest

　　　　　　**LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **ADRIAN RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 37% of the Membership Interest in the Company (the "Interests"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

　　　　　　This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:   Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)
ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto ___CSPRF2 LLC___, a 37% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints __David Blatt__ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: _11/16/2023_

_____
**ADRIAN RUDOMIN**, an individual

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of ___December 4, 2004___.

Name of Transferee: ___CSPRF2 LLC___

Signature: _____
                        (Transferee)

Dated: 12-04-2024

Address: 1207 Delaware Ave, Ste 2992
Wilmington DE 19806

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

LEVIATHAN, LLC
a California limited liability company

By: _____

Name: Adrian Rudmonin

Title:   Authorized Signatory

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 2                                                37% Membership Interest

       **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **DIEGO RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 37% of the Membership Interest in the Company (the "Interests"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

       This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:   Authorized Signatory

### (REVERSE SIDE OF CERTIFICATE)
### ASSIGNMENT OF INTERESTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto ___CSPRF2 LLC___, a 37% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints ___David Blatt___ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: 11/16/2023

**DIEGO RUDOMIN**, an individual

### APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of ___December 4, 2004___.

Name of Transferee: ___CSPRF2 LLC___

Signature: _____
(Transferee)

Dated: 12-04-2024

Address: 1207 Delaware Ave, Ste 2992
Wilmington DE 19806

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:   Authorized Signatory

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.  THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.  ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 3                                              12.5% Membership Interest

   **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **PABLO RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 12.5% of the Membership Interest in the Company (the "Interests").  The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement").  By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

   This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto ____CSPRF2 LLC____, a 12.5% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints ___David Blatt___ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated:

X _____

**PABLO RUDOMIN**, an individual

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of ___December 4, 2024___.

Name of Transferee: ____CSPRF2 LLC____

Signature: _____
(Transferee)

Dated: 12-04-2024

Address: 1207 Delaware Ave, Ste 2992
Wilmington DE 19806

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:   Authorized Signatory

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.   ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 4                                    12.5% Membership Interest

       **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **ISAAC RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 12.5% of the Membership Interest in the Company (the "Interests").  The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the [Operating Agreement] of the Company dated as of Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

       This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto ___CSPRF2 LLC___, a 12.5% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints __David Blatt__ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated:                                   X  _____

**ISAAC RUDOMIN**, an individual

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of ___December 4, 2024___.

Name of Transferee:  __CSPRF2 LLC__

Signature: _____
                                   (Transferee)

Dated:  12-04-2024

Address:  1207 Delaware Ave, Ste 2992
                 Wilmington DE 19806

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.   ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 5                                             1% Membership Interest

      **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **THE KRAKEN, LLC**, a California limited liability company (together with any assignee of this Certificate, the "Holder") is the registered owner of 1% of the Membership Interest in the Company (the "Interests").   The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the [Operating Agreement] of the Company dated as of Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement").   By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.   The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

      This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

LEVIATHAN, LLC
a California limited liability company

By: _____
Name: Adrian Rudomin
Title: Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____CSPRF2 LLC_____, a 1% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____David Blatt_____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated: *11/16/2023*

THE KRAKEN, LLC,
a California limited liability company

By: _____
Name: Adrian Rudomin
Title: Authorized Signatory

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____December 4, 2024_____.

Name of Transferee: _____CSPRF2 LLC_____

Signature: _____
(Transferee)

Dated: 12-04-2024

Address: 1207 Delaware Ave, Ste 2992
Wilmington DE 19806

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**Exhibit H**

## MANAGING MEMBER CONSENT

The undersigned, being the manager of **THE KRAKEN, LLC**, a California limited liability company ("**Kraken**"), which is the manager of **LEVIATHAN, LLC**, a California limited liability company (the "**Member**"), which is the sole Member and manager of **CHANTILLY ROAD, LLC**, a California limited liability company (the "**Company**"), hereby consent to the following:

That the undersigned hereby (i) approves the Mortgage Note, the Deed of Trust and Security Agreement, and any and all other security documents and guarantees (collectively herein, the "**Mortgage Loan Documents**") to be executed by the Company in connection with that certain loan in the principal sum of $2,350,000.00 (the "**Loan**") to be made by **CSPRF 2 LLC** ("**Lender**") to the Company, (ii) authorizes the Company to grant a second (2nd) mortgage encumbering the Company's real property located in the County of Los Angeles, State of California, and commonly known as 1116 Chantilly Road, Los Angeles, California (the "**Property**"), to secure the Loan, and (iii) consents to all the terms contained in the Loan Documents, or as the undersigned may determine; and

That the undersigned hereby approves the Ownership Interest Pledge and Security Agreement, and any and all other security documents and guarantees (collectively herein, the "**Pledge Documents**"; together with the Mortgage Loan Documents, hereinafter, collectively, the "**Loan Documents**") to be executed by The Kraken LLC, Isaac Rudomin, Pablo Rudomin, Diego Rudomin and Adrian Rudomin, the Member and the Company, as applicable, in connection with the Loan, affecting the Member's membership interest in the Company, to secure the Loan, and consents to all the terms contained in the Pledge Documents, or as the undersigned may determine; and

FURTHER, that Adrian Rudomin, be, and hereby is, Authorized Signatory of each of the Company, Member, and Kraken, and is hereby authorized to execute all Loan Documents and any other documents required by Lender to be executed by the Company, Member and/or Kraken, as the case may be, in connection with the closing of the aforementioned Loan; and

FURTHER, this Consent may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

INCUMBENCY AND SIGNATURE PAGE TO FOLLOW.

4885-6156-8383, v. 1

I further certify that the below named person(s) have been duly elected (or appointed) and have duly qualified as, and on this date are, members of Company, holding the respective offices set forth opposite their names below and the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Adrian Rudomin | Authorized Signatory | |

Dated: As of November _16_, 2023

[SIGNATURE PAGE TO FOLLOW]

The undersigned has executed this Consent as of the day and year first written above.

_____
**ADRIAN RUDOMIN**


STATE OF _____ )
                                                )    ss.:
COUNTY OF _____ )


      On the ___ day of _____, in the year 2023, before me, the undersigned, a Notary Public in and for said State, personally appeared ADRIAN RUDOMIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of ___Los Angeles___ )

On ___11/16/2023___ before me, ___Tara Gipson, notary public___
(insert name and title of the officer)

personally appeared ___Adrian Rudomin___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

TARA GIPSON
COMM. #2354010
Notary Public · California
Los Angeles County
My Comm. Expires May 6, 2025

Signature ___Tara Gipson___    (Seal)

# Exhibit I

## NOTICE OF SALE

PLEASE TAKE NOTICE, that in accordance with applicable provisions of the Uniform Commercial Code as enacted in New York, and by virtue of certain Event(s) of Default under that certain Ownership Interests Pledge and Security Agreement, dated as of November 20, 2023 (the "**Pledge Agreement**"), executed and delivered by ADRIAN RUDOMIN**,** an individual ("**AR**"), DIEGO RUDOMIN**,** an individual ("**DR**"), PABLO RUDOMIN, an individual ("**PR**"), ISAAC RUDOMIN**,** an individual ("**IR**"), and **THE KRAKEN, LLC**, a California limited liability company ("**KRAKEN**"; together with AR, DR, PR and IR, hereinafter, individually, collectively, jointly and severally, as the case may be, the "**Pledgors**"), as security, to induce CSPRF 2 LLC, a Delaware limited liability company (the "**Lender**" and/or "**Secured Party**"), to make that certain loan in the principal amount of $2,350,000.00 to CHANTILLY ROAD, LLC, a California limited liability company (the "**Borrower**"), and in accordance with Secured Party's rights as holder of the security, by virtue of possession of those certain Share Certificates held in accordance with Article 8 of the Uniform Commercial Code of the State of New York (the "**Code**"), and by virtue of those certain UCC-1 Filing Statements made in favor of Secured Party, all in accordance with Article 9 of the Code, Secured Party will offer for sale, at public auction, (i) all of Pledgor's right, title, and interest in and to the following: LEVIATHAN, LLC (the "**Pledged Entity**"), and (ii) certain related rights and property relating thereto (collectively, (i) and (ii) are the "**Collateral**"). Secured Party's understanding is that the principal asset of the Borrower is the premises located at 1116 Chantilly Road, Los Angeles, CA 90077 (the "**Property**").

Maltz Auctions ("**Maltz**"), under the direction of Richard B. Maltz or David A. Constantino (individually, the "**Auctioneer**"), will conduct a public sale consisting of the Collateral (as set forth in Schedule A below), via online bidding, on **October 4, 2024 at 2:30pm (EST)**, in satisfaction of an indebtedness in the approximate amount of **$2,511,358.89**, including principal, interest on principal, and reasonable fees and costs, plus default interest through October 4, 2024, subject to open charges and all additional costs, fees and disbursements permitted by law.  The Secured Party reserves the right to credit bid.

Online bidding will be made available for pre-registered bidders via Maltz's online bidding App available for download in the App Store or on Google play and via desktop bidding at RemoteBidding.MaltzAuctions.com .

**Bidder Qualification Deadline:  October 3, 2024 by 4:00 pm (EST)**.  Executed Terms & Conditions of Sale along with ten (10%) of Bidders intended bid amount (to be submitted via **wire transfer**) are required for consideration by any interested party and submitted directly to Maltz. Requests for wiring instructions should be sent to rmaltz@maltzauctions.com.

*SCHEDULE A*

| PLEDGED INTEREST | | |
|---|---|---|
| **_PLEDGOR_**<br>*ADRIAN RUDOMIN, an individual* | **_ISSUERS_**<br>*LEVIATHAN, LLC, a California limited liability company* | **_INTERESTS PLEDGED_**<br>*37% membership interest* |
| *DIEGO RUDOMIN, an individual* | *LEVIATHAN, LLC, a California limited liability company* | *37% membership interest* |
| *PABLO RUDOMIN, an individual* | *LEVIATHAN, LLC, a California limited liability company* | *12.5% membership interest* |
| *ISAAC RUDOMIN, an individual* | *LEVIATHAN, LLC, a California limited liability company* | *12.5% membership interest* |
| <u>*THE KRAKEN, LLC, a California limited liability company*</u> | *LEVIATHAN, LLC, a California limited liability company* | *1% membership interest* |
| *The UCC1 was filed on January 12, 2024, with the Secretary of State of the State of California under the Filing No. U240003090921, and thereafter, amended and corrected by UCC3 filed on August 14, 2024, with the Secretary of State of the State of California under Filing No. U240065026720.* | | |

KRISS & FEUERSTEIN LLP
Attn:  Michael J. Bonneville, Esq.
*Attorneys for Secured Party*
360 Lexington Avenue, Suite 1200
New York, New York 10017
(212) 661-2900

# Exhibit J

# CSPRF 2 LLC

1207 Delaware Ave, Ste 2992
Wilmington DE 19806

_____

August 20, 2024

## NOTIFICATION OF
## DISPOSITION OF COLLATERAL

**VIA OVERNIGHT MAIL**

ADRIAN RUDOMIN
578 Washington Boulevard, Apt. 148
Marina Del Ray, CA  90292

ISAAC RUDOMIN
578 Washington Boulevard, Apt. 148
Marina Del Ray, CA 90292

DIEGO RUDOMIN
1339 Appleton Way
Venice, CA 90291

THE KRAKEN, LLC
578 Washington Blvd, #148
Marina Del Rey, CA  90292

PABLO RUDOMIN
578 Washington Boulevard, Apt.  148
Marina Del Ray, CA 90292

Dear Sir/Madam:

Reference is made to a loan (the "Loan"), as evidenced by that certain $2,350,000 Mortgage Note, dated as of November 20, 2023 (the "Note"), and that certain Deed of Trust and Security Agreement (the "Deed of Trust"), given by **CHANTILLY ROAD, LLC**, a California limited liability company (the "Borrower"), in favor of **CSPRF 2 LLC,** a Delaware limited liability company (the "Lender" and/or "Secured Party"), and secured, _inter alia_, by that certain Ownership Interests Pledge and Security Agreement (the "Pledge Agreement"), dated as of November 20, 2023, whereby **ADRIAN RUDOMIN,** an individual ("AR"), **DIEGO RUDOMIN,** an individual ("DR"), **PABLO  RUDOMIN**, an individual ("PR"), **ISAAC RUDOMIN,** an individual ("IR"), and **THE KRAKEN, LLC**, a California limited liability company ("KRAKEN"; together with AR, DR, PR and IR, hereinafter, individually, collectively, jointly and severally, as the case may be, the "Pledgors"), pledged their 100% membership interests in and to LEVIATHAN, LLC, a California limited liability company (the "Pledged Entity") to Lender.  A copy of the Pledge Agreement is annexed hereto as _**Exhibit "A".**_

Further reference is made to that certain Guaranty (the "Guaranty"), and that certain Environmental Indemnity Agreement (the "EIA", together with the Guaranty, the "Guaranties"), both dated as of November 20, 2023, given by AR, DR, PR and IR (collectively, the "Guarantors"), in favor of Lender.

The Note, Deed of Trust, Pledge Agreement, Guaranties and all other documents executed in connection with the Loan are collectively referred to herein as the "Loan Documents").

Capitalized terms used herein and not otherwise defined herein shall have the meaning given to such term in the Loan Documents.

Pursuant to the Pledge Agreement, the Pledgors have pledged to Lender, and Lender has a perfected security interest in the Collateral (as defined in the Pledge Agreement) consisting of, among other assets, all of Pledgors' membership interest in and to the Pledged Entity represented by those certain Share Certificates annexed hereto as ***Exhibit "B" through Exhibit "F***.

Certain Event(s) of Default exist under the Loan Documents for, among other things, Borrower's failure to pay off the Loan by the Maturity Date on August 1, 2024 (the "**Maturity Default**", in accordance with the provisions of the Note.

As a result of the Maturity Default and pursuant to that certain maturity default notice, dated August 2, 2024, Borrower was advised that the Loan has matured, and that all obligations of the Borrower to the Lender under the Loan Documents are now due and owning and payable in full.

1.      Notification of Disposition of Collateral

Notice is hereby given that Lender will sell the Collateral to the highest qualified bidder at a public sale in accordance with the provisions of the Uniform Commercial Code as in effect in the State of New York. The sale will take place beginning at **2:30pm on October 4, 2024 (EST)**.

Online bidding will be made available for pre-registered bidders via Maltz's online bidding App available for download in the App Store or on Google play and via desktop bidding at RemoteBidding.MaltzAuctions.com.

**Bidder Qualification Deadline:  October 3, 2024 by 4:00 pm (EST)**.   Executed Terms & Conditions of Sale along with ten (10%) of Bidders intended bid amount (to be submitted via **wire transfer**) are required for consideration by any interested party and submitted directly to Maltz.  Requests for wiring instructions should be sent to rmaltz@maltzauctions.com.

The Pledgors and other obligated parties may be liable for any indebtedness which shall remain after such sale to the extent permitted by applicable law and the Loan Documents.

2.      Reservation of Rights

Nothing contained herein shall be construed as a modification of any of the Loan Documents or as a waiver of any delinquency, breach, default or Event(s) of Default under the Loan Documents, at law or in equity, or as a waiver, modification or limitation of any of rights or remedies of Lender, all of which are hereby expressly reserved. Any actions, omissions or forbearance by Lender in the exercise of any such rights and remedies shall not constitute a waiver of such rights or any other rights and shall not be deemed to establish a course of conduct nor justify an expectation by the Borrower, Pledgors or Guarantors that Lender will take any further action or continue to not take any action and will not preclude Lender from exercising any and all remedies available at any time thereafter. Lender may exercise each right and remedy available to it from time to time and as often and in such order as it may determine in its sole discretion, and the exercise or beginning of the exercise of any such right or remedy shall not be construed as a

waiver of the right to exercise at the same time or thereafter any other right or remedy available to it.

There may be other Defaults or Event(s) of Default which are not identified in this letter which may currently exist under the Loan Documents. Lender is expressly not waiving any defaults or Event(s) of Default whether or not they are identified herein.

Any conversations, correspondence, proposals or discussions of proposals with Lender shall not prejudice Lender's rights nor be legally binding on Lender unless definitive documents are executed and delivered by Lender.

3.    Governing Law

THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Sincerely,

**CSRF 2 LLC**,
a Delaware limited lability company

By: _____
Name:
Title:     David Blatt
           Authorized Signatory

## THE BORROWER

### VIA OVERNIGHT MAIL
CHANTILLY ROAD, LLC
578 Washington Blvd., Suite 148
Marina Del Rey, CA 90292

## THE GUARANTORS

### VIA OVERNIGHT MAIL
Adrian Rudomin
578 Washington Blvd., Suite 148
Marina Del Rey, CA 90292

Pablo Rudomin
578 Washington Blvd., Suite 148
Marina Del Rey, CA 90292

Isaac Rudomin
578 Washington Blvd., Suite 148
Marina Del Rey, CA 90292

Diego Rudomin
1339 Appleton Way
Venice, CA 90291

The Kraken LLC
578 Washington Blvd, #148
Marina Del Rey, CA  90292

## WITH COPIES TO:

### VIA OVERNIGHT MAIL

Simone & Roos, LLP
5627 Sepulveda Blvd., Suite 206
Sherman Oaks, CA 91411
Attn: Martin Simone, Esq.

**EXHIBIT "A"**

**PLEDGE AGREEMENT**

<u>OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT</u>

THIS OWNERSHIP INTERESTS PLEDGE AND SECURITY AGREEMENT (this "<u>Agreement</u>") is made as of the 20th day of November, 2023, by and among, **ADRIAN RUDOMIN** ("<u>AR</u>"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **DIEGO RUDOMIN** ("<u>DR</u>"), an individual having an address at 1339 Appleton Way, Venice, California 90291, **PABLO RUDOMIN** ("<u>PR</u>"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, **ISAAC RUDOMIN** ("<u>IR</u>"), an individual having an address at 578 Washington Boulevard, Apt. 148, Marina Del Ray, California 90292, and **THE KRAKEN, LLC**, a California limited liability company  having an address at 578 Washington Blvd, #148, Marina Del Rey, CA 90292 ("<u>KRAKEN</u>"; together with AR, DR, PR and IR, hereinafter, individually and collectively and jointly and severally, as the case may be, the "<u>Pledgor</u>"), and **CSPRF 2 LLC,** a Delaware limited liability company, having offices at 8 The Green, Ste. A, Dover, Delaware 19901 ("<u>Lender</u>").

WHEREAS, pursuant to the terms of the Mortgage Note (the "<u>Note</u>"), the Deed of Trust and Security Agreement (the "<u>Deed of Trust</u>"), and any and all other security documents and guarantees securing Borrower's obligations under the Note (collectively herein, the "<u>Loan Documents</u>") of even date herewith between CHANTILLY ROAD, LLC, a California limited liability company  (the "<u>Borrower</u>"), and Lender, Lender has agreed to make that certain secured loan to the Borrower in the principal amount of $2,350,000.00 (the "<u>Loan</u>"), as evidenced and secured by all of the obligations under and in connection with the Loan Documents, on the condition that Pledgor pledge all interest, right and title to their respective membership interests (as set forth on <u>Schedule A</u> annexed hereto and made a part hereof) in LEVIATHAN, LLC, a California limited liability company ("<u>Issuer</u>"), being the sole member of Borrower (the "<u>Obligations</u>"); and

WHEREAS, Pledgor are the members of the Issuer;

WHEREAS, Issuer is the sole member of Borrower; and

WHEREAS, in order to induce Lender to make the Loan, it is a condition precedent under the Loan Documents that Pledgor shall have (a) granted to Lender the security interests, and undertaken the obligations, set forth in this Agreement, and (b) executed and delivered to Lender this Agreement.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Pledge of Collateral</u>.  Pledgor hereby irrevocably and unconditionally pledges and assigns to Lender, and irrevocably and unconditionally grants to Lender a security interest in, all of Pledgor's right, title, and interest in and to the following (the "<u>Collateral</u>"):

(a)    the Pledged Interests (hereinafter defined) together with all rights to Distributions (hereinafter defined) or other payments arising therefrom or relating thereto, and

all options, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributable in respect of or in exchange for any or all of the Pledged Interests;

(b)    to the extent not covered by subparagraph (a), all rights to receive all income, gain, profit, loss, or other items allocated, allocable, distributed, or distributable to Pledgor under the Organizational Documents (hereinafter defined) of the Issuer, and all general intangibles, accounts, investment property, payment intangibles, supporting obligations, other contract rights or rights to the payment of money, and all proceeds, as each of the foregoing terms is defined in the UCC (hereinafter defined), arising out of, or in connection with, the membership interest in Issuer;

(c)    all of Pledgor' ownership interest in any capital accounts in the Issuer;

(d)    all of Pledgor' voting, consent, management, management removal and replacement, and approval rights, and/or rights to control or direct the affairs of the Issuer, inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement of the Issuer dated June  18, 2021, and any amendments thereto, as the same may be amended or amended and restated from time to time (collectively, the "Operating Agreement");

(e)    any additional ownership interests of, and any ownership interests exchangeable for or convertible into and warrants, options, and other rights to purchase or otherwise acquire shares of ownership interests of, the Issuer, or entity which is the successor of the Issuer, from time to time acquired by Pledgor in any manner (all of which interests shall be deemed to be part of the Pledged Interests), and any certificates or other instruments representing such additional interests, warrants, options, and other rights, and all Distributions and other property or proceeds from time to time received, receivable, or otherwise distributed or distributable in respect of or in exchange for any or all of such additional shares, warrants, options, or other rights.  Pledgor agrees that Lender may from time to time attach as Schedule A hereto an updated list of the Collateral at the time pledged to Lender hereunder (although the failure to so update Schedule A shall not limit the pledge of such additional interests to Lender); and

(f)    to the extent not covered by clauses (a) through (e) above, all proceeds of any or all of the foregoing Collateral.  For purposes of this Agreement, the term "proceeds" includes whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to Pledgor from time to time with respect to any of the Collateral.

2.    Certain Definitions.  Capitalized terms used herein without definition shall have the respective meanings provided therefor in the Loan Documents.  Terms (whether or not capitalized) used herein and not defined in the Loan Documents or otherwise defined herein that are defined in the Uniform Commercial Code as in effect in the State of California or other applicable jurisdiction (the "UCC") have such defined meanings

herein, unless the context otherwise indicates or requires.  In addition, the following terms used herein shall have the following meanings:

(a)      "Article 8 Matter" means any action, decision, determination or election by the Issuer or its members that the membership interest in the Issuer be, or cease to be, a "security" as defined in and governed by Article 8 of the UCC, and all other matters related to any such action, decision, determination or election.

(b)      "Business Day" means a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

(c)      "Contractual Obligation" means, as to any Person, any contract, agreement, or undertaking, regardless of how characterized, oral or written, to which such Person is a party, or by which such Person or such Person's property is bound, or to which such Person or such Person's property is subject.

(d)      "Distributions" means any distribution of property (including cash) (regardless of whether from cash flow, capital transactions, or otherwise) on account of a Pledged Interest, or any other distribution or payment on or in respect of any membership interest or the redemption or repurchase thereof.

(e)      "Governmental Authority" means any national, state, or local government, any political subdivision thereof, or any other governmental, quasi-governmental, judicial, public, or statutory instrumentality, authority, body, agency, bureau, or entity or any arbitrator with authority to bind a Person at law, and any agency, authority, department, commission, board, bureau, or instrumentality of any of them.

(f)      "Legal Requirements" means all applicable federal, state, county and local laws, by-laws, rules, regulations, codes and ordinances, and the requirements of any Governmental Authority having or claiming jurisdiction with respect thereto, including, but not limited to, all orders and directives of any Governmental Authority having or claiming jurisdiction with respect thereto.

(g)      "Lien" means any lien, encumbrance, security interest, mortgage, restriction, charge or encumbrance of any kind.

(h)      "Loan Collateral" means the "Collateral" as defined in the Deed of Trust (as defined in the Note) and includes the Collateral hereunder.

(i)      "Organizational Documents" means for any corporation, partnership, trust, limited liability company, limited liability partnership, unincorporated association, business or other legal entity, the agreements pursuant to which such entity has been established or organized, its affairs are to be governed, and its business is to be conducted, as such documents may be amended from time to time.

- 3 -

(j)     "Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, State, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(k)     "Pledged Interests" means the ownership interests or membership interest now or hereafter listed on Schedule A hereto or which would be listed on an updated Schedule A at any time of reference, together with all related rights of the holder thereof pursuant to the Organizational Documents of the Issuer.

3.     Security for the Secured Obligations.   This Agreement secures, and the Collateral is collateral security for, the payment and performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand, or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), of the following (the "Secured Obligations"):

(a)     the Obligations, including all obligations and liabilities of every nature of the Borrower now or hereafter existing under or arising out of or in connection with the Loan Documents and all renewals or extensions thereof, whether for principal, interest, fees, expenses, indemnities, or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created, or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Lender as a preference, fraudulent transfer, or otherwise, and all obligations of every nature of the Pledgor now or hereafter existing under this Agreement; and

(b)     the obligations of Pledgor hereunder.

4.     Delivery of Collateral.

(a)     If at any time the Pledged Interests are evidenced by one or more certificates, Pledgor shall deliver to Lender any original certificate evidencing the Pledged Interests (the "Certificate"), in suitable form for transfer by delivery or, as applicable, accompanied by any necessary endorsement or duly executed instruments of transfer or assignment, in blank, all in form and substance satisfactory to Lender.

(b)     Lender shall have the right, at any time after the occurrence of an Event of Default, in its discretion and without notice to Pledgor, to transfer to or to register (if not already so registered) in the name of Lender or any of its nominees any or all of the Collateral.  In addition, Lender shall have the right at any time to exchange certificates or instruments representing or evidencing Collateral for certificates or instruments of smaller or larger denominations.

5.     Representations and Warranties.  Pledgor hereby represents and warrants as follows:

- 4 -

(a)    <u>Organization; Address of Pledgor</u>.  Kraken is the type of entity, organized in the jurisdiction, and has the address set forth with respect to Kraken in the introductory paragraph to this Agreement, and with respect to AR, DR, PR and IR has the address as set forth in the introductory paragraph to this Agreement.

(b)    <u>No Conflict</u>.  The execution, delivery, and performance by Pledgor of this Agreement will not (i) violate any provision of any Legal Requirement applicable to Pledgor, or any order, judgment, or decree of any Governmental Authority binding on Pledgor, (ii) result in a breach of, or constitute with due notice or lapse of time or both, a default under any Contractual Obligation of Pledgor, (iii) result in or require the creation or imposition of any Lien upon any of Pledgor' properties or assets, except pursuant to this Agreement, (iv) require the approval or consent of any Person under any Contractual Obligation of Pledgor, except for the approvals or consents described on <u>Schedule B</u> hereto, which approvals or consents have been obtained, and true and complete copies of which have been furnished to Lender, or (v) conflict with any provision of Issuer's organizational documents and/or Pledgor' organizational documents, as applicable.

(c)    <u>Binding Obligation</u>.  The execution, delivery and performance of this Agreement and the transactions contemplated hereby is within the authority of Pledgor, has been duly authorized by all necessary proceedings, and is the legally valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws or equitable principles generally.

(d)    <u>Description of Collateral</u>.  The Pledged Interests are being certificated pursuant to this Agreement and are fully paid and non-assessable.  The Pledged Interests constitute all of the issued and outstanding ownership interests of the Issuer owned beneficially or of record by Pledgor.  Neither Pledgor nor any other Person holds, or has any right to the issuance of, any options or other rights to purchase, and is not party to any other agreement with respect to and does not hold or have the right to any property that is now or hereafter convertible into, or that requires the issuance or sale of, any ownership interests of the Issuer.  No Person other than Pledgor owns any ownership interests of any type in the Issuer.  Other than the Certificates delivered to Lender pursuant to this Agreement, there currently exist no certificates, instruments or writings representing the Pledged Interests.  However, to the extent that in the future there exist any such certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Lender.

(e)    <u>Ownership of Collateral</u>.  (i)  Pledgor is the legal and beneficial owner of, and has good and marketable title to, the Collateral, and is the record owner of the Pledged Interests, free and clear of, and subject to no, pledges, Liens, security interests, charges, options, restrictions or other encumbrances, except the pledge and security interest created by this Agreement; (ii) Pledgor has the legal capacity to execute, deliver and perform Pledgor' obligations under this Agreement and to pledge and grant a security interest in all of the Collateral of which it is the legal

- 5 -

or beneficial owner pursuant to this Agreement; (iii) except for authorizations and consents which have already been obtained, no authorization, consent of or notice to any party that has not been obtained is required in connection with the execution, delivery, performance, validity or enforcement of this Agreement, including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer by Lender pursuant to the terms hereof; and (iv) Lender's filing of UCC-1 financing statements with the Secretary of State of the State of California results in the perfection of Lender's security interest in the Pledged Interests, and such portion of the other Collateral in which a security interest may be perfected by filing such UCC-1 form or financing statement.

(f)    <u>Governmental Authorizations</u>.  No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required for either (i) the pledge by Pledgor of the Collateral pursuant to this Agreement and the grant by Pledgor of the security interest granted hereby, (ii) the execution, delivery, or performance of this Agreement by Pledgor, or (iii) the exercise by Lender of the voting or other rights in respect of the Collateral provided for in this Agreement (except as may be required in connection with a disposition of Collateral by laws affecting the offering and sale of securities generally).

(g)    <u>Article 8</u>.  Pledgor acknowledges and agrees that the terms of the Pledged Interests and the Organizational Documents of the Issuer do and will provide that the Pledged Interests shall constitute a "security" within the meaning of Article 8 of the UCC (including Section 8-102(a)(15) thereof), as in effect from time to time in the State of California, and Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Pledgor acknowledges and agrees that the Pledged Interests, and any and all Certificates which have been delivered to Lender on the date hereof, constitute and each will constitute a "certificated security" (as defined in the UCC). Pledgor therefor covenants and agrees that Pledgor shall not, directly or indirectly, without the prior written consent of Lender, alter, amend modify, supplement or change in any way, the Operating Agreement as in effect on the date hereof. However, the Pledged Interests are not and will not be investment company securities within the meaning of Section 8-103 of the UCC.  The Pledged Interests (i) will not become "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (ii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC).

(h)    <u>Creation, Perfection and Priority of Security Interest</u>.  This Agreement constitutes an authenticated record, and Lender is authorized at any time and from time to time to file any and all UCC financing statements and take such other actions determined by Lender to be necessary or desirable to perfect its security interest in the Collateral.

(i)    <u>No Other Financing Statements</u>.  Other than the UCC financing statements filed by Lender describing the Collateral, there is no financing statement (or similar statement or registration under the laws of any jurisdiction) now on file or registered in any public office covering any interest of Pledgor or any other Person in the Collateral.

(j)    <u>Other Information</u>.  All information heretofore, herein or hereafter supplied to Lender by Pledgor with respect to the Collateral in writing is accurate and complete in all material respects.

6.    <u>Assurances and Covenants of Pledgor</u>.

(a)    <u>Transfers and Other Liens</u>.  Pledgor shall not:

(i)    sell, assign (by operation of law or otherwise), pledge, or hypothecate or otherwise dispose of, or grant any option with respect to, any of the Collateral, except to Lender pursuant to this Agreement; or

(ii)    create or suffer to exist any Lien upon or with respect to any of the Collateral, except for the Lien created hereunder.

(b)    <u>Covenants of Pledgor</u>.  Pledgor covenants and agrees, with respect to itself and the Pledged Interests, that so long as any Secured Obligation is outstanding:

(i)    Pledgor shall not vote for, or agree or consent to, the sale, transfer, pledge or encumbrance of the Pledged Interests while the Loan is outstanding.

(ii)    Pledgor shall not vote for, or agree or consent to, the discontinuance of the business or the dissolution or liquidation of the Issuer or the Borrower.

(iii)    Pledgor shall not vote for, or agree or consent to, any material modifications to the Organizational Documents of the Issuer or the Borrower.

(iv)    Pledgor shall provide Lender with copies of any modifications made to the Organizational Documents of the Issuer or the Borrower within thirty (30) days after the date such modifications are made.

(v)    Pledgor shall not enter into any agreements which restrict, limit or otherwise impair the transferability of the Pledged Interests.

(vi)    Pledgor shall be the sole members of the Issuer and the sole holder of membership interests in the Issuer and shall not resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Issuer or any change in the management of the Issuer.

(vii)    Pledgor shall cause the Issuer to remain the sole member of the Borrower and the sole holder of the membership interest in the Borrower and shall

refrain from causing Issuer to resign or withdraw as a member or vote for, agree or consent to, or permit the admission of any new members to the Borrower or any change in the management and/or control of the Borrower.

(c)     <u>Additional Collateral</u>.    Pledgor shall pledge hereunder, immediately upon Pledgor' acquisition (directly or indirectly) thereof, any and all additional ownership interests of Pledgor in the Issuer.

(d)     <u>Pledge Amendments</u>.  Pledgor shall, upon obtaining any additional ownership interests or other securities required to be pledged hereunder promptly (and in any event within five (5) Business Days) deliver to Lender such documents as Lender may require to confirm the pledge hereunder of such additional collateral; provided that the failure of Pledgor to execute any such additional documents with respect to any additional Pledged Interests pledged pursuant to this Agreement shall not impair the security interest of Lender therein or otherwise adversely affect the rights and remedies of Lender hereunder with respect thereto.

(e)     <u>Taxes and Assessments</u>.    Pledgor shall pay promptly when due all taxes, assessments, and governmental charges or levies imposed upon, and all claims against, the Collateral, except to the extent the validity thereof is being contested in good faith and by appropriate proceedings and in which reserves or other appropriate provisions have been made or provided therefor; provided that Pledgor shall in any event pay such taxes, assessments, charges, levies, or claims not later than five (5) days prior to the date of any proposed sale under any judgment, writ, or warrant of attachment entered or filed against Pledgor or any of the Collateral as a result of the failure to make such payment.

(f)     <u>Further Assurances</u>.  Pledgor shall from time to time, at the expense of Pledgor, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary and that Lender may request, in order to give full effect to this Agreement and to perfect and protect any security interest granted or purported to be granted hereby or to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral, provided that such further instruments, documents and action are consistent with this Agreement.

(g)     <u>Warranty of Title to Collateral</u>.  Pledgor covenants that Pledgor will defend its rights and title in the Collateral against the claims and demands of all Persons whomsoever.  Pledgor further covenants that Pledgor will have title to and right to pledge and grant a security interest in the Collateral hereafter pledged or in which a security interest is granted to Lender hereunder and will likewise defend its rights therein.

(h)     <u>Good Standing</u>.  Pledgor will at all times be duly formed and is, and will at all times be, validly existing, in good standing and qualified to do business in each jurisdiction where required.  Pledgor will at all times have all requisite power to

- 8 -

own its property and conduct its business as now conducted and as presently contemplated.

7.  <u>Voting Rights, Dividends, Etc.</u>

(a)   So long as no Event of Default shall have occurred:

(i)   Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement and the Loan Documents; provided, however, that any and all such rights shall remain subject to the provisions of <u>Section 7(b)</u> hereof;

(ii)   Subject to the terms and conditions of this Agreement and the Loan Documents, if applicable, Pledgor shall be entitled to receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all Distributions, paid in respect of the Collateral; provided, however, if any such property is distributed in the form of shares of membership interest in the Issuer, such membership interest shall be pledged, and any certificates representing such membership interest delivered, to Lender (collectively, "<u>Collateral Payments and Distributions</u>").

(b)   After the occurrence of an Event of Default:

(i)   all rights of Pledgor to exercise the voting, management, and other consensual rights which it would otherwise be entitled to exercise pursuant to <u>Section 7(a)(i)</u> shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to exercise such voting, management, and other consensual rights;

(ii)   all rights of Pledgor to receive the Collateral Payments and Distributions which Pledgor would otherwise be authorized to receive and retain pursuant to <u>Section 7(a)(ii)</u> shall cease, and all such rights shall thereupon become vested in Lender who shall thereupon have the sole right to receive and hold as Collateral such Collateral Payments and Distributions; and

(iii)   all Collateral Payments and Distributions which are received by Pledgor contrary to the provisions of paragraph (ii) of this <u>Section 7(b)</u> shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor, and shall forthwith be paid over to Lender as Collateral in the same form as so received (with any necessary endorsements).

(c)   In order to permit Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant to <u>Section 7(b)(i)</u> and to receive all Collateral Payments and Distributions which it may be entitled to receive under <u>Section 7(a)(ii)</u> or <u>Section 7(b)(ii)</u>, (i) Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to Lender all such proxies, dividend

payment orders, and other instruments as Lender may from time to time request, and (ii) without limiting the effect of the immediately preceding clause (i), Pledgor hereby grants to Lender an irrevocable proxy to vote the Pledged Interests and to exercise all other rights, powers, privileges, and remedies to which a holder of the Pledged Interests would be entitled (including, without limitation, giving or withholding written consents of members, calling special meetings of members, and voting at such meetings), which proxy shall be effective, automatically and without the necessity of any action (including any transfer of any Pledged Interests on the record books of the Issuer) by any other Person (including the Issuer or any officer or agent thereof), provided, however, Lender shall not exercise any rights granted under such proxy except upon the occurrence of an Event of Default.

(d)     Notwithstanding any of the foregoing, Pledgor agrees that this Agreement shall not in any way be deemed to obligate Lender to assume any of Pledgor' obligations, duties, expenses, or liabilities unless Lender otherwise expressly agrees to assume any or all of said obligations, duties, expenses, or liabilities in writing.

8.      <u>Lender Appointed Attorney-in-Fact</u>.  Pledgor hereby irrevocably appoints Lender as Pledgor' attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor, exercisable after the occurrence of an Event of Default, from time to time in Lender's discretion to take any action and to execute any instrument that Lender may in good faith deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)     to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)     to receive, endorse, and collect any instruments made payable to Pledgor representing any dividend or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same; and

(c)     to file any claims or take any action or institute any proceedings that Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

9.      <u>Standard of Care</u>.  The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and except as specifically set forth herein shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral, it being understood that Lender shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relating to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, (b) taking any necessary steps (other than steps taken in accordance with the standard of care set forth above to maintain possession of the Collateral) to preserve

rights against any parties with respect to any Collateral, (c) taking any necessary steps to collect or realize upon the Secured Obligations or any guaranty therefor, or any part thereof, or any of the Collateral, or (d) initiating any action to protect the Collateral against the possibility of a decline in market value. In no event shall the standard of care imposed upon Lender hereunder exceed the minimum applicable standard of care imposed under Section 9-207 of the UCC.

10.    <u>Waiver of Defenses; Secured Obligations Not Affected</u>.

(a)    Pledgor hereby waives and agrees, not to assert or take advantage of any defense, for itself or on behalf of Borrower or Issuer (whether directly or indirectly), based on: (i) except for a breach of the standard of care set forth in <u>Section 9</u>, any lack of diligence by Lender in collection, protection or realization upon any Loan Collateral; (ii) the failure to make or give notice of presentment and demand for payment, or failure to make or give protest and notice of dishonor or of default to Pledgor or to any other party with respect to the Secured Obligations; (iii) any exculpation of liability of any party contained in the Loan Documents; (iv) the failure of Lender to perfect any security or to extend or renew the perfection of any security; (v) any valuation, stay, moratorium law or other similar law now or hereafter in effect or any right to require the marshalling of assets of Pledgor; (vi) any fraudulent, illegal or improper act by the Issuer, Borrower or Pledgor; (vii) all rights and remedies, including, but not limited to, any rights of subrogation, contribution, reimbursement, exoneration or indemnification pursuant to any agreement, express or implied, or now or hereafter accorded by applicable law to any party; (viii) the right to a trial by jury in any manner related to this Agreement; and (ix) to the fullest extent permitted by law, any other legal, equitable or suretyship defenses whatsoever to which Pledgor or Issuer might otherwise be entitled, it being the intention that the obligations of Pledgor hereunder shall be absolute, unconditional and irrevocable.

(b)    All rights and remedies of Lender hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of, shall remain in full force and effect without regard to, and shall not be impaired by, any of the following, whether or not Pledgor shall have notice or knowledge thereof:

(i)    any lack of validity or enforceability of this Agreement or the Loan Documents or any other agreement or instrument relating to any of the foregoing;

(ii)    Pledgor have or had no legal existence or legal capacity or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from Pledgor by operation of law or for any other reason;

(iii)    the acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Pledgor, or for any other reason;

- 11 -

(iv)    any exercise or nonexercise, or any waiver, by Lender of any right, remedy, power or privilege under or in respect of any of the Obligations or any security therefor (including this Agreement);

(v)    any change in the time, manner, or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment, waiver, or modification of or any consent to any departure from the Loan Documents or any provision thereof;

(vi)    any exchange, release, or nonperfection of any interest in any Collateral, or any release or amendment or waiver of or consent to any departure from any guaranty, for all or any of the Obligations, or the taking of additional security for, or any other assurances of payment of, any of the Obligations; or

(vii)    any other circumstances (other than payment in full of the Secured Obligations) that might otherwise constitute a defense available to, or a discharge of, Issuer.

11.    <u>Events of Default</u>. An "<u>Event of Default</u>" shall exist if any of the following occurs:

(a)    The occurrence of an "*Event of Default*", as such term is defined in the Note and the other Loan Documents;

(b)    if any representation or warranty of Pledgor made herein, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(c)    Pledgor' failure to pay any fees, costs or other amounts as and when required to be paid under this Agreement within five (5) days after demand by Lender;

(d)    Except with respect to (i) the payment of money and (ii) the matters herein before and hereafter specified in this Section 11, if Pledgor shall default in the observance or performance of any covenant or agreement contained in this Agreement for ten (10) days after the giving by the Lender to Pledgor of notice thereof (<u>provided</u>, <u>however</u>, if such default cannot reasonably be cured within such ten (10) day period, then Pledgor shall have such additional time as is reasonable under the circumstances, so long as Pledgor commence such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion, provided that in no event shall such additional time period exceed sixty (60) days); or

(e)    Any transfer made by Pledgor in violation of the provisions of this Agreement or any breach or violation by Pledgor of the provisions of Sections 4(a) or 6 (b)(iii), either of which shall be an immediate Event of Default hereunder without notice or opportunity to cure.

12.    <u>Remedies</u>.

(a)    If any Event of Default shall have occurred, then Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), inclusive of the management rights of the Pledgor in the Issuer, as set forth in the Operating Agreement, and Lender may also in its sole discretion, without notice except as specified below, sell the Collateral or any part thereof in one or more parts at public or private sale, at any recognized exchange or broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such time or times and at such price or prices and upon such other terms as Lender may deem commercially reasonable.  Lender may be the purchaser of any or all of the Collateral at any such sale, and Lender shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Lender at such sale. Notwithstanding anything herein to the contrary, Pledgor shall have a right of redemption prior to a UCC sale of the Collateral in accordance herewith. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Pledgor, and Pledgor hereby waive all rights of redemption which such Pledgor now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted which might otherwise have been applicable subsequent to a UCC sale of the Collateral in accordance herewith. In addition, Pledgor hereby waive all rights of stay, and/or appraisal which Pledgor now have or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Lender accepts the first offer received and does not offer such Collateral to more than one offeree.

(b)    Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as from time to time amended (the "Securities Act"), and applicable state securities laws, Lender may be compelled, with respect to any sale of all or any part of the Collateral conducted without prior registration or qualification of such Collateral under the Securities Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Pledgor acknowledge that any such private sales may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act) and,

- 13 -

notwithstanding such circumstances, Pledgor agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

(c)     If Lender determines to exercise its right to sell any or all of the Collateral, then, upon Lender's written request, Pledgor shall, and Pledgor shall cause the Issuer to (and/or cause the Issuer to cause the Borrower to), furnish to Lender such information as Lender may request of Pledgor concerning Pledgor and the Collateral.

(d)     Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agree that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)     Intentionally Omitted.

(ii)     The foreclosure sale is conducted in accordance with the laws of the State of New York,

(iii)     Not less than five (5) days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale,

(iv)     The foreclosure sale is conducted by an auctioneer licensed in the State of California and is conducted either (A) online via a teleconference or videoconference platform reasonably acceptable to Lender or (B) in front of the New York Supreme Court located in New York City, such other New York State Court having jurisdiction over the Collateral, Lender's office (located in New York City), or Lender's agent's office (including Lender's attorney) (located in New York City), in each case on any Business Day between the hours of 9 a.m. and 5 p.m.  Further, Pledgor hereby waive, for itself and on behalf of Borrower or Issuer, whether directly or indirectly, any offsets, counterclaims or defenses to the commercial reasonableness of a foreclosure sale arising directly or indirectly from the existence and/or spread of the Coronavirus Disease (COVID-19) or any related strain or mutation thereof,

(v)     The notice of the date, time and location of the foreclosure sale is published in a widely circulated newspaper in California once a week for four (4) consecutive weeks prior to the date of the foreclosure sale, and

(vi)     Lender sends notification of the foreclosure sale to all secured parties against Pledgor identified as a result of a search of the UCC financings

- 14 -

statements in the filing offices located in the State of California conducted not earlier than thirty (30) days before such notification date.

Notwithstanding Pledgor' agreement that any foreclosure sale conducted in accordance with the foregoing provisions shall be considered a commercially reasonable sale, the foregoing description of potential foreclosure sale procedures and the agreement of Pledgor that such procedures are commercially reasonable shall create no implication that a foreclosure sale conducted using different procedures is commercially unreasonable.  As used herein the term "foreclosure sale" shall be deemed to include a public auction as such term is used in the UCC.

13.    <u>Application of Proceeds</u>.  Except as expressly provided elsewhere in this Agreement, all proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of Lender, be held by Lender as Collateral for, and/or then, or at any time thereafter, applied in full or in part by Lender against, the Secured Obligations in the following order of priority:

FIRST: To the payment of all costs and expenses of such sale, collection, or other realization, including compensation to Lender and its agents, the fees and expenses and disbursements of Lender's counsel, and all other expenses, liabilities, and advances made or incurred by Lender in connection therewith, and all amounts for which Lender is entitled to indemnification hereunder and all advances made by Lender hereunder for the account of the Pledgor, and to the payment of all costs and expenses paid or incurred by Lender in connection with the exercise of any right or remedy hereunder, all in accordance with <u>Section 14</u>;

SECOND:  To the payment in full of the Secured Obligations, in the manner provided for in the Loan Documents; and

THIRD: To the payment to or upon the order of Pledgor, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

14.    <u>Indemnity and Expenses</u>.

(a)    Pledgor agree to indemnify Lender from and against any and all claims, losses, and liabilities in any way relating to, growing out of, or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses, or liabilities result from Lender's gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.

(b)    Pledgor shall pay to Lender upon demand the amount of any and all costs and expenses, including the fees and expenses of its counsel and of any experts and agents, that Lender may incur in connection with (i) the sale of, collection from, or other realization upon, any of the Collateral, (ii) the exercise or enforcement of

any of the rights of Lender hereunder, or (iii) the failure by Pledgor to perform or observe any of the provisions hereof.

15.     **Continuing Security Interest**.  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the payment in full of all Secured Obligations and the Borrower has no further obligations under the Loan Documents, (b) be binding upon Pledgor and Pledgor' legal representatives, successors and assigns, and (c) inure, together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors, transferees and assigns.  Upon the payment in full of all Secured Obligations and the cancellation or termination of the Loan Documents, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Pledgor.  Upon any such termination Lender will, at Pledgor' expense, execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination, and Pledgor shall be entitled to the return, upon Pledgor' request and at Pledgor' expense, against receipt and without recourse to Lender, of such of the Collateral as shall not have been sold or otherwise applied pursuant to the terms hereof.

16.     **Amendments, Etc**.  No amendment, modification, termination, or waiver of any provision of this Agreement, and no consent to any departure by Pledgor from the terms and conditions hereof, shall in any event be effective as to Pledgor unless the same shall be in writing and signed by Lender and, in the case of any such amendment or modification, by Pledgor.  Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

17.     **Failure or Indulgence Not Waiver; Remedies Cumulative**.  No failure or delay on the part of Lender in the exercise of any power, right, or privilege hereunder shall impair such power, right, or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right, or privilege preclude any other or further exercise thereof or of any other power, right, or privilege.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

18.     **Severability**.  In case any provision in or obligation under this Agreement shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

19.     **Headings**.  Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

20.     **Counterparts**.  This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically

attached to the same document.  Further, facsimile or electronic (e.g., .pdf format) copies of signatures shall be considered originals for purposes of binding the parties hereto.

21.   Marshalling.  Lender shall not be required to marshal any present or future security for (including, but not limited to, this Agreement and the Collateral), or other assurances of payment of, the Secured Obligations or any of them, or to resort to such security or other assurances of payment in any particular order.  All of Lender's rights hereunder and in respect of such security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent lawfully permissible, Pledgor hereby agree that Pledgor will not invoke any law, doctrine, or principle relating to the marshalling of collateral that might cause delay in or impede the enforcement of Lender's rights under this Agreement or under any other instrument evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that Pledgor lawfully may, Pledgor hereby irrevocably waives the benefits of all such laws.

22.   Notices, Etc.  All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission followed by telephonic confirmation or similar writing) and shall be given to such party as follows: (i) to Lender, to the address set forth in the Loan Documents, and (ii) to Pledgor, to the following address:

> Adrian Rudomin
> 578 Washington Boulevard, Apartment 148,
> Marina Del Ray, California 90292
>
> Pablo Rudomin
> 578 Washington Boulevard, Apartment 148,
> Marina Del Ray, California 90292
>
> Isaac Rudomin
> 578 Washington Boulevard, Apartment 148,
> Marina Del Ray, California 90292
>
> Diego Rudomin
> 1339 Appleton Way,
> Venice, California 90291
>
> with a copy in like manner to:
>
> Simone & Roos, LLP
> 5627 Sepulveda Blvd., Suite 206
> Sherman Oaks, California 91411
> Attn: Martin Simone, Esq.

Any such addressee may change its address for such notices to any other address in the United States as such addressee shall have specified by written notice given as set forth above.

- 17 -

Each such notice, request or other communication shall be effective (i) if given by facsimile transmission, when such facsimile is transmitted to the facsimile number specified in this Section and the appropriate facsimile confirmation is received, (ii) if given by mail, on the earlier of actual receipt or three (3) Business Days after such communication is deposited in the mail with first class certified or registered mail, postage prepaid, addressed as aforesaid, (iii) if given by a nationally recognized overnight carrier, one (1) Business Day after such communication is deposited with such carrier with delivery charges prepaid, or (iv) if given by any other means, when delivered at the address specified in this Section.

23.    <u>Delay Not Waiver</u>.  No delay on Lender's part in exercising any right, power or privilege hereunder or under any of the Loan Documents shall operate as a waiver of any such privilege, power or right.  No waiver by Lender in any instance shall constitute a waiver in any other instance.

24.    <u>Irrevocable Proxy</u>.  With respect to Article 8 Matters and all other matters, including without limitation, the rights, remedies and powers granted by this Agreement, and to the extent applicable, Pledgor hereby irrevocably grant and appoint Lender, from the date of this Agreement until the payment in full of the Secured Obligations and the termination of all obligations of the Issuer under the Loan Documents, exercisable whether or not there has been an Event of Default hereunder or under the Loan Documents, as Pledgor's true and lawful proxy, for and in Pledgor's name, place and stead, to vote the Pledged Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to such Article 8 Matters.  The proxy granted and appointed in this <u>Section 24</u> shall include the right to sign Pledgor' name (as the holder of a membership interest in the Issuer) to any consent, certificate or other document relating to an Article 8 Matter and the related Pledged Interests that applicable law may permit or require and to cause the Pledged Interests to be voted in accordance with the preceding sentence. Pledgor hereby represent and warrant that there are no other proxies and powers of attorney with respect to an Article 8 Matter.  Pledgor will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Interests with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.

THE PROXIES AND POWERS GRANTED BY PLEDGOR PURSUANT TO THIS AGREEMENT ARE COUPLED WITH AN INTEREST AND ARE GIVEN TO SECURE THE PERFORMANCE OF PLEDGOR'S OBLIGATIONS UNDER THIS AGREEMENT.

25.    <u>Miscellaneous</u>.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Lender to enforce any provision shall not preclude Lender from enforcing any such provision thereafter.

(b)    Pledgor hereby authorize Lender to file one or more financing statements describing all or part of the Collateral, and continuation statements, or amendments thereto, relative to all or part of the Collateral as authorized by applicable law.  Such financing statements, continuation statements and amendments will contain any other information required by the UCC for the

sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Pledgor is an organization, the type of organization and any organizational identification number issued to Pledgor. Pledgor agree to furnish any such information to Lender promptly upon request.

(c)     This Agreement shall be governed by and construed according to the internal laws of the State of Delaware.  Pledgor and Lender hereby irrevocably (i) submit to the non-exclusive jurisdiction of any United States Federal or State court sitting in the State of Delaware, in any action or proceeding arising out of or relating to this Agreement, and (ii) waive to the fullest extent permitted by law any defense asserting an inconvenient forum in connection therewith.  Service of process by Lender in connection with such action or proceeding shall be binding on Pledgor if sent to Pledgor by registered or certified mail at its address specified above.

26.     <u>WAIVER OF JURY TRIAL</u>.  TO THE EXTENT ALLOWED BY APPLICABLE LAW, PLEDGOR AND LENDER EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING ON OR ARISING OUT OF THIS AGREEMENT.

[Remainder of page intentionally left blank; signature pages follow]

- 19 -

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**

_____
**ADRIAN RUDOMIN**, an individual

_____
**DIEGO RUDOMIN**, an individual

_____
**PABLO RUDOMIN**, an individual

_____
**ISAAC RUDOMIN**, an individual

**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name:  Adian Rudomin
Title:   Authorized Signatory

**LENDER:**

**CSPRF 2 LLC,**
a Delaware limited liability company

By: _____
Name:  David Blatt
Title:   Authorized Signatory

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**

_____

**ADRIAN RUDOMIN**, an individual

_____

**DIEGO RUDOMIN**, an individual

✗ _____

**PABLO RUDOMIN**, an individual

✗ _____

**ISAAC RUDOMIN**, an individual

**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adian Rudomin
Title:  Authorized Signatory

**LENDER:**

**CSPRF 2 LLC,**
a Delaware limited liability company

By:  _____
Name:  David Blatt
Title:  Authorized Signatory

IN WITNESS WHEREOF, intending to be legally bound, Pledgor and Lender have caused this Agreement to be executed as of the date first above written.

**PLEDGORS:**

_____

**ADRIAN RUDOMIN**, an individual


_____

**DIEGO RUDOMIN**, an individual


_____

**ADRIAN RUDOMIN**, an individual, as agent for
**PABLO RUDOMIN**, an individual


_____

**ADRIAN RUDOMIN**, an individual, as agent for
**ISAAC RUDOMIN**, an individual


**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adian Rudomin
Title:   Authorized Signatory


**LENDER:**

**CSPRF-2 LLC,**
a Delaware limited liability company

By: _____
Name: David Blatt
Title:   Authorized Signatory

## JOINDER AND CONSENT OF THE ISSUER

The undersigned hereby (a) joins in the above Agreement for the sole purpose of consenting to the terms thereof; (b) agrees to cooperate fully and in good faith with the Lender and Pledgor in carrying out this Agreement (including, without limitation, by admitting Lender or its transferee (including from a secured party's sale) as a substituted member); (c) waives any transfer or other restrictions existing pursuant to Contractual Obligations, Organizational Documents, or otherwise (other than under any applicable securities laws), which otherwise might apply to the granting of the pledges and security interests hereunder, or to the exercise by the Lender of the rights and remedies provided in this Agreement or applicable law, at law or in equity, so as to, among other things, permit (x) Pledgor to enter into and perform Pledgor's obligations under this Agreement, and (y) the Lender's exercise of the Lender's rights and remedies hereunder and under applicable law, at law or in equity; (d) represents and warrants that the (i) Issuer has elected to have its membership interest deemed to be "securities" for the purposes of Articles 8 and 9 of the UCC, and any and all Certificates being delivered to Lender pursuant to the Agreement are each a "certificated security" (as defined by the UCC), (ii) Lender is duly noted in the Issuer's books and records as the sole pledgee of the Collateral, and (iii) Issuer will not recognize any transferee or pledgee of the Collateral other than Lender or pursuant to the exercise of Lender's rights and remedies under this Agreement; and (e) agrees to comply with any "instructions" (as defined in Section 8-102(a)(12) of the UCC) originated by the Lender in conformity with this Agreement without further consent of the Pledgor, including, without limitation, instructions regarding the transfer, redemption or other disposition of the Collateral or the proceeds thereof, including any Distributions with respect thereto (this clause (e) shall not be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in the above Agreement).

Capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the undersigned has caused this Joinder and Consent to be executed as an instrument under seal of the date first above written.

**ISSUER**:

**LEVIATHAN, LLC**
a California limited liability company

By: _____

Name: Adrian Rudomin
Title:  Authorized Signatory

## SCHEDULE A

### Pledged Interests

| PLEDGOR | ISSUER | INTERESTS PLEDGED |
|---|---|---|
| **Adrian Rudomin** | LEVIATHAN, LLC, a California limited liability company | 37% membership interest |
| **Diego Rudomin** | LEVIATHAN, LLC, a California limited liability company | 37% membership interest |
| **Pablo Rudomin** | LEVIATHAN, LLC, a California limited liability company | 12.5% membership interest |
| **Isaac Rudomin** | LEVIATHAN, LLC, a California limited liability company | 12.5% membership interest |
| **The Kraken, LLC** | LEVIATHAN, LLC, a California limited liability company | 1% membership interest |

## SCHEDULE B

### Consents

## MANAGING MEMBER CONSENT

The undersigned, being the manager of **THE KRAKEN, LLC**, a California limited liability company ("**Kraken**"), which is the manager of **LEVIATHAN, LLC**, a California limited liability company (the "**Member**"), which is the sole Member and manager of **CHANTILLY ROAD, LLC**, a California limited liability company (the "**Company**"), hereby consent to the following:

That the undersigned hereby (i) approves the Mortgage Note, the Deed of Trust and Security Agreement, and any and all other security documents and guarantees (collectively herein, the "**Mortgage Loan Documents**") to be executed by the Company in connection with that certain loan in the principal sum of $2,350,000.00 (the "**Loan**") to be made by **CSPRF 2 LLC** ("**Lender**") to the Company, (ii) authorizes the Company to grant a second (2nd) mortgage encumbering the Company's real property located in the County of Los Angeles, State of California, and commonly known as 1116 Chantilly Road, Los Angeles, California (the "**Property**"), to secure the Loan, and (iii) consents to all the terms contained in the Loan Documents, or as the undersigned may determine; and

That the undersigned hereby approves the Ownership Interest Pledge and Security Agreement, and any and all other security documents and guarantees (collectively herein, the "**Pledge Documents**"; together with the Mortgage Loan Documents, hereinafter, collectively, the "**Loan Documents**") to be executed by The Kraken LLC, Isaac Rudomin, Pablo Rudomin, Diego Rudomin and Adrian Rudomin, the Member and the Company, as applicable, in connection with the Loan, affecting the Member's membership interest in the Company, to secure the Loan, and consents to all the terms contained in the Pledge Documents, or as the undersigned may determine; and

FURTHER, that Adrian Rudomin, be, and hereby is, Authorized Signatory of each of the Company, Member, and Kraken, and is hereby authorized to execute all Loan Documents and any other documents required by Lender to be executed by the Company, Member and/or Kraken, as the case may be, in connection with the closing of the aforementioned Loan; and

FURTHER, this Consent may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

INCUMBENCY AND SIGNATURE PAGE TO FOLLOW.

I further certify that the below named person(s) have been duly elected (or appointed) and have duly qualified as, and on this date are, members of Company, holding the respective offices set forth opposite their names below and the signatures set forth opposite their respective names below are their genuine signatures:

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Adrian Rudomin | Authorized Signatory | |

Dated: As of November 16, 2023

[SIGNATURE PAGE TO FOLLOW]

The undersigned has executed this Consent as of the day and year first written above.

**ADRIAN RUDOMIN**

STATE OF _____ )
                                              )   ss.:
COUNTY OF _____ )

On the ___ day of _____, in the year 2023, before me, the undersigned, a Notary Public in and for said State, personally appeared ADRIAN RUDOMIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

## ACKNOWLEDGMENT

> A notary public or other officer completing this
> certificate verifies only the identity of the individual
> who signed the document to which this certificate is
> attached, and not the truthfulness, accuracy, or
> validity of that document.

State of California
County of ___Los Angeles_____ )

On ___11/16/2023_____ before me, _Tara Gipson, notary public_
(insert name and title of the officer)

personally appeared ___Adrian Rudomin_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

TARA GIPSON
COMM. #2354010
Notary Public · California
Los Angeles County
My Comm. Expires May 6, 2025

Signature ___Tara Gipson___      (Seal)

**EXHIBIT "B"**

**ADRIAN RUDOMIN**
**SHARE CERTIFCATE**

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.   ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number <u>1</u>                                        37% Membership Interest

    **LEVIATHAN, LLC** a California limited liability company (the "<u>Company</u>"), hereby certifies that **ADRIAN RUDOMIN**, an individual (together with any assignee of this Certificate, the "<u>Holder</u>") is the registered owner of 37% of the Membership Interest in the Company (the "<u>Interests</u>").   The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "<u>Operating Agreement</u>").   By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.   The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.   Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

    This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto
_____, a 37% membership interest in **LEVIATHAN, LLC** a California limited
liability company, effective as of the date specified in the Application for Transfer of Interests
below, and irrevocably constitutes and appoints _____ and its authorized officers,
as attorney-in-fact, to transfer the same on the books and records of the Company, with full power
of substitution in the premises.

Dated: *11/16/2023*

ADRIAN RUDOMIN, an individual

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the
percentage of membership interest in the Company described above (the "Transfer") and applies
to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with
and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that
the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents
that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute
and acknowledge such instruments (including, without limitation, a counterpart of the Operating
Agreement), in form and substance satisfactory to the Company, as the Company reasonably
deems necessary or desirable to effect the Applicant's admission to the Company as a substitute
member of the Company and to confirm the agreement of the Applicant to be bound by all the
terms and provisions of the Operating Agreement with respect to the membership interest the
Company described above. Initially capitalized terms used herein and not otherwise defined herein
are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the
Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
(Transferee)

Dated:                                    Address:

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudmomin
Title:  Authorized Signatory

**EXHIBIT "C"**

**DIEGO RUDOMIN
SHARE CERTIFCATE**

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.   THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.   ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 2                                    37% Membership Interest

　　　　　**LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **DIEGO RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 37% of the Membership Interest in the Company (the "Interests").  The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement").  By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

　　　　　This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____

Name: Adrian Rudomin

Title: Authorized Signatory

**(REVERSE SIDE OF CERTIFICATE)**
**ASSIGNMENT OF INTERESTS**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto
_____, a 37% membership interest in **LEVIATHAN, LLC** a California limited
liability company, effective as of the date specified in the Application for Transfer of Interests
below, and irrevocably constitutes and appoints _____ and its authorized officers,
as attorney-in-fact, to transfer the same on the books and records of the Company, with full power
of substitution in the premises.

Dated: 11/16/2023

_____
**DIEGO RUDOMIN**, an individual

**APPLICATION FOR TRANSFER OF INTERESTS**

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the
percentage of membership interest in the Company described above (the "Transfer") and applies
to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with
and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that
the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents
that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute
and acknowledge such instruments (including, without limitation, a counterpart of the Operating
Agreement), in form and substance satisfactory to the Company, as the Company reasonably
deems necessary or desirable to effect the Applicant's admission to the Company as a substitute
member of the Company and to confirm the agreement of the Applicant to be bound by all the
terms and provisions of the Operating Agreement with respect to the membership interest the
Company described above. Initially capitalized terms used herein and not otherwise defined herein
are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the
Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
　　　　　　　　　(Transferee)

Dated:

Address:

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

**EXHIBIT "D"**

**PABLO RUDOMIN**
**SHARE CERTIFCATE**

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.  THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.  ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 3                                    12.5% Membership Interest

      **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **PABLO RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 12.5% of the Membership Interest in the Company (the "Interests").  The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement").  By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

      This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

LEVIATHAN, LLC
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

## (REVERSE SIDE OF CERTIFICATE)
## ASSIGNMENT OF INTERESTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a 12.5% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated:

X _____

**PABLO RUDOMIN**, an individual

## APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
(Transferee)

Dated:                                                    Address:

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____

Name: Adrian Rudomin

Title:  Authorized Signatory

**EXHIBIT "E"**

**ISAAC RUDOMIN**
**SHARE CERTIFCATE**

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE.    THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF.    ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 4                                          12.5% Membership Interest

   **LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **ISAAC RUDOMIN**, an individual (together with any assignee of this Certificate, the "Holder") is the registered owner of 12.5% of the Membership Interest in the Company (the "Interests").  The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the [Operating Agreement] of the Company dated as of Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement.  The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business.  Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

   This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

## (REVERSE SIDE OF CERTIFICATE)
## ASSIGNMENT OF INTERESTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto _____, a 12.5% membership interest in **LEVIATHAN, LLC** a California limited liability company, effective as of the date specified in the Application for Transfer of Interests below, and irrevocably constitutes and appoints _____ and its authorized officers, as attorney-in-fact, to transfer the same on the books and records of the Company, with full power of substitution in the premises.

Dated:

X _____

**ISAAC RUDOMIN**, an individual

## APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the percentage of membership interest in the Company described above (the "Transfer") and applies to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute and acknowledge such instruments (including, without limitation, a counterpart of the Operating Agreement), in form and substance satisfactory to the Company, as the Company reasonably deems necessary or desirable to effect the Applicant's admission to the Company as a substitute member of the Company and to confirm the agreement of the Applicant to be bound by all the terms and provisions of the Operating Agreement with respect to the membership interest the Company described above. Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
(Transferee)

Dated:                          Address:

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title: Authorized Signatory

**EXHIBIT "F"**

**THE KRAKEN LLC
SHARE CERTIFCATE**

**THIS SHARE CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE. THE HOLDER OF THIS CERTIFICATE, BY ITS ACCEPTANCE HEREOF, REPRESENTS THAT IT IS ACQUIRING THIS SECURITY FOR INVESTMENT AND NOT WITH A VIEW TO ANY SALE OR DISTRIBUTION HEREOF. ANY TRANSFER OF THIS CERTIFICATE OR ANY MEMBERSHIP INTEREST REPRESENTED HEREBY IS SUBJECT TO THE TERMS AND CONDITIONS OF THE OPERATING AGREEMENT (AS DEFINED BELOW).**

Certificate Number 5                                              1% Membership Interest

**LEVIATHAN, LLC** a California limited liability company (the "Company"), hereby certifies that **THE KRAKEN, LLC**, a California limited liability company (together with any assignee of this Certificate, the "Holder") is the registered owner of 1% of the Membership Interest in the Company (the "Interests"). The rights, powers, preferences, restrictions and limitations of the Interests are set forth in, and this Share Certificate and the Interests represented hereby are issued and shall in all respects be subject to the terms and provisions of, the [Operating Agreement] of the Company dated as of Operating Agreement of the Company dated as of June 18, 2021, as the same may be amended or restated from time to time (collectively, the "Operating Agreement"). By acceptance of this Share Certificate, and as a condition to being entitled to any rights and/or benefits with respect to the Interests evidenced hereby, the Holder is deemed to have agreed to comply with and be bound by all the terms and conditions of the Operating Agreement. The Company will furnish a copy of the Operating Agreement to the Holder without charge upon written request to the Company at its principal place of business. Each Interest shall constitute a "security" within the meaning of (i) Section 8-102(a)(15) of the Uniform Commercial Code as in effect from time to time in the State of California and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

This Share Certificate shall be governed by and construed in accordance with the laws of the State of California, without regard to principles of conflicts of laws.

Dated as of: November 20, 2023

Share Certificate

IN WITNESS WHEREOF, the Company has caused this Certificate to be executed as of the date set forth above.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:   Authorized Signatory

## (REVERSE SIDE OF CERTIFICATE)
## ASSIGNMENT OF INTERESTS

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto
_____, a 1% membership interest in **LEVIATHAN, LLC** a California limited
liability company, effective as of the date specified in the Application for Transfer of Interests
below, and irrevocably constitutes and appoints _____ and its authorized officers,
as attorney-in-fact, to transfer the same on the books and records of the Company, with full power
of substitution in the premises.

Dated: _11 /16 /2023_

**THE KRAKEN, LLC,**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title: Authorized Signatory

## APPLICATION FOR TRANSFER OF INTERESTS

The undersigned applicant (the "Applicant") hereby (a) applies for a transfer of the
percentage of membership interest in the Company described above (the "Transfer") and applies
to be admitted to the Company as a substitute member of the Company, (b) agrees to comply with
and be bound by all of the terms and provisions of the Operating Agreement, (c) represents that
the Transfer complies with the terms and conditions of the Operating Agreement, (d) represents
that the Transfer does not violate any applicable laws and regulations, and (e) agrees to execute
and acknowledge such instruments (including, without limitation, a counterpart of the Operating
Agreement), in form and substance satisfactory to the Company, as the Company reasonably
deems necessary or desirable to effect the Applicant's admission to the Company as a substitute
member of the Company and to confirm the agreement of the Applicant to be bound by all the
terms and provisions of the Operating Agreement with respect to the membership interest the
Company described above. Initially capitalized terms used herein and not otherwise defined herein
are used as defined in the Operating Agreement.

The Applicant directs that the foregoing Transfer and the Applicant's admission to the
Company as a Substitute Member shall be effective as of _____.

Name of Transferee: _____

Signature: _____
                        (Transferee)

Dated: _____                    Address: _____

The Company (a) has determined that the Transfer described above is permitted by the Operating Agreement, (b) hereby agrees to effect such Transfer and the admission of the Applicant as a substitute member of the Company effective as of the date and time directed above, and (c) agrees to record, as promptly as possible, in the books and records of the Company the admission of the Applicant as a substitute member.

**LEVIATHAN, LLC**
a California limited liability company

By: _____
Name: Adrian Rudomin
Title:  Authorized Signatory

# Exhibit K

## <u>MEMORANDUM OF SALE</u>

High Bid Realized at Auction: <u>$1,000.00</u>

2% Buyer's Premium: <u>          N/A          </u>

**Purchase Price:    <u>  $1,000.00          </u>**

The undersigned has this 4th day of December, 2024 agreed to purchase certain Pledged Interest (as defined in the Notice of Sale) (the "Collateral"), being sold by Secured Party for the sum of $1,000.00 and hereby promise and agree to comply with the Terms and Conditions of Sale of said Collateral (incorporated herein by reference) and this Memorandum of Sale.

<br>

_____          _____
SUCCESSFUL BIDDER (Signature)          SUCCESSFUL BIDDER (Signature)

<u>CSPRF 2 LLC     </u>                      _____
PRINT NAME                             PRINT NAME

<u>1207 Delaware Avenue, Suite 2992     </u>    _____
ADDRESS                                ADDRESS

<u>Wilmington, DE 19806          </u>          _____
ADDRESS (City, State, Zip)             ADDRESS (City, State, Zip)


_____          _____
TELEPHONE NUMBER                       TELEPHONE NUMBER


_____          _____
EMAIL ADDRESS                          EMAIL ADDRESS

Received from CSPRF 2 LLC the sum of $1,000.00, as a credit bid for the purchase of the Collateral pursuant to the Terms and Conditions of Sale.

*Seller:*

Seller Signature: _____

This is to verify that the final selling price in the above sale was for the sum of $1,000.00.

_____
DAVID CONSTANTINO OF MALTZ AUCTIONS

**SUCCESSFUL BIDDER'S ATTORNEY INFORMATION**

Name: Kriss & Feuerstein LLP.  Address: 360 Lexington Avenue, 12th Floor, New York, NY 10017

Phone (646) 454-4124        Email mbonneville@kandfllp.com

# Exhibit L

THIS AMENDMENT to the Operating Agreement is made as of the 4th day of December, by CSPRF LLC, a Delaware Limited Liability Company having an address at 1207 Delaware Avenue, Suite 2992, Wilmington, Delaware 19806 (hereinafter referred to as, the "Sole Member").

<u>WITNESSETH</u>

WHEREAS, Leviathan LLC, a California Limited Liability Company (the "Original Member") entered into that certain Operating Company Agreement of the Company dated as of June 18, 2021 (the "Operating Agreement") which governs the Company, pursuant to the California Limited Liability Company Law;

WHEREAS, CSPRF2 LLC, a Delaware Limited Liability Company (the "Lender"), originated a loan (the "Loan") in the amount of $2,350,000 on November 20, 2023 to the Company which Loan was evidenced by that certain Ownership Interest Pledge and Security Agreement by and between Original Member, as borrower, and Lender, as lender, dated as of November 20, 2023 (the "Pledge Agreement"), and other documents and instruments delivered by Lender to Original Member (collectively, the "Loan Documents");

WHEREAS, Original Member defaulted in its obligations under the Loan Documents and in accordance with the Loan Documents and the Operating Agreement, Sole Member became the owner of one hundred percent (100%) of the limited liability company interests in Company pursuant to a foreclosure sale held on December 4, 2024.

WHEREAS, the parties signing this Agreement desire to amend and restate the Operating Agreement in its entirety and appoint Sole Member as the Manager of the Company;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the individuals/entities signing this Agreement below agree to amend and restate the Operating Agreement in its entirety as follows, which terms hereof shall modify, supersede and replace the terms of the Operating Agreement.

WHEREAS, the Certificate of Formation of LEVIATHAN LLC (hereinafter, the "Company") was filed in Illinois.

NOW, THEREFORE, the Sole Member hereby adopts the following as the operating agreement of the Company.

1.    <u>Formation of the Company.</u> The Company was formed by the filing of the Certificate of Formation in accordance with and pursuant to the Illinois Limited Liability Company Law (the "Law"), as such Law may from time to time be amended; provided, however, that in the event of any inconsistency between any provision of the Law and the provisions of this Operating Agreement, the provisions of this Operating Agreement shall govern.

2.    <u>Name.</u> The name of the Company is LEVIATHAN LLC.  The business of the Company shall be conducted solely under such name and title to all assets of the Company shall be held in such name.

3.    <u>Purpose of the Company.</u>  The purpose to be conducted or promoted by Company is to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of California that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

1

4.    <u>Company Filings.</u> The Sole Member of the Company shall execute and file all documents required by Law to be filed in connection with the continuation of the Company.

5.    <u>Place of Business.</u> The principal place of business of the Company shall be at 1207 Delaware Avenue, Suite 2992, Wilmington, Delaware 19806, or at such other location as may be selected by the Sole Member from time to time.

6.    <u>Term.</u> The Company has no specific date of dissolution and shall continue until dissolved and liquidated pursuant to the provisions of Section 10 hereof or pursuant to the Law.

7.    <u>Interests of Members.</u> The respective interests of the members in the company shall be as follows:

<p align="center">CSPRF2 LLC - 100%</p>

8.    <u>Capital Contribution.</u> No member is required to make capital contributions to the Company, but any member may, at its option, make capital contributions to the Company.

9.    <u>Management Powers.</u>  The management, operation and control of the Company shall vest solely in the Manager (as defined herein). The manager of the Company shall be David Blatt (the "Manager"). The Manager shall have all necessary and appropriate powers to carry out the purposes of the Company, including, without limitation, the power to execute, acknowledge and deliver any and all documents and instruments deemed appropriate to carry out any of the foregoing or the purposes and intent of this Operating Agreement.

10.    <u>Dissolution.</u> The Company shall be dissolved upon the happening of the first of the following to occur:

(a)    On the date approved by all of the Sole Member; or

(b)    Upon the occurrence of an event set forth in the Law.

Notwithstanding any provision to the contrary herein: (i) the Company shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the business of the Company is continued in a manner permitted by its operating agreement or the Law, or (B) the entry of a decree of judicial dissolution under the Law; (ii) upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Sole Member to cease to be a member of the Company (other than (A) upon an assignment by the Sole Member of all of its limited liability company interest in the Company and the admission of the transferee, if permitted pursuant to the organizational documents of the Company, or (B) the resignation of Sole Member and the admission of an additional member of the Company, if permitted pursuant to the organizational documents of the Company), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the existence of the Company, and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such member in the Company; (iii) the bankruptcy of the Sole Member shall not cause such Sole Member to cease to be a member of the Company and upon the occurrence of such an event, the business

<p align="center">2</p>

of the Company shall continue without dissolution; (iv) in the event of the dissolution of the Company, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in the Law; and (v) to the fullest extent permitted by law, the Sole Member shall irrevocably waive any right or power that it might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties hereto intending to be legally bound, have executed this Operating Agreement as of the day and year first above written.

**SOLE MEMBER:**

CSPRF2 LLC

By: _____

Name: David Blatt

Its: Authorized Representative

**MANAGER:**

_____

David Blatt

# Exhibit M

**CORPORATE RESOLUTION TO REPLACE MANAGER**

Leviathan LLC (the "Sole Member"), being the sole member of Chantilly Road LLC, a California Limited Liability Company (the "company"), does hereby certify that the Company adopted the following resolution:

RESOLVED, that the manager of the Company shall be David Blatt (the "Manager"), who is hereby authorized to manage all matters of the Company and make any decisions on behalf of the Company and/or its Sole Member as the Manager deems necessary or appropriate.

This action is effective this 4th day of December, 2024.

Leviathan LLC, Sole Member
By: CSPRF2 LLC, Sole Member

By: _____
David Blatt, Authorized Signatory

Accepted:

_____
David Blatt, Manager

# Exhibit N

**United States Bankruptcy Court**
**Central District of California**

In Re:   Chantilly Road, LLC

Case No:_____

Chapter:

## STATEMENT REGARDING AUTHORITY TO SIGN AND FILE PETITION

I,  Adrian Rudomin_____ , declare under penalty of perjury that I am the
[President or Managing Member] of __the owner of the LLC_____ a [California
Corporation or Limited Liability Company] and that on __12/15/2024_____ the following
resolution was duly adopted by the [Board or Members] of this [Corporation or LLC]:

"Whereas, it is in the best interest of this [Corporation or LLC] to file a voluntary
petition in the United States Bankruptcy Court pursuant to Chapter 11 of Title 11 of the
United States Code:

Be it Therefore Resolved, that Adrian Rudomin_____, [President or Managing
Member] of this [Corporation or LLC], is authorized and directed to execute and deliver all
documents necessary to perfect the filing of a Chapter 11 voluntary bankruptcy case on
behalf of the [Corporation or LLC]: and

Be it Further Resolved, that __Adrian Rudomin_____, [President or Managing
Member] of this [Corporation or LLC], is authorized and directed to appear in all
bankruptcy proceedings on behalf of the [Corporation or LLC], and to otherwise do and
perform all acts and deeds and to execute and deliver all necessary documents on behalf of
the [Corporation or LLC] in connection with such bankruptcy case; and

Be it Further Resolved that __Adrian Rudomin_____, [President or Managing
Member] of this [Corporation or LLC], is authorized and directed to employ the law firm of
Totaro & Shanahan, LLP and its attorneys, to represent the [Corporation or LLC] in such
bankruptcy case."

Executed on: __12/15/2024_____   Signed: _____

Adrian Rudomin

[President or Managing Member]

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

1331 Garden Hwy, 2nd Floor, Sacramento, CA 95833

A true and correct copy of the foregoing document entitled (*specify*):

Notice of Motion and Motion to Dismiss Case Pursuant to 11 U.S. Section 1112(b((1); Memorandum of Points and Authorities; and Declaration of David Blatt

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) January 14, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See Attachment 1.

☒   Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On January 14, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will</u> <u>be completed</u> no later than 24 hours after the document is filed.

See Attachment 2.

☒   Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) January 14, 2025  , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.
    Judge Theodor C. Albert
    US Bankruptcy Court
    Ronald Reagan Federal Building
    411 W. Fourth Street, Suite 5085
    Santa Ana, CA 92701

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 14, 2025 | Bao Xiong | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
4936-5467-3935.1 014764.005

**F 9013-3.1.PROOF.SERVICE**

| In re Chantilly Road, LLC | Case No. 8:24-bk-13197-TA |
| --- | --- |

Attachment 1 to Proof of Service

**Service by NEF**

**Arnold L Graff**                                           *Attorneys for Civic Real Estate Holdings III,*
Wright, Finlay & Zak, LLP                          *LLC by Fay Servicing, LLC its Attorney-in-*
4665 MacArthur Court, Suite 200              *Fact*
Newport Beach, CA 92660
Email: agraff@wrightlegal.net

**Michael R Totaro**                                       *Attorneys for Debtor*
Totaro & Shanahan, LLP
P.O. Box 789
Pacific Palisades, CA 90272
Email: Ocbkatty@aol.com

**Queenie K Ng**                                           *Attorneys for United States Trustee (SA)*
411 West Fourth St.
Suite 7160
Santa Ana, CA 92701
Email: queenie.k.ng@usdoj.gov

**United States Truste (SA)**
Email: Ustpregion16.sa.ecf@usdoj.gov

Label Matrix for local noticing
0973-8
Case 8:24-bk-13197-TA
Central District of California
Santa Ana
Tue Jan 14 14:06:46 PST 2025

Chant Bly Road, LLC
c/o Penny M. Fox, CPA
15615 Alton Parkway Suite 450
Irvine, CA 92618-3308

Civic Real Estate Holdings III, LLC by Fay S
WRIGHT, FINLAY & ZAK, LLP
4665 MacArthur Court, Suite 200
Newport Beach, CA 92660-1811

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

ACS Security
3803 West Chester Pike #100
New Town Square, PA 19073-2333

Adrian Rudomin
13920 Old Harbor Land #208
Marinade Rey, CA 90292-7323

All State Lending Group, Inc
2540 Corporate Place #B-108
Monterey Park, CA 91754-7636

Banc of California
11611 San Vicente Blvd., #500
Los Angeles, CA 90049-6505

Bank of America
P.O. Box 982238
El Paso, TX 79998-2238

Baywood Mgmt Corp
P.O. Box 2414
Palos Verdes Peninsula CA 90274-8414

CapStack Partners
1601 Clint Moore Rd #182
Boca Raton, FL 33487-5713

Castro's HVAC
1990 Meadow View Court
Thousand Oaks, CA 91362-1853

(p)SMB BANKRUPTCIES
1600 DUBLIN RD
FLOOR 3
COLUMBUS OH 43215-2095

Christopher Lai
Johathan M. Deer
Quantum Law Group
8383 Whilshire Blvd. #935
Beverly Hills, CA 90211-2427

Creative Art Partners, LLC
6542 Hayes Dr.
Los Angeles, CA 90048-5320

DWP
2417 Daly St.
Los Angeles, CA 90031-2220

Diego Rudomin
36 Breeze Ave.
Venice, CA 90291-3274

Edifica USA
400 Coyote Pass
Lake Forest CA 92610-3033

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

German Cruz
1522 W. 112 St
Los Angeles, CA 90047-4927

Gomez R Plumbing, Inc.
14320 Ventura Blvd. #704
Sherman Oaks, CA 91423-2717

HM Cali, Inc.
153 Lafayette St. 5th Fl
New York, NY 10013-3139

M & M Air Conditioning and Heating, Inc.
13995 Wallabi Ave.
Sylmar, CA 91342-1936

Martinez Pools & Spas
2334 S. Cloverdale Ave.
Los Angeles, CA 90016-2121

McCoy Capital
10880 Wilshire Blvd. #2230
Los Angeles CA 90024-4117

Showroom Interiors. LLC
dba Vesta Home
8905 Rex Rd
Pico Rivera, CA 90660-3799

Simone & Roos, LLP
5627 Sepulveda Blvd. #206
Sherman Oaks CA 91411-2920

Southern California Gas Co
P.O. Box C
Monterey Park, CA 91754-0932

Spectrum
1600 Dublin Rd
Columbus, OH 43215-2098

Stoney Miller Consutants, Inc./Geofirm
33 Journey #200
Aliso Viejo CA 92656-5345

The Kraken LLC
578 Washington Blvd. #148
Marina del Rey CA 90292-5421

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

Zuniga Pool & Spa
9330 Telfair Ave.
Sun Valley CA 91352-1329

Michael R Totaro
Totaro & Shanahan, LLP
P.O. Box 789
Pacific Palisades, CA 90272-0789

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Charter Communications
Spectrum,
P.O. Box 223085
Pittsburg, PA 15251

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Courtesy NEF

(d)Zuniga Pool & Spa
9330 Telfair Ave.
Sun Valley, CA 91352-1329

End of Label Matrix
Mailable recipients    33
Bypassed recipients     2
Total                  35